DECISION
Before this Court are various post-trial* motions following a jury verdict against Defendants The Sherwin Williams Company (SW), NL Industries, Inc. (NL), and Millennium Holdings, LLC (Millennium).[1]
Also before the Court is the issue of whether and how to proceed with an abatement remedy. At trial, the jury found that the "cumulative presence of lead pigment in paints and coatings on buildings throughout the State of Rhode Island" constituted a public nuisance. (Jury Verdict Form, Question 1, Feb. 22, 2006.) The jury found that these three Defendants[2] "caused or substantially contributed to the creation of the public nuisance." Id. at Question 2. Finally, it concluded that these three Defendants "should be ordered to abate the public nuisance."Id. at Question 3. Following the verdict, rendered after what is considered to have been the longest civil trial in Rhode Island history, the Defendants brought the present motions *Page 2 
for judgment as a matter of law, or alternatively for a new trial pursuant to Super. R. Civ. P. Rules 50 and 59. In addition, they have brought motions denominated as "supplemental" motions for a new trial under Rules 26(e), 59 and 60(b)(2) and 60(b)(3). (Supplemental Motion).
 I Facts/Travel
This ruling is the eighteenth written ruling that this Court has issued in the seven years since this case was filed.[3] The Court will describe only a brief history of the case here, and will then set forth specific facts below where relevant to the motions presently before the Court.
In 1999, the State of Rhode Island, through its Attorney General, filed the present action against various companies. The State brought ten claims including public nuisance, indemnity, unjust enrichment, and conspiracy. See State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *2 (Apr. 2, 2001) (addressing each claim on a 12(b)(6) motion to dismiss). Throughout the history of this case, various claims were dismissed either voluntarily or as a result of defendants' motions, and various defendants have been added or removed. In addition, this Court has ordered that the claims against another Defendant, American Cyanamid, be adjudicated in a separate trial. There is also a third-party complaint against various named and unnamed parties pending before this Court.
This Court had adopted a phased trial approach which would have consisted of three phases. The first phase would address whether "the presence of lead pigment in paint and coatings in homes and public buildings" constituted a public nuisance. State v. Lead Indus.Ass'n, 2002 R.I. Super. LEXIS 43, *1 (Mar. 15, 2002). A second phase, if *Page 3 
necessary, would then address whether any individual defendant was liable for creating that nuisance, and would also address other claims of the State against the various defendants. Id. at *2. The third and final phase would then address appropriate equitable and damage remedies, assuming that the State prevailed in the first two phases. In late 2002, however, an eight-week trial addressed solely to the first phase resulted in a so-called "hung jury" and a mistrial. See State v.Lead Indus. Ass'n, 2003 R.I. Super. LEXIS 50, *1 (March 20, 2003).
Following the mistrial, the phased trial approach was abandoned and the parties proceeded through a variety of pre-trial matters which are documented in written and oral decisions of this Court from 2003 to 2005. On November 1, 2005, a jury trial began on all of the State's claims which were still pending against SW, NL, Millennium, and ARCO. The State presented its case and rested on January 26, 2006.
Each of the Defendants immediately rested, without presenting any evidence, and then each moved for judgment as a matter of law pursuant to Super. R. Civ. P. Rule 50.[4] In support of their motions, the Defendants argued that they were entitled to judgment on a variety of issues, some of which were applicable to all Defendants and some of which were specific to each individual Defendant. The Defendants argued generally that the State has failed to present sufficient evidence to meet its burden of proof on various aspects of its public nuisance claim. In particular, they argued vehemently that the State *Page 4 
failed to present sufficient evidence of a "nexus" between the Defendants' activities and the presence of lead pigment in Rhode Island.
The Court heard arguments on the motions during the trial. Prior to charging the jury, the Court granted Rule 50 motions on the State's claims against all Defendants for indemnification, unjust enrichment, as well as the claim for compensatory damages. (Off. Dr. Tr. 4:6-13, 14:7-18 Feb. 6, 2006; Order Dismissing Compensatory Damage, Unjust Enrichment, Indemnity Claims, Feb. 20, 2006.)[5] However, the Court deferred its decision on the "nexus" issue. Therefore, the only claim that remained for the jury was the State's public nuisance claim for abatement relief.[6]
Following several days of hearings on jury instructions and related matters, closing arguments began on February 8, 2006, and concluded on February 10, 2006. The jury received its instructions on the afternoon of February 13, 2006, and began its deliberations the following day. After eight days of deliberations, the jury returned its verdict.
After the verdict, each Defendant[7] renewed its motion for judgment as a matter of law under Rule 50[8] or, alternatively, moved under Rule 59 for a new trial.[9] Defendants *Page 5 
each allege that the State has failed to present sufficient evidence to sustain its verdict under the relevant standards of Rules 50 and 59. However, they further contend that, even if the Court decides that the State has met its burden under both standards, various procedural, evidentiary, and constitutional errors, as well as alleged misconduct at trial, entitle them to a new trial.
In the months following the jury verdict, while the other post-trial motions were pending, SW, Millennium, and NL brought their Supplemental Motions under Super. R. Civ. P. Rules 26(e), 59, 60(b)(2) and 60(b)(3). The Supplemental Motions are based on allegations that the State had a duty to produce certain data to the Defendants during trial and failed to do so. In addition to the Defendants' post-trial motions, the State has requested that the Court appoint a special master to oversee the implementation of an abatement remedy. The Defendants contend that such an appointment would be premature and unwarranted by law.
Rules 50 and 59 provide that the respective post-trial motions must be brought within 10 days of judgment. See Super R. Civ. P. Rules 50(b) and 59(b); see also Rule 6(b) (prohibiting the enlargement of time for such motions). Typically a judgment is entered contemporaneously with, or shortly after, a jury verdict. See Super. R. Civ. P. Rule 58(a) (providing for entry of judgment after a trial or hearing). If that had occurred, the Defendants' post-trial motions of April 19, 2006, could have been untimely since the jury verdict was returned on February 22, 2006. However, in this case no judgment has *Page 6 
yet been entered. The Court finds that the lack of a judgment should not preclude consideration of the Rule 50 and 59 motions at this time, which have been fully briefed and argued.
The Court will first deal with the Rule 50 and Rule 59 motions as they relate to the sufficiency of the evidence presented at trial. Next it will consider the aspects of the Rule 59 motions which relate to alleged errors of law and misconduct at trial. Whether or not the Court grants the Rule 50 motion for judgment as a matter of law, it must also address the Rule 59 motion for a new trial. Obviously, if it denies the Rule 50 motions, the Defendants may still be entitled at least to a new trial under Rule 59. However, even if the Court grants the Rule 50 motions, the Court must either conditionally grant or conditionally deny the motion for a new trial in the event that the grant of the Rule 50 motion is later vacated or reversed.[10]
Then, if necessary, the Court will address the Supplemental Motions which relate to the State's alleged failure to produce certain data to the Defendants. Finally, if necessary, the Court will address the abatement issues.
 II Sufficiency of the State's Evidence
The Court will first outline the appropriate standards of review under Rule 50 and 59 motions that relate to the sufficiency of the evidence at trial. (Part II.A.) The Court will then address the limits upon drawing inferences of fact from the evidence presented. (Part II.B.) The Court will then examine the Defendants contentions that the State failed *Page 7 
to present sufficient evidence of a "nexus" between the Defendants and Rhode Island (Part II.C); on the State's public nuisance claim (Part II.D); and the abatement remedy (Part II.E).
 A. Standards of Review
In ruling on a post-verdict renewed motion for judgment as a matter of law, a trial justice must consider the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of the witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party. E.g., Blue Coast, Inc. v. Suarez Corp. Indus., 870 A.2d 997, 1008
(R.I. 2005); Skaling v. Aetna Ins. Co., 742 A.2d 282, 287 (R.I. 1999). If, after such a review, there remain factual issues upon which reasonable persons might differ, the motion for judgment as a matter of law must be denied. Blue Coast, Inc., 870 A.2d at 1008;Skaling, 742 A.2d at 287. Therefore, in order to find for the Defendants on their Rule 50 motion, the Court must find that no reasonable jury could find for the State based upon the evidence presented. SeeMcLaughlin v. Moura, 754 A.2d 95, 98 (R.I. 2000).[11]
In ruling on a Rule 59 motion for a new trial, however, the Court must evaluate the evidence against a less rigorous standard. "The trial justice acts as a `superjuror,' reviewing evidence and assessing credibility." Blue Coast, Inc., 870 A.2d at 1008 (citing CraffordPrecision Products Co. v. Equilasers, Inc., 850 A.2d 958, 963 (R.I. 2004)). Based on its review, the Court may grant a new trial "if the verdict is against the preponderance of the evidence and thereby fails to either do justice to the parties or respond to the merits of the controversy." Id. (quotations omitted). In making its review *Page 8 
of the evidence, the court must (1) presume that the jury instructions are correct; (2) assess the credibility of the evidence and choose which of any conflicting testimony to accept and which to reject; and (3) determine, in light of the charge to the jury, whether the trial justice would have reached a result different from that of the jury.Id. However, a trial justice "should not substitute his conclusions for those of the jury and he should not disturb the jury's findings merely because he would have made a contrary finding on the same evidence."Turgeon v. Davis, 120 R.I. 586, 590, 388 A.2d 1172, 1175 (1978).[12]
Normally, the proper mode of analysis would be to assess the evidence under the Rule 50 standard and then separately under the Rule 59 standard. However, if the State has satisfied the Rule 50 standard here, it will almost certainly have satisfied the Rule 59 standard because the Defendants' have not presented any contradictory evidence.[13]
Therefore, it is unlikely that there are competing inferences of fact which would require a credibility determination to resolve. If the State has presented a prima facie case, then it likely prevails under both standards. In any event, the Court finds that it makes more sense to consider the sufficiency of the evidence together, keeping in mind the separate standards.[14] *Page 9 
 B. "Mosaics" and Inferences of Fact
A recurring theme in this case is the extent of the jury's ability to derive inferences from the evidence presented at trial. Our Supreme Court articulated in Waldman v. Shipyard Marina that a "trier of fact may draw reasonable inference[s] from established evidentiary facts that become facts upon which reliance may be placed in the fact-finding process. 230 A.2d 841, 844, 102 R.I. 366, 371 (R.I. 1967). However, in order to guard against verdicts which are based upon "speculation or remote possibility," there are limits on the inferences which a jury properly may draw from established facts. See id. The Supreme Court rejected a "pyramiding of inferences" and found that when a party relies upon drawing a further inference from a reasonable inference of an established fact, that inference must clearly exclude all other inferences. Id. The inference "resting on an inference drawn from established facts must be rejected as being without probative force where the facts from which it is drawn are susceptible of another reasonable inference." Id. at 845, 102 R.I. at 374. Defendants generally rely upon Waldman to show that they are entitled to judgment as a matter of law.
Conversely, the State generally argues that it has presented a "mosaic" of facts and circumstances which is sufficient to prove each of the required elements of their public nuisance claim. See State v.Mercado, 635 A.2d 260, 265 n. 4 (R.I. 1993) (ruling that, while resting a guilty verdict solely on inferences from two pieces of evidence alone might violate Waldman, the State had "presented a mosaic of circumstantial evidence that considered as a whole constitutes proof beyond a reasonable doubt"). Cf. State v. Castro, 891 A.2d 848, 853
(R.I. 2006) (noting that "the mosaic of facts and circumstances *Page 10 
[available to the arresting officer] must be viewed cumulatively" in determining whether probable cause for an arrest existed) (internal quotations omitted).
This Court instructed the jury that "[i]f on any point based on the evidence before you, you draw a reasonable inference; you may not draw a further inference on the earlier inference unless such further inference is the only reasonable inference to be draw[n] from the earlier inference." (Jury Instructions 5, Feb. 14, 2006.) Likewise, in evaluating the sufficiency of the evidence, this Court will consider whether any inferences are too speculative or remote to support the jury verdict, or whether a sufficient "mosaic" of circumstantial evidence exists to support the verdict.
 C. Evidence of a "Nexus" Between the Defendants and RhodeIsland
Each of the Defendants has argued that the State has failed to present sufficient evidence connecting a particular Defendant with Rhode Island, for the purposes of finding them liable for the public nuisance which the jury found to exist. This argument has been referred to throughout this case as the "nexus" argument. They argue that the evidence presented in the case requires an impermissible "pyramiding of inferences" in order to conclude that a sufficient Rhode Island nexus exists. See Waldman, 230 A.2d at 844, 102 R.I. at 371. The State, conversely, argues that it has presented a "mosaic" of facts and circumstances which demonstrates a sufficient nexus. See Mercado,635 A.2d at 265 n. 4.
 1. The Law on Rhode Island Nexus
The Court must now determine whether the evidence actually admitted at trial was sufficient to support the jury's answer of "yes" on Question 2 of the Jury Verdict *Page 11 
Form. See Jury Verdict Form, Question 2 (finding that SW, NL, and Millennium each "substantially contributed to the creation of the public nuisance"). There are two related concepts raised by the nexus arguments: proximate causation and substantiality.
The Court instructed the jury, in a manner intended to be consistent with its previous rulings on nexus and Restatement (Second) of Torts § 834, that if it found that a public nuisance existed,
 "you then must decide whether one or more of the Defendants in this case are responsible or liable for that public nuisance. You are asked to decide whether the actions of any of these Defendants, either alone or in combination with others, substantially contributed to the creation of a public nuisance in this State.
 A Defendant is liable for a public nuisance if the public nuisance is caused by its activity or by an activity in which it participated to a substantial extent. When a Defendant is only one of several actors participating in carrying on an activity that causes a public nuisance, its participation must be substantial before it can be held liable for the resulting public nuisance. The Defendant that participates to a substantial extent in the activity that causes a public nuisance is liable for the nuisance even after it has withdrawn from or stopped the activity and even if it is not in a position to stop the harm or to abate the condition.
 . . . Liability for public nuisance arises when the Defendant's acts set forth in motion a force or chain of events which proximately cause the public nuisance.[15]
 You need not find that lead pigment manufactured by the Defendants, or any of them, is present in particular properties in Rhode Island to conclude that Defendants, or one or more of them, are liable for creating, maintaining, or substantially contributing to the creation or maintenance of *Page 12 
a public nuisance in this case nor do you have to find that the Defendants, or any of them, sold lead pigment in Rhode Island to conclude that the conduct of such Defendants, or of any of them, is a proximate cause of a public nuisance. Instead, you must consider the totality of each Defendant's conduct individually in order to determine whether such Defendant is liable for a public nuisance as herein defined." Id. at 13-14 (emphasis added).
Therefore, in order to answer "yes" to Question 2, the jury was required to determine whether a particular Defendant substantially[16]
participated in certain activities which proximately caused the public nuisance.[17]
The jury was further instructed that proximate cause means
 "a cause that in a natural, continuous, and unbroken sequence produces an event or injury and without which the event or injury would not have occurred. The proximate cause of an event or injury is a substantial, primary or moving cause without which the event or injury would not have happened. Causes that are merely incidental are not proximate causes.
 A cause that is a proximate cause may be the sole cause of an event or injury; or, it may be one of two or more or even several causes of an event or injury, some of which are proximate cause[s] and some of which are not. Cause is a proximate cause even if it comes together with or unites with some other cause and produces the event or injury. The test to be used is whether the particular cause at issue is a substantial cause or whether it is merely incidental." (Jury Instructions 13.)
The Court will consider each activity; whether the jury could properly have found that the activity was a proximate cause of the public nuisance; and whether the jury could properly have found that the participation of SW, Millennium, and NL in such activities *Page 13 
was substantial enough to impose liability. However, before considering those activities, the Court makes note of one argument that appears repeatedly through each Defendants' briefs.
 2. Failure to Show Evidence of a Particular Defendant's Product at a Particular Rhode Island Location
Each Defendant argues that the State's nexus claim should fail because the State failed to demonstrate that a particular Defendant's product exists at any particular location in Rhode Island. For example, they point to Dr. David Rosner's testimony on cross examination:
 "Q. And you have no evidence whatsoever that based on that ad someone or some institution or someone, anyone in the state of Rhode Island purchased and applied in this state Glidden's white lead, do you?
 A. No. It was a national magazine. It was Fortune. It was Time. It was going to people in — in Rhode Island. But I cannot specify who in Rhode Island may or may not have bought it based on that ad."
 (Off. Dr. Tr. 45:25-46:7, Jan. 19, 2006 AM Session.) See also U. Tr. 65:15-21, Jan 19, 2006 PM Session (containing a similar cross-examination by SW's counsel).
The Court finds that this type of argument is merely a restatement of an argument that the Court has rejected in the past.
Shortly before trial, this Court denied the Defendants' motions for summary judgment brought on similar grounds. Contrary to the position of Defendants, the Court found that the State did not have to "identify a particular paint containing a lead pigment manufactured by any particular defendant at any particular location within the State."State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 95, *8 (Jun. 3, 2005) at *2. Rather, the State *Page 14 
 "need only show that each defendant (or such defendants as it seeks to hold liable for the public nuisance here claimed), has engaged in activities which were a substantial factor in bringing about the alleged public nuisance and the injuries and harm found to have been proximately caused thereby. These activities may but need not necessarily include the manufacture or sale or promotion of any lead pigment or paint containing the same within Rhode Island. . . ." Id. at *8 (relying, inter alia, upon Restatement (Second) of Torts § 834).
Obviously, such "property-specific" evidence would be probative of whether a particular Defendant substantially participated in activities which proximately caused the public nuisance.[18] However, its absence is not fatal to the State's case. Therefore, even though the State has not produced evidence of a specific Defendant's product in a specific location in Rhode Island, it may still have satisfied its evidentiary burden.
 3. Proximate Causes of the Public Nuisance
The Court begins its nexus analysis from the premise that there exists lead pigment in paint and coatings on buildings in Rhode Island, since the jury so found (Jury Verdict Form, Question 1), and will reason backwards to determine if liability for that public nuisance may be attributed to these Defendants. The Court must first ascertain what types of activities could be a proximate cause of the public nuisance. The State relies upon evidence of three categories of activities: evidence that Defendants had knowledge of the toxic effects of lead; evidence of manufacturing lead pigment; and evidence of promoting and selling lead pigment. Most of the evidence of these activities *Page 15 
was admitted during the testimony of Dr. David Rosner[19] on January 12-13 and 17-20, 2006.
The Court first addresses the evidence of Defendants' knowledge. The State points to volumes of evidence indicating that each Defendant knew that lead was potentially toxic, and continued to manufacture and sell lead pigment. (Pl's Mem. Opp. Def's Motions, Appx A. § II.D, June 30, 2006.) It argues that if Defendants had taken steps to reduce its output of lead, or had taken steps to warn the public, then the harms caused by lead would be reduced, and therefore, such evidence demonstrates substantial contribution to the public nuisance.
However, this argument fails to consider that the underlying cause of the nuisance is the manufacturing activity, and not the knowledge, because without the manufacturing there could be no public nuisance.[20] Public nuisance is not an intentional tort, and intent is not an element that needs to be proved. See infra Part III.G.1.a (recounting the Court's October 31, 2005 bench decision on this issue). Whether a particular Defendant is liable for a public nuisance is based only upon the substantiality of that Defendant's activities, and whether those activities proximately caused the nuisance. See Restatement (Second) *Page 16 
of Torts § 824 (noting that a public nuisance can be based on a failure to act only when the person is under a legal duty to take action).[21]
Therefore, knowledge evidence is not helpful in establishing a nexus between Defendants' activities and the public nuisance in Rhode Island, and the Court must look to other evidence of "nexus."[22]
As an illustration, assume arguendo that uncontradicted evidence demonstrated not only that a particular party had knowledge that lead was toxic, but that it continued to manufacture and sell its products with the express intention and purpose of killing children. Such knowledge would not make that party's activities more proximate a cause of the public nuisance in Rhode Island. If that party had such knowledge and intent, but sold lead pigment only in California, then it could not be a cause of the public nuisance in Rhode Island.[23] Similarly, if that California party sold only one can of lead-containing paint in Rhode Island, it would be a cause of the public nuisance, but it would not be a legal cause because selling one can of paint is unlikely to be considered "substantial." See Restatement § 834 com. d. In that case, no amount of evidence of knowledge or intent could render that party's participation substantial.
The Court will now consider the manufacturing activities. It is uncontradicted that each Defendant was a manufacturer of lead pigment and related products. (U. Tr. 43-46, Nov. 16, 2005 PM Session (containing stipulations to the manufacturing activities *Page 17 
of each Defendant, and their predecessors, during various time periods).)[24] Moreover, in order to have lead pigment on buildings, the pigment had to have been manufactured, so manufacturing is a cause of the public nuisance. However, it also appears uncontradicted that the Defendants did not manufacture lead pigment in Rhode Island. Without some further evidence of a connection to Rhode Island, it is entirely plausible that the products manufactured by the Defendants in another state remained in another state.[25] Therefore, it would be too speculative to infer, without more evidence, that the manufacturing activities alone proximately caused the public nuisance.
However, having answered Question 1 affirmatively, the jury has concluded that lead pigment exists in paint on buildings in Rhode Island. (Jury Verdict Form, Question 1.) The only reasonable inference is that, in order for the lead pigment in paint to end up on a Rhode Island building, some person must have used such paint on the buildings, and that some person or entity must have promoted and sold, in Rhode Island, the paint containing the lead pigment. Therefore, the sale or promotion of lead pigment in paint would, "in a natural, continuous, and unbroken sequence" result in the cumulative presence of lead pigment on buildings in Rhode Island, and without such sale or promotion, the public nuisance "would not have occurred." See Jury Instructions 13 (defining proximate cause). Therefore, based on the evidence that a public nuisance exists (described below) and on common sense, the jury properly could have concluded that whoever sold and promoted lead pigment in Rhode Island proximately caused the *Page 18 
public nuisance. In effect, the sale and promotion would complete the chain of causation that begins at manufacture, and ends with the existence of the public nuisance. See infra Part II.C.5 (finding that there is no superseding, intervening cause which would relieve the Defendants from liability).
The only question for the Court then is whether there is sufficient evidence for the jury to conclude that any or all of SW, NL, and Millennium substantially participated in the sale and/or promotion of lead pigment in Rhode Island. If so, then it follows that they substantially participated in activities which proximately caused the public nuisance.
 4. Evidence that the Defendants Substantially Participated in the Promotion and Sale of Lead Pigment in RhodeIsland
On the second day of Dr. Rosner's testimony, the State elicited the following testimony as to each Defendant:
 "Q. And in your review of the hundreds of thousands of documents that you talked about, were there documents from each of these company's corporate files as well?
 A. Yes, there were.
 Q. And within the corporate documents of each of the defendants, did you find business records that details activities of any of the defendants within the state of Rhode Island?
 A. Yes, I did.
 Q. Do you have an opinion after that review, Professor Rosner, to a reasonable degree of professional certainty as to whether any of the defendants sold, distributed, advertised, and/or promoted lead products within the state of Rhode Island?
 A. Yes, I do. *Page 19 
 Q. And what is that opinion as to NL Industries — National Lead?
 A. They sold and promoted in the state of Rhode Island. . . .
 Q. And as to Millennium Holding's predecessor, Glidden?
 MR. NILAN: Objection. Lack of foundation.
 Q. As to the Glidden Company?
 MR. NILAN: Same objection.
 A Yes.
 MR. NILAN: Lack of foundation.
 THE COURT: Overruled.
 A. Yes. They promoted and sold in the state of Rhode Island.
 Q. And as to Sherwin-Williams?
 A. They also sold and promoted in the state of Rhode Island.
 Q. And was this at a time when each of them had actual knowledge about childhood lead poisoning?
 A. Yes, it is." (Off. Dr. Tr. 76:21-78:5, Jan. 13, 2006 AM Session.)
Dr. Rosner's opinion, if properly admitted, clearly provides a basis for which the jury could find that the three Defendants sold and promoted lead products within Rhode Island.
Certain Defendants contend that the reference to "lead products" — as opposed to lead pigment — which was made by State's counsel and adopted by the witness, is too *Page 20 
vague to support the conclusion that the various Defendants sold and promoted lead pigment in Rhode Island. (Off. Dr. Tr. 76: 8, 13, 24, 78:2, Jan. 13, 2006 Morning Session.) (reprinted above.) The State responds that, taken in its proper context, the testimony means lead pigment.
The reference to both "lead products" and "lead pigment" in Dr. Rosner's testimony is an ambiguity. However, in his later testimony, counsel for Millennium elicited the following testimony:
 "Q Now, let me talk about what you've said in regard to Rhode Island. You said in your direct testimony, again with the reasonable degree of professional — a reasonable degree of professional certainty that each of the defendants, and you said specifically Glidden, based on your review of the hundreds of thousands of documents, sold and promoted lead pigment in the state of Rhode Island. That was your testimony; was it not?
 A Yes." (Off. Dr. Tr. 45:12-20, Jan. 19, 2006 AM Session.) (Emphasis added.)
Perhaps counsel's reference to "lead products" as opposed to "lead pigment" was inadvertent, or perhaps there was significance to the distinction. However, as finder of fact, the jury was entitled to conclude, based upon the later testimony on cross-examination, that the meaning of Dr. Rosner's testimony as a whole was that the Defendants sold and promoted lead pigment in Rhode Island. Therefore, even if the context of Dr. Rosner's statement on direct did not clear up the ambiguity, his cross-examination was adequate to do so.
Of course, it is possible and perhaps probable that many entities also sold and promoted lead pigment in Rhode Island in addition to the Defendants. Therefore, in order to impose liability on these Defendants, their sale and promotion activity must be *Page 21 
"substantial." Restatement (Second) of Torts § 834, com. d (stating that when a person "is only one of several persons participating in carrying on an activity, his participation must be substantial before he can be held liable").
The Defendants contend that Dr. Rosner's opinion, quoted above, provides no basis for the jury to find that each Defendant's sale and promotion in Rhode Island was "substantial." However, the State introduced other evidence through Dr. Rosner, which not only attempted to provide an evidentiary foundation for the testimony, but which, if believed, would have provided a basis for the jury to find that the Defendant's activities were substantial. As noted above, where there is reasonable doubt, substantiality is a question for the trier of fact, which in this case was the jury. Id.
Dr. Rosner testified that each Defendant advertised their lead pigment in the various national media during the 1920's and 1930's, and presented examples of such advertisements from each company. (Off. Dr. Tr. 20:16-25:17, Jan. 13, 2006.) (describing Plaintiff's Exhibits 178-181.) See also Pl's Ex. 198 (containing a 1950 NL advertisement).
He then testified about various joint promotion campaigns among lead pigment producers. For example, NL and SW "participated and funded" the "Forest Products Better Paint Campaign" in 1934 to 1941 which was designed to promote lead pigment. (Off. Dr. Tr. 43:16-44:11, 45:6-46:2, Jan. 13, 2006.) Dr. Rosner testified that the goals of the campaign were to increase the sale of lead paint in lumberyards, encourage consumers to use more lead paint in new construction, and to encourage manufacturers of non-leaded paint to begin using lead in their products.Id. 46:24-47:13. To accomplish that goal, representatives traveled *Page 22 
 "to different states' conventions and fairs with trailers that they would use as kind of evidence of the values of lead — leaded products. They have, of course, an advertising campaign. They also tried to get lumber associations to put labels on their products that it recommended white lead products." Id. at 48:1-8.
Moreover, this advertising campaign included parts of New England and was considered successful. Id. at 51:8-14.
NL similarly participated in the "White Lead Promotion Campaign" from 1939 to 1942. Id. at 55:5-11.[26] This campaign was targeted to consumers through national magazine advertisements, and also involved salesmen traveling with model homes on trailers. Id. at 60:14-62:21. Dr. Rosner specifically testified as to NL that this campaign took place in Rhode Island, and had quite a broad reach nationally and in New England.Id. at 65:23-25, 69:17-70:6, 71:7-72:22.
In 1950, a second White Lead Promotion Campaign was undertaken in which SW and Glidden (Millennium's predecessor) joined NL as participants, although they believed that campaign to be unsuccessful.Id. at 96:7-18, 100:14-18. As to Millennium, the State elicited further testimony with respect to their sale and promotion activity in Rhode Island in 1952.
 "Q. Professor Rosner, did Glidden promote lead products in Rhode Island?
 A. Yes, it did.
 Q. And did Glidden sell lead products in Rhode Island?
 A. Yes, it did.
 Q. Did Glidden have branch stores here in Rhode Island? *Page 23 
 A. Yes, it did.
 Q. And did Glidden have independent dealers selling Glidden paint here in Rhode Island?
 A. Yes, it did.
 Q. And in your investigation, did you discover agreements between various distributors and Glidden that covered the sale of lead pigments?
 A. Yes, I did.
 Q. And did these agreements include distributors that covered the State of Rhode Island?
 A. Yes.
 . . . .
 Q. Professor Rosner, can you identify that document for the record, please?
 A. Yes, this is a memo from the Glidden Company in Cleveland to sales agency — it's a sales agency agreement, and it's dated 15th day of March, 1952.
 MR. McCONNELL: Your Honor, at this time plaintiff moves Exhibit 206 against Millennium Holdings Industries only.
 . . . .
 MR. McCONNELL: Your Honor, I — 206 is a full exhibit against Millennium Holdings only?
 THE COURT: Yes.
 . . . .
 Q. It's a sales agency agreement by the Glidden Company?
 A. Yes.
 . . . . *Page 24 
 Q. Did Glidden Company have a sales agreement to sell lead pigment to the Oliver Johnson and Company here in Providence, Rhode Island?
 A. Yes, it did.
 . . . .
 Q. And did they have a sales agreement to sell lead pigment to Voit Paint Products, Inc. in Central Falls, Rhode Island?
 A. Yes.
 Q. And that Oliver Johnson and Company, is that the company that Mr. Pohl asked you about on cross-examination?
 A. That's right.
 Q. And did this agreement cover the sale of Euston White Lead?
 A. Yes.
 Q. And Euston was owned by Glidden?
 A. Yes.
 Q. Did Glidden's advertising campaign include Rhode Island?
 A. Yes.
 Q. Glidden advertised lead products here in Rhode Island?
 A. Yes.
 . . . .
 Q. Did Glidden Company have a sales agreement to sell lead pigment to the Oliver Johnson and Company here in Providence, Rhode Island?
 A. Yes, it did. *Page 25 
 Q. And did they have a sales agreement to sell lead pigment to Voit Paint Products, Inc. in Central Falls, Rhode Island?
 A. Yes." (U. Tr. 14:23-17:23.) See also Pl's Ex. 206.
The following evidence further supports the jury's finding that each Defendant's participation in the sale and promotion of lead pigment in Rhode Island was substantial:
 "Q. Professor Rosner, in connection with your historic review of documents we — have you been able to determine the market share of these four defendants during the 1930's and 1940's for dry white lead?[27]
 A. Yes, I have.
 Q. What is that information?
 A. The market share was approximately 50 to 75 percent of the market for dry white lead.
 Q. And in connection with your investigation, were you able to determine what the market share for these four defendants was during the 1930's and 1940's with regard to lead-in-oil?
 A. Yes, I can.
 Q. And what is that information?
 A. It's between 70 and 80 percent." (Off. Dr. Tr. 24:22-25:11, Jan. 12, 2006.)
While perhaps, on the basis of this "market share" evidence alone, the most that a jury could infer was that the four Defendants collectively held 50 to 75 percent of the national market for dry white lead, and 70 to 80 percent of the market for lead-in oil. This of course does not reveal any particular Defendant's individual market share, and the Defendants strenuously object on this basis. However, the testimony continued: *Page 26 
 "Q. Now, in the 1930's and 1940's, Professor Rosner, how many manufacturers of paint were there in this country?
 A. I have seen reference to at least a thousand; between a thousand and two thousand, I would assume.
 Q. Now, compared to paint manufacturers, how many manufacturers of lead pigment for use in paint were there in this country during the 30's and 40's?
 A. Very, very few. Just a handful.
 Q. And were each of the defendants that are in this case a manufacturer of lead pigment?
 A. Yes.
 Q. And did the manufacturers of the lead pigment supply the lead for the thousands of manufacturers of paint that you just talked about?
 A. Yes, they did.
 Q. And did each of these defendants own a lead mine?
 A. Yes.
 Q. And were each of these defendants — strike that, I have already asked you that. Was Sherwin-Williams, National Lead, and Glidden manufacturers of lead paint as well?
 A. Yes, they were.
 Q. And was ARCO's predecessor also a manufacturer of lead paint?
 A. Um, no. ARCO produced a white lead in oil which was sometimes used as — as paint.
 Q. But all four of them are lead pigment manufacturers?
 A. Yes, that's correct. *Page 27 
 Q. And all four own mines?
 A. Yes, that's correct." (Off. Dr. Tr. 25:12-26:16, Jan. 12, 2006.)
This testimony indicates that while there were many manufacturers of paint in the 1930's and 1940's, there were "only a handful" of lead pigment manufacturers. Id. at 25:12-19. Further, each of the defendants separately owned a lead mine, and each was one of a handful of lead pigment manufacturers which supplied lead pigment to the many manufacturers of paint, and collectively held over 50 percent of the market for dry white lead and lead-in-oil.
The jury could properly have concluded from this testimony that the Defendants' substantially participated in the sale and promotion of lead pigment nationally. Then, in combination with Dr. Rosner's testimony on each Defendant's individual promotion efforts in Rhode Island, and his opinion that each Defendant sold and promoted lead pigment in Rhode Island, the jury could have inferred (though it was not required to so infer) that each Defendant's participation in Rhode Island was similarly substantial. It is also undisputed that lead pigment became illegal on or near 1978, so that any lead-containing paint that still exists on buildings in Rhode Island today has been there for almost thirty years. Therefore, although each Defendant stopped manufacturing some time ago, the jury could still have concluded that the Defendants' lead pigment is still on Rhode Island buildings in substantial amounts. On the basis of the foregoing, the Court concludes that the evidence was sufficient to make a prima facie case that the Defendants substantially participated in activities which proximately caused the public nuisance. Therefore, it is sufficient under Rule 50. *Page 28 
As noted above, the Court is required to assess credibility under Rule 59. Therefore, the Court will look to Dr. Rosner's cross-examination, where the Defendants attempted to test the basis of Dr. Rosner's opinion. For example, NL elicited testimony that the promotional campaigns were actually performed as part of the Lead Industries Association's (LIA) activities. (Off. Dr. Tr. 58:11-24, Jan. 18, 2006.) Although the Court ruled that acts of the LIA are not attributable to the Defendants, this is still relevant circumstantial evidence to show the extent that the lead-pigment products of LIA members were marketed nationally and in Rhode Island. See Off. Dr. Tr. 2:14-6:7, Dec. 12, 2006 (ruling that agency has not been shown). Such evidence permitted the jury to infer that the LIA was marketing the products of its members — the Defendants — who admittedly were in the business of manufacturing and selling lead-pigment. See U. Tr. 43-46, Nov. 16, 2005 PM Session (containing stipulations to the manufacturing activities of each Defendant, and their predecessors, during various time periods). So while the LIA's activities are not attributable to any Defendant, the evidence is still competent to demonstrate that the Defendants products reached Rhode Island.
SW also attempted to undercut the basis for Dr. Rosner's "sold and promoted" opinion. When asked about the basis for his opinion as to SW, the following exchange took place:
 "Q. In fact, you do not have any evidence or information that any lead ingredient that was made, sold or promoted by Sherwin Williams is present today in a building in Rhode Island in an area accessible to children, you don't have any evidence or information of that point, do you?
 A. Well, you — again, I don't want to sound redundant, but you advertised it here, had stores here, you sold it *Page 29 
here, and I would assume that people bought it here and, hence, I would assume that they used it.
 Q. You're saying that's your assumption as you sit here today. Is that what you just said?
 A. Well, it's — it's more than an assumption. I know you had stores here. You had one over on Traverse Street, you had a warehouse, you had salesmen here. You had outlets for ACME paint and other paints here. You had a representative who lived in Pawtucket who was here selling something, and I would assume it's various products of Sherwin Williams, or I know was various products of Sherwin Williams. And I must assume that you were selling what you usually advertised in throughout the nation, you were selling the same products here. So, therefore, I would assume that they're here." (U. Tr. 59:19-60:18, Jan. 19, 2006 PM Session.)
Millennium and ARCO engaged in similar cross-examinations. See Off. Dr. Tr. 34:25-45:25, Jan. 17, 2006 AM Session (ARCO cross-examination); Off. Dr. Tr. 40:21-47:4, Jan. 19, 2006 AM Session (Millennium cross-examination).[28] These cross-examinations were sufficient to illustrate what was not the basis for the opinion — specific sales of goods in specific Rhode Island stores. However, the Court finds that Dr. Rosner's testimony; the evidence of national advertisements of lead-containing paint for each Defendant; SW and NL's participation in the Forest Products campaign which included Rhode Island; NL's participation in the first White Lead Promotion Campaign, the three Defendants' participation in the unsuccessful second White Lead Promotion Campaign; Millennium's contracts referring to Rhode Island and its participation in the second White Lead Promotion campaign; the national composition of the lead-pigment market; *Page 30 
and the Defendants' participation in that national market, formed a sufficient basis to find substantial contribution.[29]
This Court has had opportunity in another context to remark that the evidence of Rhode Island conduct was "thin at best" for purposes of imposing punitive damages. (Off. Dr. Tr. 10:18-20, Feb. 28, 2006 PM Session.)[30] Surely, the jury was free to reach an opposite conclusion, especially if it felt that Dr. Rosner's testimony was not credible. However, the evidence on the nexus issue was sufficient to make a prima facie case, and was not contradicted. The Defendants had an adequate opportunity through cross-examination to attempt to discredit Dr. Rosner's testimony on substantiality and the sale of goods in Rhode Island, but they failed to convince the jury. Perhaps if the Defendants had introduced conflicting evidence, which would tend to discredit the proposition that the Defendants substantially promoted and sold lead pigment in Rhode Island, then another result would have obtained. However, even if the Court might have reached a different conclusion, it will not substitute such conclusion for the jury's verdict. See Turgeonv. Davis, 120 R.I. at 590, 388 A.2d at 1175; see also Restatement (Second) of Torts § 834 com. d (noting that where reasonable doubt exists, substantiality is a question for the trier of fact). Therefore, the Court finds that a sufficient mosaic of circumstantial evidence exists on this record to support a Rhode Island nexus, and will not order a new trial on this basis. *Page 31 
 5. Superseding, Intervening Cause
A central theme to the Defendant's case is that property-owners, and not the Defendants, are the only proximate cause of the public nuisance in Rhode Island because those property-owners failed to maintain the paint on their buildings. They further argue that a defendant cannot be held liable where an unforeseeable intervening force causes the plaintiff's injuries, because it would break the chain of causation between the Defendants and the public nuisance. See, e.g.,Pantalone v. Advanced Energy Delivery Sys., 694 A.2d 1213, 1215 (R.I. 1997) (recognizing that "an intervening act of negligence will not insulate an original tortfeasor if it appears that such intervening act is a natural and probable consequence of the initial tortfeasor's act. . . however, [if] the intervening cause was not reasonably foreseeable, the intervening or secondary act becomes the sole proximate cause of the plaintiff's injuries.") (internal quotations omitted).
Prior to trial, when the Court ruled on the State's motion for summary judgment on the superseding, intervening cause defense, it held that a Defendant relying upon this defense had the burden of proving that the "intervening act could [not] reasonably have been foreseen as a natural and probable result of the original act of negligence of the defendant." (Off. Dr. Tr. 11:25-12:3, Oct. 31, 2005.) It further held that whether an act was reasonably foreseeable was a question for the trier of fact.Id. at 12:9-12.
The alleged acts which Defendants argue constitute a superseding cause are actually not acts, but failures to act — the failure of property owners to maintain the paint on their buildings. However, as a general rule, the mere failure "of a third person to act to prevent harm to another threatened by the actor's. . . conduct is not a superseding cause of such harm." See Restatement (Second) of Torts, § 452(1). *Page 32 
However, the Defendants argue that since property owners now have a duty to maintain their properties, the failure to do so constitutes negligence which was unforeseeable, and which breaks the chain of causation between the Defendants and the public nuisance. The Defendants rely upon the 2002 Lead Hazard Mitigation Act and the 1991 Lead Poisoning Prevention Act for the argument that property owners have a duty to maintain their properties free from lead hazards. However, these laws did not even exist during the time when the Defendants' activities occurred. Therefore, it was at least arguably foreseeable that, in the absence of such duty, the property owners would fail to maintain the paint on their properties.
The Defendants seem to argue that because laws were passed during the period between their activities and the verdict, that they should be relieved of liability as a matter of law. This argument is consistent with Restatement (Second) § 452(2), which is an exception to the general rule quoted above:
 "Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause." Restatement (Second) of Torts § 452(2).[31]
However, the Court has already ruled on numerous occasions that these laws were not intended to "authorize" the presence of lead paint or otherwise insulate actors such as the Defendants from public nuisance liability. See infra Part III.E.2 (reciting the Court's various rulings on the issue). Therefore, the Court does not find that the property-owners, as a matter of law, constitute an intervening, superseding cause. *Page 33 
Moreover, the Court cannot find that the Defendants are entitled to a new trial on this issue. Even though they did not present a defense, the Defendants assert that they presented "overwhelming, unrebutted evidence in support of their superseding/intervening cause defense." (Defendant The Sherwin-Williams Company's Motion for Judgment as a Matter of Law, and in the Alternative, Defendants' NL Industries, Millennium Holdings LLC, and the Sherwin-Williams Company's Motion for New Trial 29, Apr. 19, 2006.) (Defendants' Brief). However, they cite only to their earlier memorandum of law, objecting to the Plaintiff's motion for partial summary judgment on this defense, and this is not evidence. This Court rejected the State's motion for partial summary judgment because SW's objection was sufficient to create a genuine issue of material fact. (Off. Dr. Tr. 12:13-19, Oct. 31, 2005). However, the trial has now occurred, and the Defendants rested without presenting any evidence. Further, they have not pointed to any compelling evidence introduced as part of the State's case that would support their superseding, intervening cause defense.
The Defendants had the burden to show that some superseding, intervening cause, and not their activities, proximately caused the nuisance. The Court does not find as a matter of law that the failure of property owners to prevent harm, arising from an alleged duty which did not exist when the Defendants acted, is an intervening, superseding cause. See Restatement (Second) § 452(1). Moreover, the jury could reasonably have found it foreseeable that property owners would apply lead-containing paint to their properties and that it would deteriorate. If it was foreseeable, then it could not be a superseding cause. Defendants have not identified any other force or actor which could constitute a superseding cause. The jury simply rejected the Defendants' position, and this Court *Page 34 
does not find that their decision was so inconsistent with substantial justice such that a new trial should be ordered. For these reasons, the Court will not grant the Defendants' motion for judgment as a matter of law, or alternatively for a new trial, on their superseding, intervening cause defense.
 D. Evidence Supporting the Existence of a Public Nuisance
In the joint brief submitted by SW, NL, and Millennium, the Defendants allege that the State's evidence does not support the existence of a public nuisance from the cumulative presence of lead pigment in paints on buildings in Rhode Island. They argue that the alleged public nuisance — the "cumulative presence of lead pigment in paint and coatings in and on buildings in Rhode Island" — means that all lead pigment is harmful. Therefore, according to the Defendants, if the State cannot show that all lead pigment is harmful then it has not made its case.
The Court instructed the jury that it could find the existence of a public nuisance based upon "actual present harm or the threat of likely future harm. The threat of likely future harm means harm likely would occur in the future. . . as a result of a condition which exists today." (Jury Instructions 11-12.) Compare Wood v. Picillo, 443 A.2d 1244, 1247
(R.I. 1982) ("The essential element of an actionable nuisance is that persons have suffered harm or are threatened with injuries that they ought not have to bear.")
The condition which exists today — the "cumulative presence" of lead pigment — consists of lead pigment contained in deteriorating paint, in intact paint, and in paint which exists on friction surfaces. It appears undisputed that lead pigment in deteriorated *Page 35 
paint and paint on friction surfaces either has caused actual harm or threatens to do so.[32] The Court finds the evidence in support of that proposition to be overwhelming and will not recite it here. Defendants' argument is only valid, therefore, if the record lacks sufficient evidence to show that intact paint is likely to deteriorate and cause harm in the future. However, the Court finds ample evidence in the record to support that conclusion.
The following evidence, which is not the exclusive evidence on this point, indicates that even intact lead paint can be considered likely to cause future harm. The State presented testimony from Dr. Philip Landrigan, who agreed that, even though intact lead paint cannot poison a child, all lead paint should be considered harmful:
 "Q. . . .The CDC says that lead in paint should always be considered a potential hazard. Do you agree with that?
 A. Yes, I do.
 Q. An immediate lead hazard exists when lead-based paint is. Let's stop there for a second. Why is lead in paint always to be considered a potential hazard?
 A. Well, the way I'll answer that question is to define what I mean by potential hazard or define what CDC means by potential hazard since I was part of the committee that put this report together. And a potential hazard, I think the best way to describe a potential hazard, it's an accident waiting to happen. It's — if the lead paint is there, and then if the lead paint becomes disturbed in any of the six ways that are listed in the following paragraph, the potential has — moves into the status of becoming an immediate hazard. *Page 36 
 Q. Okay. An immediate hazard exists when lead-based paint is, one, chipping, peeling or flaking. That would constitute an immediate hazard?
 A. Yes, it would.
 Q. When it's chalking, thereby producing lead dust; that would represent an immediate hazard?
 A. Yes. Chalking means it's breaking off and (INAUDIBLE) into the dust (INAUDIBLE) it would constitute an immediate hazard.
 Q. It goes on to say, `When lead is on a part of a window which is abraded through the opening and closing of the window,' that would be an immediate hazard?
 . . . .
 A. Yes, lead on a window frame becomes an immediate hazard when the window is raised and lowered and that lead-based paint abrades off.
 Q. Does it matter what the condition of the paint is on that window in order to — for it to become an immediate hazard?
 A. No, it's not. The lead paint on the window could be absolutely intact, but then when the window is raised and lowered, friction results. It's like sandpaper and the lead paint could abraded off and (INAUDIBLE).
 Q. It goes on to say that when lead is on any surface which is walked on, like floors, or is otherwise abraded, is that an immediate lead hazard,
 Dr. Landrigan?
 A. Yes, it would be.
 Q. It says that lead that can be mouthed by a child; for example, on a window sill, is an immediate hazard. Do you agree with that?
 A. Yes, I do." (U. Tr. 124:10-126:16, Nov. 3, 2005 PM Session.) *Page 37 
Dr. James Girard, a chemist, testified similarly that lead-containing paint will deteriorate:
 "Q. Dr. Girard, what is your opinion as to whether a person can stop paint from deteriorating?
 A. I don't think you can stop paint from deteriorating. I think that what an individual might be able to do in some very limited cases is maybe slow down or speed up its deterioration, but it is all ultimately going to deteriorate and fail.
 Q. Why is that, Doctor?
 A. Well, if we think about the items we just talked about, the mechanisms of how it interacts with moisture, air and the sun, I mean, a homeowner doesn't have control over the environment and there's little that you can do to stop any of these. About the only thing a homeowner can do is to really, you know, try to minimize wear and tear on the paint. But other — outside of that, there's not much." (U. Tr. 28:4-19, Nov. 7, 2005 PM Session.)
Perhaps all paint will not deteriorate as the Defendants have contended. But the standard for finding a public nuisance speaks only of "likelihood" of future harm and not of absolute certainty. Therefore, while it may be true that some paint which contains lead pigment has lasted 300 or 400 years, the jury was entitled to conclude that even intact paint is likely to cause harm.[33] On the basis of the foregoing and other similar evidence, the Court finds that the State presented ample evidence for a jury to conclude that intact *Page 38 
paint is likely to deteriorate, and therefore, even lead pigment in intact paint is likely to cause harm in the future.
Moreover, the Court is not convinced that the Defendants' argument is even valid. Defendants' argue that "if some [lead-containing paint] is a hazard and some is not, the case, as the State proffered it, must fail." (Defendants' Brief 22.) Even if there were no evidence that intact paint was likely to deteriorate and cause harm, evidence of the extent of both deteriorating paint and paint on friction surfaces provides an ample basis for finding that the cumulative presence of lead pigment causes actual or threatened harm even if intact paint is removed from the calculation. The Court finds Defendants' argument in this regard to be little more than semantics.
Defendants have also argued that the possibility of harm from future deterioration of lead-containing paint has been significantly reduced by the State's legislative efforts and by better maintenance by property owners. The Court finds that these efforts by the State and by property owners to curtail the deterioration of lead-containing paint do not negate the conclusion that future harm is likely. In fact, the costs arising from those efforts are part of the harm caused by the public nuisance and are evidence of its existence. They are burdens that the jury concluded ought not to be borne by the State. They do not constitute evidence that a public nuisance does not exist.
Finally, the Defendants have argued that the State has not demonstrated a causal link between the existence of the public nuisance and harm to the State. They argue that no evidence was presented at trial of any specific child harmed as a result of their specific lead pigment product. See, e.g., DeLuca v. Merrell Dow Pharmaceuticals,Inc., 911 F.2d 941, 945 (3d Cir. 1990) ("Epidemiological studies do not provide direct evidence that a *Page 39 
particular plaintiff was injured by exposure to a substance");Merrell Dow Pharms. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997) ("a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies").
Although the State did not set forth such evidence, the Court finds that the State did introduce more than sufficient epidemiological evidence connecting lead paint with harm to children, and the Court will not recite it here. See Pl's Mem. Appx. A § I.A., I.E.1, I.E.3, Jun. 30, 2006. While the above-quoted cases appear facially to support the Defendants' position that such evidence is insufficient, when read in their proper context, it is clear that the Defendants reliance on them is misplaced. For example, one notes that epidemiological "studies have the potential, however, of generating circumstantial evidence of cause and effect through a process known as hypothesis testing. . . ."DeLuca, 911 F.2d at 945. Most importantly, however, those cases involved the claims of individual plaintiffs. Here, the plaintiff is the State, so while such studies may be insufficient to prove causation of a specific harm to an individual, they are very relevant in proving the harms suffered by the State.
 E. Sufficiency of Evidence Regarding Abatement
The Defendants have argued in the context of their Rule 50 and Rule 59 motions that the State has failed to proffer evidence sufficient to sustain its burden on abatement. They argue (1) that the State has failed to offer evidence of immediate harm; (2) that the State has failed to demonstrate the lack of an adequate remedy at law; and (3) that the State has failed to offer evidence that its proposed abatement remedy would be practical and feasible. *Page 40 
As to whether there is immediate harm, the Defendants argue again that the State failed to show that intact non-deteriorating paint is a threat. However, as noted above in Part II.D, there is sufficient evidence to conclude that such paint is likely to cause future harm. As to the adequacy of the remedy at law, this issue is taken up below in Part V.A of this decision.
As to the practicality of the abatement remedy, the Court will also address Defendants' various practical concerns below in Part V.D. The Court will note here only that, while practicality of the remedy is a factor that the Court must consider in the remedy phase, the Defendants have not demonstrated that the State had the burden to demonstrate practicality. Rather, it appears that the Defendants have the burden to demonstrate that a remedy would be impractical before the Court will deny the State a remedy. Cf. Hart v. Community School Bd.,383 F. Supp. 699, 741 (D.N.Y. 1974) (placing the burden upon the Defendants to show relief would be impractical in a school desegregation case).
Therefore, the Court will not grant judgment as a matter of law, or a new trial, on the grounds that the State has not shown that its remedy would be practical. Moreover, given the Court's prior ruling that it would determine how any abatement remedy would be carried out,[34] it is premature to consider practicality at this stage in the proceeding.
 F. Conclusion as to Sufficiency of the Evidence
For the reasons stated above, the Court finds that the evidence adduced at trial was sufficient to support the jury's verdict. Therefore, the Court will deny the motions of each Defendant for judgment as a matter of law pursuant to Rule 50. Likewise, the Court *Page 41 
will not order a new trial on the basis of insufficiency of the evidence. The Court will now consider whether errors of law at trial require granting Defendants' Rule 59(a) motions for a new trial. *Page 42 
 III Defendants' Motions for a New Trial Based Upon Errors or Misconduct at Trial
In addition to arguing that the State failed to present sufficient evidence at trial to support the jury verdict, the Defendants also allege that various errors of law by the Court and alleged misconduct by the State require a new trial under Rule 59. The Court will first set forth the appropriate standard of review for a new trial motion based upon errors of law at trial. (Part III.A.) The Court will then examine the appropriateness of reconsidering certain pre-trial rulings in such a motion. (Part III.B.) The Court will then examine the different categories of alleged error upon which Defendants rely. The Defendants allege the following types of errors: due process violations (Part III.C); improper joinder of four Defendants in the same trial (Part III.D); miscellaneous constitutional violations (Part III.E); procedural and evidentiary errors (Part III.F); errors in instructing the jury (Part III.G); misconduct by the State (Part III.H); and other miscellaneous errors (Part III.I).
In addressing the motion, the Court responds to arguments raised in the joint brief submitted by the three liable Defendants, as most of the alleged grounds for a new trial are common to NL, Millennium, and SW. (Defendants' Brief.) In addition, where the parties' other briefs raise allegations of errors or misconduct at trial specific to a particular Defendant, those issues will be addressed where appropriate.
 A. Standard of Review
The Court may grant a new trial "for error[s] of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in the courts of this state." Super. R. Civ. P. Rule 59(a). The 1995 Revision to Rule 59 "works a major *Page 43 
change in Rhode Island practice" by permitting a motion for a new trial for errors of law committed at trial. Rule 59, Committee Notes; seeVotolato v. Merandi, 747 A.2d 455, 460 (R.I. 2000) (noting that the 1995 revision "significantly expanded" the traditional grounds for a new trial, and that "any error of law, if prejudicial, is a good ground for a new trial") (quotations omitted).[35] Therefore, even though the Court finds that the evidence presented was sufficient to support the verdict, prejudicial errors of law occurring at trial may entitle the Defendant to a new trial.
However, "[i]n considering motions for a new trial on the ground of error at the trial, care must be taken to observe the provision of Rule 61 mandating the disregard of harmless error." Rule 59, Committee Notes;see Rule 61 (stating that
 "[n]o error in either the admission or the exclusion of evidence and no error or defect in. . . anything done or omitted by the court or by any of the parties is ground for granting a new trial. . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.")
Consistent with the obligation to observe the harmless error rule, our Supreme Court has noted that while a litigant is entitled to a fair trial, there is no entitlement to a perfect trial. State v. Buxton,643 A.2d 172, 177 (R.I. 1994); State v. Peabody, 611 A.2d 826, 833 (R.I. 1992). Indeed, even where the litigants, parties, and judges harbor the best of intentions and exert their greatest efforts, "there are no perfect trials." McDonough Power Equip. v. Greenwood, 464 U.S. 548, 553
(U.S. 1984).[36] Therefore, as to alleged *Page 44 
errors at trial, the Court must first determine whether the claim of error has merit, and must then determine whether that error was wrongfully prejudicial to the Defendants or to any individual Defendant.
 B. Reconsideration of Prior Rulings
The Court notes that many of the grounds asserted by Defendants in support of their new trial motion merely seek reconsideration of the Court's pre-trial rulings of law, even though some of these grounds are phrased as objections to jury instructions.[37] In fact, as support for many arguments now raised, Defendants merely incorporate their prior briefing on the various topics and raise a general objection to all adverse rulings that have occurred in this case. (Defendants' Brief, Appx. A-B.) The State and the Defendants disagree on the appropriateness of raising pre-trial issues in a motion for a new trial.
Rule 59 states that a motion for a new trial may be based upon errors of law "occurring at the trial." Rule 59(a).[38] While it is probably impracticable to exhaustively list all of the permissible grounds for a new trial, those grounds include erroneous evidentiary rulings, jury instructions, and misconduct at closing argument. See 11 Wright, Miller, Kane, Federal Practice and Procedure § 2805 at 54-55, (2d ed. 1995) *Page 45 
(noting the most commonly raised grounds are "that the verdict is against the weight of the evidence, that the verdict is too large or too small, that there is newly discovered evidence, that conduct of counsel or the court has tainted the verdict, or that there has been misconduct affecting the jury"). Granting a new trial on such grounds makes sense because the fast-paced nature of a trial, and the need for immediate rulings on such matters, make rulings at trial more prone to error. Therefore, where such errors have occurred, the trial justice is given the opportunity to "first address" errors occurring at trial. See AmicaMut. Ins. Co. v. Tashjian, 703 A.2d 93, 97 (R.I. 1997) (noting also that a failure to raise such issues in a motion for new trial precludes appellate review on those issues).
Rule 59(a) is not, however, an invitation for a party to reargue every adverse ruling since the filing of the complaint, especially when it is clear that the Court has considered and rejected that argument. For example, denied summary judgment motions, in limine motions,[39] and decisions with respect to joinder of parties which occurred prior to trial are inappropriate for such a motion. Therefore, where the Defendants have raised such arguments, the Court will not consider them as grounds for a new trial. Rather, the Court will treat them as a motion for reconsideration, and not as grounds for a new trial.See 11 Wright, Miller, Kane, Federal Practice and Procedure § 2810.1 at 123, (2d ed. 1995) (noting that a motion for reconsideration is generally included within Rule 59(e) which provides for amending or altering a judgment).[40] *Page 46 
It is this Court's view that it may occasionally be appropriate for a trial court to reconsider an earlier ruling when, in reaching that decision, it clearly has overlooked an important argument, legal authority, or piece of evidence that was presented originally.See Super. R. Civ. P. Rule 59(e) (providing for the alteration or amendment of judgments); Rule 60(b) (providing for relief from a judgment or order). Similarly, our Supreme Court has entertained petitions for reargument when "matters presented in the briefs and relied upon in the original argument" appear to have been "overlooked or misapprehended by the appellate court in reviewing the case."Brimbau v. Ausdale Equip. Rental Corp., 120 R.I. 670, 672,389 A.2d 1254, 1255 (1978).
However, when an issue has been considered and decided prior to trial with the benefit of full briefing and argument, it is inappropriate for a party to continually raise the same arguments on such issues. Where a Court has clearly ruled on issues which were or which could have been raised during the earlier proceeding, a motion for reconsideration is inappropriate. See, e.g., See American Fed'n of Teachers Local 2012 v.Rhode Island Bd. of Regents, 477 A.2d 104, 106 (R.I. 1984) (noting that motions for "reconsideration merely to relitigate old matters is not available under Rule 59(e)"); 11 Wright, Miller, Kane § 2810.1 at 127 (collecting cases for the proposition that a "Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment") (footnotes omitted); see also Jackson v. Medical Coaches, 734 A.2d 502,505 (R.I. 1999) (finding that Rule 60(b) could not be used "to reconsider [a] previous judgment in light of later-discovered legal authority that could have and should have been presented to the court before the original judgments entered"). If a party believes that such arguments are meritorious, it should address them *Page 47 
to an appellate court, but it would be a misuse of judicial resources to continually seek to relitigate old matters.
Therefore, for purposes of the present motions, the Court will only consider grounds for a new trial which are based upon alleged errors occurring at the trial itself, and for which raising an objection prior to trial would have been impossible. The Court generally will not reconsider the Court's prior rulings unless a good cause is shown.[41]
For grounds involving jury instructions, the Court generally will not consider them if the substance is merely to seek reconsideration of an issue which has already received due consideration prior to trial. However, if an objection to jury instruction is based on a ground that was not and could not have been considered previously — for example, if the wording of a particular instruction is misleading or inconsistent with the Court's prior ruling of law — then the Court will consider such grounds in this decision.
 C. Due Process Objections
The Defendants have raised various objections as violations of their right to due process, although many of these arguments overlap with other categories of alleged error. For example, these include objections to the elements that plaintiff was or was not required to establish in order to prove its public nuisance claim; not instructing the jury on products liability defenses; and the admission of evidence making reference to "paint" as opposed to "lead pigment." Such objections will be addressed below with regard to the jury instructions and evidentiary rulings. The Court will focus here on allegations of *Page 48 
due process violations which do not overlap with those other categories — specifically, these are arguments about the nature of the State's "cumulative presence" theory.
The Defendants make several arguments that the definition of the alleged nuisance — the cumulative presence of lead in paints and coatings on buildings in Rhode Island — violates the Defendants' due process rights. The core of their objections can be reduced to three issues: (1) whether a public nuisance must be confined to a specific property or properties; (2) whether the State's definition of the alleged nuisance was too vague to be enforceable, and (3) whether the Defendants were improperly denied the opportunity to conduct "property-specific" discovery.
 1. Location of the Alleged Public Nuisance
The Defendants' argue that Rhode Island law "only supports location-specific public nuisance liability." (Defendants' Brief 52.) At the outset, the Court notes that this issue has been addressed before, and indeed forms the very foundation of this litigation. The Court has consistently found that the State had the right to define the alleged nuisance. It alleged that the cumulative presence of lead was such a nuisance. E.g., State v. Lead Indus. Ass'n, 2002 R.I. Super. LEXIS 90, *6-7 (July 3, 2002) ("The jury is not to be asked if each such property is a separate public nuisance but rather, as to whether the cumulative effect of all such properties constitutes a single public nuisance.");State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *26-28 (R.I.Super.Ct. Apr. 1, 2001) (finding that the State had properly pled an unreasonable interference with a public right). *Page 49 
The Defendants rely upon G.L. 1956 § 10-1-1 and various cases in support of their position.[42] The Court has noted in the past, however, that § 10-1-1 is not an exclusive remedy. Therefore, it does not bar an action against the Defendants, even though they do not own any specific property alleged to form part of the alleged nuisance.See State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37 *26-28.
Defendants also rely upon Camden County Bd. of Chosen Freeholders v.Beretta, 273 F.3d 536, 539 (3d Cir. 2001). In Beretta, the Court found that the sale of handguns was neither connected with land, nor did it involve interference with a public right. Id. The Court found that unless a case fit within one of those two categories, a public nuisance could not exist. Id. However, in this case the alleged nuisance exists only on buildings and clearly is connected with land. Moreover, the jury found that it violated a public right. See Jury Instructions 11 (noting that to find a public nuisance, the State must prove unreasonable interference with a public right, and defining that phrase). Therefore, Defendants' reliance on this case is unavailing.
Defendants have not set forth a valid reason why a cumulative presence case cannot form the basis for a public nuisance, if the requisite elements are met. As to the other objections to the elements of a public nuisance, the Court takes up those objections below in its analysis of the jury instructions. *Page 50 
 2. Vagueness
The Defendants argue that the "cumulative" or "collective" presence of lead pigment was never defined for the jury, so that there would be no way to interpret what the jury meant when it found that a public nuisance exists, and when it found that the Defendants should be ordered to abate.
The State presented evidence that lead pigment existed on buildings in Rhode Island, and then presented evidence on the various types of harms caused by that presence. For example, there could be present and future harms to children, costs to property owners and taxpayers, and similar harms and costs to various subcategories of those groups. Defendants' suggest that because the jury could have based its public nuisance verdict on any of those harms, that the verdict is somehow indecipherable. They further argue that the verdict may not have been unanimous because any given juror might have based its finding upon a different category of harm.
The Court finds this argument to be without merit. Although there might be many harms, there is only one alleged nuisance and it was clearly defined. It was the cumulative presence of lead pigment on buildings which gives rise to the alleged harms, and it was the cumulative presence of lead that the jury ordered should be abated. That the word "cumulative" was used in the jury question and jury instructions, to reference the widespread presence of lead-containing paint in the State which comprises the alleged nuisance, does not violate due process. *Page 51 
 3. Property-Specific Discovery
The Defendants allege that, due to the "cumulative presence" case, they were denied the opportunity to conduct "property-specific" discovery to develop a defense in this case. They similarly argue that due process requires that notice of this proceeding be given to all property owners who might be affected by its pendency. The "property-specific" theme is probably the most recurring of any theme in this litigation. The Court has addressed it in several written rulings.State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 79 (May 18, 2005);State v. Lead Indus. Ass'n, 2004 R.I. Super. LEXIS (Nov. 9, 2004);State v. Lead Indus. Ass'n, 2004 R.I. Super. LEXIS 92, *1-4 (May 14, 2004); State v. Lead Indus. Ass'n, 2002 R.I. Super. LEXIS 90 (Jul. 3, 2002).)
In its July 3, 2002 ruling, the Court denied requests by the Defendants to give notice of the proceeding to all property owners who might be affected by its pendency. State v. Lead Indus. Ass'n, 2002 R.I. Super. LEXIS 90 (Jul. 3, 2002). In its May 14, 2004 ruling, the Court directed the parties to engage in discovery providing for "a statistically relevant number of properties to be subject to discovery, together with a proposed methodology for determining the properties to be selected for such discovery. . . ." State v. Lead Indus. Ass'n, 2004 R.I. Super. LEXIS 92, *1-4 (May 14, 2004).
This Court noted in a later decision that no party had taken up the Court's invitation to engage in such discovery. State v. Lead Indus.Ass'n, 2004 R.I. Super. LEXIS 191, *3-4 (Nov. 9, 2004). In that decision, this Court also granted the State's motion in limine to exclude property-specific evidence because it would neither "(1) make the existence or non-existence of a public nuisance throughout Rhode Island more *Page 52 
or less probable, or (2) make the Defendants' liability in this case more or less probable." Id. at *5. The Court then denied a request by the Defendants to conduct additional property-specific discovery on the eve of the close of discovery. State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 79 (May 18, 2005).
The Defendants seem to base their continued requests for such property-specific evidence on the position that the State alleged thatall lead pigment in paint constitutes the public nuisance, and thereforeall lead pigment is harmful. See supra Part II.D. Therefore, the Defendants seek individual instances of intact lead paint to rebut that allegation, because they allege that intact lead paint poses no harm. However, this is merely a "straw man" argument. As described above, the State need not show that all lead paint causes immediate harm. Rather, the State's case is based upon the position that deteriorated lead paint causes or threatens to cause immediate harm, and that intact lead paint is likely to cause harm in the future through deterioration. The jury accepted this conclusion, as evidenced by their verdict. Even if the jury accepted the Defendant's position that intact lead paint is not immediately harmful, it could still have found a public nuisance.
Therefore, the Defendants have not provided sufficient cause for the Court to revisit its pre-trial ruling that individual instances of intact lead paint are not probative on the existence of a public nuisance, and the Court will not grant a new trial on the basis of a need for property-specific discovery.
 D. Motions to Sever or for Separate Trials
Defendants SW and Millennium contend that the denial of their earlier motions to sever, or alternatively for separate trials, was erroneous. They further contend that they *Page 53 
were deprived of a fair trial because the jury heard and considered evidence which, while admissible against one or more Defendant(s), was unfairly prejudicial as to the other Defendants.[43] The Defendants' argument is consistent with their initial severance motions, in which each argued that such prejudice was likely to occur and that separate trials were necessary to avoid that prejudice.
The Court denied their motions, finding that the alleged relationship among each Defendant and the LIA formed a sufficient commonality of fact that severance and separate trial was unwarranted. (Off. Dr. Tr. 3:1-5:9, Oct. 14, 2005 (denying SW's motion); Off. Dr. Tr. 1:15-4:7 Oct. 20, 2005 (similarly denying Millennium's severance motion)).[44]
However, the Court did express its intention to design procedures calculated to avoid any unfair prejudice to the individual Defendants. "[T]hrough proper instructions and physical segregation of the exhibits," this Court concluded that a scheme may be developed which would constrain the jury's consideration of a particular defendant only to evidence admissible against that defendant. (Off. Dr. Tr. 3:1-5:9, 6:19-21, Oct. 14, 2005 (denying SW's motion); Off. Dr. Tr. 1:15-4:7 Oct. 20, 2005 (denying Millennium's similar severance motion)).
Pursuant to these rulings and procedures developed in cooperation with the parties, when State's counsel introduced evidence and elicited testimony, specific note *Page 54 
was made as to which Defendant(s) the testimony or evidence pertained.[45] When State's counsel occasionally forgot to be specific, Defendants' counsel frequently objected.[46] Further, as the Court informed the jury, the tangible evidence was sorted into five binders for the jury's deliberations:
 "Although there are four Defendants in this action, it does not follow that if one Defendant is liable to the State, all four Defendants are liable. Each Defendant is entitled to a fair and individual consideration of the evidence admitted against it and a separate consideration of whether it is independently liable.
 Throughout this trial, some evidence, including documents and testimony about those documents, has been admitted in full only as to some Defendants. You may consider such evidence of limited admission only against those particular Defendants as to whom it was admitted.
 In that regard, you will be supplied with five sets of binders containing documents for your deliberations. . . ." (Jury Instructions 2.)
Under this system, the jury received one binder of evidence admissible against all Defendants, and one binder for each Defendant which would contain evidence admitted only against that particular Defendant.
The Court will not reconsider here its ruling that the claims against SW and Millennium should not be severed under Super. R. Civ. P. Rules 20(a) and 21. Similarly, the Court will not reconsider its pre-trial determination under Rule 20(b) that the *Page 55 
likelihood of prejudice at trial, in light of the procedures adopted to avoid such prejudice, did not warrant separate trials. Therefore, the Court will not order a new trial on the mere grounds that a joint trial was conducted.
However, it is proper for the Court to consider, in hindsight and with knowledge of how the trial actually unfolded, whether the Defendants actually suffered some prejudice arising from the consolidation of four Defendants in one trial.[47] If a Defendant did suffer unfair prejudice, it would have been due to the erroneous admission of evidence against it, an improper instruction, or another related error of law, and a new trial would be proper. Therefore, keeping in mind the procedural protections utilized throughout the trial, and the harmless error rule, the Court will consider the Defendants' generalized allegations of prejudice below in terms of specific evidentiary and procedural rulings throughout the trial.
 E. Alleged Constitutional Violations
Obviously, the Defendants have a right to due process, which includes the right to a fair trial. Many of the Defendants' alleged grounds for a new trial, addressed in other parts of this decision, involve claims that their right to a fair trial was abridged. However, in addition to these types of grounds, the Defendants also claim that various other constitutional rights have been violated in these proceedings, such as: violations of Defendants' First Amendment Rights; violations of the Commerce Clause; violation of the doctrine of Separation of Powers; and violations of Takings Clause.
Prior to trial, the Court addressed several related motions denominated as motions for partial summary judgment, but which the Court treated as motions to strike, related to *Page 56 
these constitution-based defenses. (Off. Dr. Tr. 21:20-22:7, 24:23-27:12, Oct. 5, 2005.) This Court granted the State's motion to strike each of these affirmative defenses. Id. at 24:23-27:10. The Court will not reconsider the Commerce Clause or Takings Clause issue.Id.[48] As to the First Amendment issue, the Court will consider it below. Finally, the Court will not reconsider its position on Separation of Powers, but will make reference below to its prior rulings, of which there are several.
 1. First Amendment Rights
The Defendants allege that this trial has violated their First Amendment rights — specifically they allege four violations: the right to petition the government; to associate with trade organizations; to engage in commercial speech; and a right to refrain from speaking out or educating the public. The Defendants' objections are based on theNoerr-Pennington doctrine, which was developed "in the context of antitrust litigation in order to protect the legitimate exercise of the constitutional right to petition the government after retributive civil claims were brought by parties harmed by petitioning activity."Hometown Props. v. Fleming, 680 A.2d 56, 60 (R.I. 1996). The doctrine has been used to protect defendants from common-law tort claims, such as malicious prosecution or abuse of process, based upon protected speech activities. See id. (citing Cove Road Development v. Western CranstonIndustrial Park Associates, 674 A.2d 1234, 1236 (R.I. 1996)).
In its pre-trial ruling striking an affirmative defense based on the First Amendment, the Court noted that *Page 57 
 "the suit brought and proffered here is not directed at the speech, the protected commercial speech, by the defendants or any of them. What is the subject of this suit is an alleged public nuisance. There may be evidence that comes in. . . that deals with what has been said or advertised by one or more of the defendants. If that's the case, that speech is not something that defendants would be liable for.
 . . . And the Court goes further and indicates that its ruling should not be deemed a license to the plaintiff to, quote, misquote again from the defendants. In the ordinary course, one would expect the Attorney General to be the champion of free speech, and the Court sees nothing yet that precludes its view that the Attorney General is adhering to his responsibilities." (Off. Dr. Tr. 26:16-27:9, Oct. 5, 2005.)[49]
This Court further ordered, in response to a motion in limine, that the State could not present evidence of legislative or advocacy efforts as a basis for imposing liability on the Defendants. (Order Granting Mot. in Limine Excluding Reference to Legislative or Advocacy Efforts, Oct. 31, 2005.) Finally, the Court instructed the jury that "mere membership in a trade association is not sufficient to impose liability on any Defendant herein." (Jury Instructions 15.)
The Defendants now allege that the evidence admitted at trial, and various arguments made by State's counsel during closing argument, violated their First Amendment rights as well as the Court's October 31, 2005 order. However, the State responds that the evidence of such protected activities is admissible if admitted to show the "purpose or character" of other, unprotected activities. Alexander v. NationalFarmers Organization, 687 F.2d 1173, 1196 (8th Cir. 1982).[50] *Page 58 
This Court reiterates its prior ruling that the State's claim of public nuisance is not directed at protected First Amendment activities per se. Therefore, the Court finds that the affirmative defenses were properly stricken. However, certain evidence was admitted that related to protected commercial speech and lobbying activities. Therefore, the Court must consider whether any such evidence was admitted for a proper purpose, or whether it impermissibly invited the jury to find liability on the basis of protected speech activities. Since the creation of a public nuisance is clearly not protected by the First Amendment, evidence admitted to show the "purpose or character" of conduct creating that nuisance was properly admitted, even if it also refers to speech activities. The Court will examine the Defendants' specific instances of that evidence below to determine whether that evidence was admitted for a proper purpose.
 2. Separation of Powers
The Defendants argue, as they have repeatedly, that the Rhode Island Lead Poisoning Prevention Act (LPPA) authorizes the presence of lead pigment. See G.L. 1956 § 23-24.6-1 to 23-24.6-27. Therefore, this Court would violate the Separation of Powers doctrine by finding a public nuisance on the basis of the presence of lead pigment. The Court has ruled previously that the LPPA does not
 "address in any fashion the actions of these defendants but simply in accordance with their terms do not require landlords and/or property owners to remove intact lead paint from their properties. The statutes and regulations do not authorize the existence of the claimed public nuisance, if, in fact, one is found to exist by the trier of fact." (Off. Dr. Tr. 13:3-14:12, Oct. 5, 2005.) *Page 59 
The Court ruled similarly in its prior rulings, and will not reconsider its decision. State v. Lead Indus. Ass'n, 2003 R.I. Super. LEXIS 50, *4-9 (Mar. 20, 2003); State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *12-16.
The Defendants also argue that any remedy here would violate the "free public services" doctrine, and would be an additional Separation of Powers violation. That doctrine generally provides, as this Court discussed in its prior ruling, that "public expenditures made in the performance of governmental functions are not recoverable." State v.Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *16-17 (Apr. 2, 2001) (internal quotations omitted). The Defendants have not provided a reason for the Court to reconsider its past ruling, which denied a motion to dismiss on the basis of this doctrine. When the Court denied the Defendants' motion to dismiss, the State was seeking damages as part of its remedy for the alleged public nuisance. In fact, it is not clear to the Court that the doctrine would even be applicable to this case now, since the only remedy presently involved in the case is abatement, and not damages to compensate for the State's expenditures.[51] Therefore, the Court finds this argument to be without merit.
 F. Alleged Procedural and Evidentiary Errors During Trial
The Defendants allege that various procedural and evidentiary rulings were erroneous and require a new trial. The Court will first consider several arguments which address broad categories of evidence, the admission of which allegedly constitutes an error of law requiring a new trial. These categories include "paint" evidence, "knowledge" evidence, and evidence of LIA activities. The Court will then address *Page 60 
objections to specific evidence and testimony, keeping in mind the Defendants' arguments concerning potential prejudice from the joint trial, and potential violations of the First Amendment. The Court will also address the Defendants' procedural objection to the scope of the State's redirect examination of certain witnesses.
 1. Admission of "Paint" Evidence
The Defendants object to the admission of evidence at trial which made reference to paint as opposed to the lead pigment which is contained in paint. Understanding this argument requires reference to several pre-trial proceedings. In this Court's ruling on the Defendants' motion to dismiss, the Court found that a statute of repose[52] relating to improvements to real property did not apply to "the relevant causes of action" against the Defendants. State v. Lead Indus. Ass'n, 2001 R.I. Super LEXIS 27, *35-*40 (Apr. 2, 2001) (interpreting G.L. 1956 §9-1-29). The Court reasoned that, while the statute may arguably immunize manufacturers of paint, the statute did not apply to manufacturers of the lead pigment which may be found in paint and which is merely a component of the paint. Id. at *39.
Prior to trial, this Court denied a motion in limine by Millennium which sought to exclude evidence of paint, as opposed to lead pigment, based upon the earlier ruling on the statute of repose. The Court denied the motion, without prejudice to the Defendants *Page 61 
raising a similar motion at trial with respect to specific evidence. (Off. Dr. Tr. 4:18-25, Oct. 5, 2005.) The Defendants renew their argument here that the admission of evidence mentioning paint, as opposed to lead pigment, was somehow improper. They cite to various testimony, as well as repeated references to lead paint during the State's closing argument, in support of their objection to the "paint" evidence.
The Defendants arguments on this issue are somewhat murky. They basically argue that the State unfairly concealed the nature of its case, arguing lead pigment when it was convenient, and at other times arguing lead paint when it served its purpose. They argue that such tactics were unfair and warrant a new trial because the Defendants have a right to know the claims asserted against them. However, they have not demonstrated how evidence that mentions paint would not be relevant to whether "the cumulative presence of lead pigment in paint and coatings" constitutes a public nuisance. (Jury Verdict Form.) (Emphasis added.) Simply because the State argued, and the Court relied upon the distinction between lead pigment and paint, does not mean that the word paint can never be mentioned at trial. Therefore, the Court finds this argument to be without merit.
The Court also notes that the statute of repose upon which the Defendants rely insulates manufacturers only from "action[s]. . . in tort to recover damages." Section 9-1-29. Throughout the history of this case, the State had maintained various claims for indemnity, compensatory damages, and punitive damages. However, the jury never considered damages during its deliberations. After the jury rendered its verdict on the public nuisance claim, the Court held hearings to determine whether a punitive damages question should be submitted to this jury, and decided that punitive damages were *Page 62 
inappropriate. The only claim now remaining in this case is the State's claim for abatement relief based upon the existence of a public nuisance. Therefore, even if the statute of repose would otherwise require that "paint evidence" be excluded — and the Court finds that it does not — that statute now has no application to the State's public nuisance claim for abatement relief, and cannot form a basis for a new trial motion.
 2. Admission of "Knowledge" Evidence
The State introduced evidence which tended to illustrate that the Defendants, or some of them, had knowledge of the potentially harmful and toxic aspects of lead at various points in time.[53] In addition, this evidence demonstrated that the Defendants failed to take affirmative steps to mitigate the potential for harm, such as by issuing warnings about these potential harms. This Court has ruled above in Part II.C.3 that such evidence generally is not relevant to establishing a causal link between the Defendants' conduct and the existence of the public nuisance in Rhode Island. In addition, this Court has ruled that a Defendant's conduct need not be "intentional or negligent to impose liability for creating a public nuisance," and so instructed the jury. (Jury Instructions 14.) Therefore, the Defendants argue, that it was prejudicial error to allow the jury to consider this type of evidence.
However, the jury was also instructed that "a public nuisance is something that unreasonably interferes with a right common to the general public. . . . An essential element of a public nuisance is that persons have suffered harm or are threatened with injuries that they ought not to have to bear. (Jury Instructions 10-11.) Whether or not an interference is unreasonable depends upon "whether the conduct is of a continuing nature *Page 63 
or has produced a permanent or long-lasting effect, and, as the actorknows or has reason to know, has a significant effect upon the public right." Restatement (Second) Torts, § 821B (emphasis added).[54]
Having concluded that the Defendants' conduct was a cause of the public nuisance, the jury was permitted to consider whether the Defendants had knowledge that their conduct affected the public right which was abridged by the public nuisance. If so, then they could properly conclude that the members of the general public ought not to be required to bear the harms caused by lead pigment, and that the Defendants should be ordered to abate. Therefore, the "knowledge" evidence was properly admitted.
 3. LIA Documents
The Court ruled near the end of trial that the State had failed to introduce sufficient evidence to find that the LIA was an agent of any Defendant. (Off. Dr. Tr. 59:1-24, Jan. 12, 2006.) Therefore, the jury was instructed
 "not to consider any statements or actions of the LIA as statements or actions that were made by, for, or on behalf of any of the defendants. This evidence, however, may be considered for other purposes as may be consistent with instructions that the Court will give to you at the conclusion of the case." (Off. Dr. Tr. 59:1-24, Jan. 12, 2006.)
Much of the LIA evidence was admissible not to demonstrate acts of the LIA that were attributable to the Defendants, but to show that some or all of the Defendants had knowledge of a particular matter. The Defendants sought exclusion of all of the evidence attributable to the LIA, and the Court declined to do so because certain exhibits were admissible for other purposes. Therefore, the Court will consider such purposes below. *Page 64 
 4. Specific Objections to Certain Exhibits
In addition to the above grounds for a new trial addressed to general issues, the Defendants object to the admission of certain exhibits and accompanying testimony.
 a. Plaintiff's Exhibit 170: NPVLA 1939 Memorandum
The Defendants object to the admission of Plaintiff's Exhibit 170, a 1939 Memorandum to the "Class A" Members of the National Paint, Varnish, and Lacquer Association. This memorandum addresses "toxic materials" which, by its terms, include "Lead Compounds: white lead, red lead, litharge, lead chromates. . ., or other lead pigments. (Pl's Ex. 137 at 1, 2.) Defendants argue, inter alia, that a reference to legal standards in the document, such as a duty to warn, could improperly prejudice the jury.
This Court had an opportunity at trial to address the admissibility of this document during a motion in limine, where the Defendants had objected to the admissibility of the entire document. (Off. Dr. Tr. 50:13-51:18, Oct. 31, 2005.) The Court ruled that the document could be admitted, with certain redactions of the statements of legal standards.Id. Shortly thereafter, the Defendants concluded that "the redactions made actually exacerbate the prejudice." (Off. Dr. Tr. 67:20-25, Oct. 31, 2005.) At trial, prior to the document being introduced, the Court entertained argument outside of the presence of the jury on this issue. In response to the Defendants' objections, the Court again ruled the document admissible with the redactions. (U. Tr. 17:18-22, Jan. 12, 2006, PM Session.)
Finally, the State introduced this document at trial during the testimony of Dr. Rosner. (Off. Dr. Tr. 42:16 et. seq., Jan. 12, 2006.) The memorandum and related *Page 65 
testimony were used by the State to demonstrate that the Defendants against whom the document was admitted — SW and NL — had knowledge and failed to act upon the knowledge of the ill effects of lead. Seeid. Therefore, the Court finds no error in its admission, on the various grounds alleged by the Defendants, for the reasons stated above in Part III.F.2.
 b. Plaintiff's Exhibit 10: 1900 Chameleon Article
Defendants object to the use of Plaintiff's Exhibit 10, a monthly publication created in 1900 "by the Sherwin Williams Press. . . for the interest and benefit of the Sherwin-Williams Co's loyal staff." (Pl's Ex. 10 at 1.) The State offered this document as a full exhibit against SW during the testimony of Dr. Gerald Markowitz. (Off. Dr. Tr. 38:15-39:3, Dec. 8, 2005 AM Session.) That publication contained an article, under the name of a pseudonym for an anonymous author, which stated that
 "[i]t is also familiarly known that white lead is a deadly cumulative poison. . . . This noxious quality becomes serious in a paint which disintegrates and is blown about by the wind; but if a paint containing lead. . . is not subject to chalking, the danger is minimized." (Pl's Ex. 10 at 23-24.)
SW objects on hearsay grounds, arguing that the credit of the document to an anonymous author renders this a hearsay-within-hearsay issue.
The Court notes that the evidence is admissible to show knowledge on the part of SW of the risks involved with lead pigment, since SW published the article. The State used it largely for this purpose in the testimony following its admission (Off. Dr. Tr. 40:6-17, Dec. 8, 2005 AM Session) and in its closing arguments. (U. Tr. 6:16-24, Feb. 10, 2006.) *Page 66 
However, the evidence was also introduced into evidence for the truth of the matter asserted — whether chalking lead is hazardous — which raises the hearsay issue. Since the statement is contained in a one-hundred year old document, it fits within the hearsay exception for statements contained in ancient documents. R.I.R. Evid. Rule 803(16) (excepting from the hearsay rule "statements in a document in existence twenty years or more the authenticity of which is established"). The ancient documents exception is sufficient to overcome both levels of hearsay — as to SW as publisher and as to the unknown declarant. Therefore, the evidence was properly admitted.
The unknown identity of the author goes to the weight of the evidence — whether the author had any competence with regards to the toxic qualities of lead — but not to its admissibility on hearsay grounds.[55] Moreover, the State relied upon this document chiefly for the knowledge aspect, and not to prove the harmful effects of lead. Therefore, even if admission for the truth of the assertion was erroneous, it would be harmless error because there was ample other evidence corroborating the harmful effects of lead.
 c. Plaintiff's Exhibit 212: Federal Report on LeadPoisoning
Defendants object to Plaintiff's Exhibit 212, an approximately 60-page document entitled "Eliminating Childhood Lead Poisoning, the Federal Strategy Targeting Lead Paint Hazards." The State attempted to introduce this exhibit during the testimony of Dr. Michael Shannon on January 23, 2006, but the Defendants objected. (U. Tr. 58:6-59:3, Jan. 25, 2006 AM Session.) The State temporarily withdrew its motion for admission in *Page 67 
an attempt to reach agreement as to which parts should be redacted. After several iterations of argument and redactions, the State sought to introduce it into evidence following the conclusion of Dr. Shannon's testimony and immediately before the State rested. (Off. Dr. Tr. 24:5-20, Jan. 26, 2006.)
Defendants have now raised their initial objections to the introduction of the report on hearsay grounds. The Court rules now, as it ruled during trial, that the document as redacted was admissible under the hearsay exception found in Rule 803(8), relating to public records and reports. The Court relies on the reasoning articulated in its bench decision during trial. (U. Tr. 58:6-63:2, Jan. 25, 2006 AM Session.)
 d. Exhibit 35: Legislative Findings from LPPA
The Defendants assert error in the denial of their motion in limine to exclude the legislative findings of the Lead Pollution Prevention Act. However, at trial it appears that they did not renew their objection, so it is therefore waived. (U. Tr. 46:21-47:13, Nov. 14, 2005 PM Session.)
 e. Exhibit 129: LIA Physicians' Report
Defendants assert error in the admission of Plaintiff's Exhibit 129, which contains selected pages from a 1937 report of a conference of physicians of member companies of the LIA. However, it appears that they did not object to its admission, so their objection is waived. (U. Tr. 40:10-17, Dec. 12, 2005 PM Session.)
 f. Exhibit 168: 1970 Letter of Blackburn to Aeroprojects,Inc.
SW objects to the admission of Plaintiff's Exhibit 168, which was admitted only against SW. This is a signed letter whose signature reads: *Page 68 
 "From the Sherwin-Williams Company,
 (handwritten signature)
 R.L. Blackburn." (Pl's Ex. 168.)
The letter refers to the then-recent publicity of lead poisoning of children "in slum tenant buildings." Id. The document speaks generally about the feasibility of removing lead paint from walls, and notes that the company has stopped using lead in paint. Id.
This exhibit was the subject of argument during the afternoon of January 12, 2006, where SW objected on various grounds, including hearsay, and that its prejudicial effect substantially outweighed its probative value. (U. Tr. 20:18-27:11, Jan. 12, 2006 PM Session.) The Court did order that a portion of the document be redacted which referred to the "paint industry's obligations" on R.I.R. Evid. Rule 403 grounds. Id. at 23:15-18. The Court deferred ruling the specific manner of redaction until the parties could agree to a suitable redaction.Id. at 25:23-26:2. It was then admitted into evidence at the conclusion of Dr. Rosner's testimony without further objection. (Off. Dr. Tr. 103:6-11, Jan. 13, 2006.)[56]
The Court finds that this evidence was properly admitted because the knowledge of SW of remedial measures for lead pigment was relevant even in 1970, and that the redactions were sufficient to avoid undue prejudice under Rule 403. Moreover, as a statement of a party-opponent, the hearsay rule does not apply. *Page 69 
 g. Exhibits 164 and 165: SW's Internal Memoranda
Defendants object to the admission of Plaintiff's Exhibit 164, a 1921 internal document of SW described as the "Minutes of the Spring Sales Conference." SW also objects to Plaintiff's Exhibit 165, a 1944 document described as notes on a "Board of Operators" meeting. SW objects on relevance grounds, while the State contends that the documents are evidence of continuing efforts to market white lead and lead pigment products after they had been charged with knowledge of the ill effects of lead. The Court finds that the documents are relevant for these purposes.[57]
 h. Exhibit 181: SW Advertisement
Plaintiff's Exhibit 181 is a 1921 advertisement in "The Painters Magazine" by SW, which was admitted against SW over its objection during the testimony of Dr. Rosner. (Off. Dr. Tr. 25:8-18, Jan. 13, 2006.) SW objects on Rule 403 and relevance grounds because the document does not evidence any connection to Rhode Island. SW also argues that use of the document would punish constitutionally protected speech. However, the Court finds it relevant for the purpose of demonstrating that SW continued to promote lead pigment after having knowledge of its harmful effects. In addition, it is also relevant to SW's sale and promotion of lead pigment. Further, its use in this regard does not attempt to punish speech, but rather is used as circumstantial evidence of various elements of the State's public nuisance case. Therefore, the objection to admissibility is without merit. *Page 70 
 i. Exhibit 167: 1969 SW Internal Memorandum
SW objects to the admission of Plaintiff's Exhibit 167, a 1969 internal memorandum of SW, on hearsay, relevance, and Rule 403 grounds.[58] The document appears to have been written after the writer attended a meeting which discussed the health effects of lead, as well as methods for neutralizing the potential for harm caused by lead in paint. However, the document was prepared by SW and demonstrates knowledge on SW's part of the contents of the document. Moreover, the Court finds that its probative value is not substantially outweighed by any prejudicial effect. Therefore, the objection to its admissibility is without merit.
 j. Exhibits 55, 56, 65: Excerpts from Various MedicalJournals
Defendants object to the admission of the above-referenced exhibits on the grounds that they are hearsay and that no foundation existed for the admission of the articles. Exhibits 55 and 56 were admitted during the testimony of Dr. Michael Kosnett. (U. Tr. 44:9-46:23, 50:11-53:20, Nov. 17, 2005 PM Session.) Exhibit 65 was similarly admitted during his testimony. (Off. Dr. Tr. 27:21-28:25, Nov. 21, 2005 AM Session.) The purpose of the testimony elicited in conjunction with these various articles, which generally indicate adverse health effects to children caused by lead, was to demonstrate their availability in the medical literature. The Court instructed the jury that these exhibits were admitted as full exhibits, but that they could only be considered for the limited purpose to show that the articles were available in the medical literature at the times indicated by each article. (Off. Dr. Tr. 95:23-96:15, Nov. 17, 2005 AM Session.) *Page 71 
Since the documents were not admitted for the truth of the matter asserted, and because the jury was so instructed, the Court finds the Defendants' objections to be without merit.
 k. Exhibit 113: 1957 Letter from Bowditch to Kehoe
The Defendants object to the admission against Millennium and NL of a letter from Manford Bowditch, the Director of Health and Safety of the Lead Industries Association. They argue that its prejudicial impact far outweighed its probative value under Rule 403. The document states,inter alia, that "the overwhelmingly major source of lead poisoning in children is from structural lead paints chewed from painting surfaces, picked up or off in the form of flakes, or adhering to bits of plaster and subsequently ingested." (Pl's Ex. 113 at 1.) However, the document also states that "childhood lead poisoning is essentially a problem of slum dwellings and relatively ignorant parents" and makes other similar references to slums. Id. at 2. Defendants' objection is directed at the concern that the Defendants will be portrayed as racists.
The Court notes that other documents of a more inflammatory nature were excluded on Rule 403 grounds after motions in limine, as reflected in the argument following the introduction of this exhibit. (Off. Dr. Tr. 56-86, Dec. 12, 2005 AM Session.) However, because this document does not specifically mention race, and because it has relevance as to the motivations of members of the LIA to take corrective action with respect to lead pigment which exists on buildings, the Court overruled the objection to admissibility on Rule 403 grounds. Moreover, the jury was given a *Page 72 
cautionary instruction relating to the agency status of the LIA with respect to these Defendants, so it would not have caused undue prejudice on that basis.[59]
 l. Exhibit 123: 1941 LIA Board of Directors Meeting Report
The State introduced Plaintiff's Exhibit 123 during the testimony of Dr. Gerald Markowitz. (U. Tr. 11:3-18, Dec. 12, 2005 PM Session.) The Defendants allege error in its admission, although they do not state grounds in their brief. (Defendants' Brief 161.) Moreover, the trial transcript is not clear as to the basis for the objection. Id. at 8:7-8, 11:17-18 (referring to the "same objection as this morning"). While it appears to the Court that this objection is rooted in either agency or First Amendment issues, the Court will not speculate where the Defendants have failed to clearly state their grounds.
 m. Exhibit 206: 1952 Sales Agency Agreement
Millennium objects to the admission of Exhibit 206, which is a 1952 sales agency agreement between Glidden, its predecessor, and a Boston company. The exhibit was admitted during Dr. Rosner's testimony, over Millennium's objection, and forms part of the basis for his opinion that Millennium was doing business in Rhode Island. (U. Tr. 15:16-17:5, Jan. 20, 2006 PM Session.) The document gives the Boston company permission to sell Glidden products in a defined territory, which includes two named Rhode Island companies. (Pl's Ex. 206 at 1, 4.)
Millennium relies upon its cross-examination of Dr. Rosner to demonstrate lack of an actual connection between Glidden and Rhode Island. (U. Tr. 65:3-70:20, Jan. 20, 2006.) Their argument is that although the agreement gives the Boston company rights to *Page 73 
sell Glidden products to the Rhode Island companies, it does not prove that such sales actually took place. This may be so. However, from an agreement giving the rights to sell Glidden's products in Rhode Island, the jury could properly have inferred that such sales actually took place. Therefore, the evidence is competent to show whether Millennium contributed to the sale and promotion of goods in Rhode Island, and is therefore admissible.
 5. Scope of State's Redirect Examination
In support of their motion for a new trial, the Defendants argue that the State's redirect examination of certain witnesses exceeded the scope of the cross-examination, and, therefore, that testimony should not have been admitted into evidence. They point to approximately seven examples of such instances in support of their motion for a new trial. They argue that by allowing such matters to be admitted on redirect, they were deprived of an opportunity to cross-examine the various witnesses with respect to those matters, and were therefore deprived of a fair trial.
Rhode Island Rule of Evidence 611 restricts the scope of cross-examination only to matters testified to on direct examination. The purposes of this rule are to (1) promote the ascertainment of truth, (2) to avoid needless consumption of time, and (3) to protect witnesses from harassment or undue embarrassment. R.I.R. Evid. Rule 611(a). "Likewise, the scope of redirect examination is limited to matters testified to on cross-examination." State v. Studley, 671 A.2d 1230,1231 (R.I. 1996). The purpose of redirect is to "clarify matters that are brought out or raised for the first time on cross-examination.State v. Gomes, 764 A.2d 125, 137 (R.I. 2001). *Page 74 
However, it is improper to use redirect examination merely "to rehash the witness's direct examination and get in the last word."Id. Controlling the scope of examination is a matter within "the sound discretion of the trial justice and will be reviewed only for an abuse of discretion." Studley, 671 A.2d at 1231. Therefore, the Court will look to whether redirect was used simply to rehash testimony from direct examination, or whether it was properly used to explain matters brought out on cross-examination.
 a. Use of Exhibits 20 and 22 on Dr. Girard's Redirect
The State sought to introduce two exhibits on redirect which were not first introduced on their direct examination of Dr. Girard. The Court heard argument on this issue outside of the jury's presence and allowed the exhibits to be used. (U. Tr. 9:10-15:5, 22:19-36:8, Nov. 8, 2005 PM Session.) In general, the State attempted to demonstrate that there were adequate safe substitutes for lead pigment in paint. Conversely, the Defendants attempted to show that lead-containing paints had superior durability.
Exhibit 20 is an excerpt from a book called "Time Tested Paints" which was offered against Millennium. The relevant excerpt refers to a specific type of paint which does not contain lead. (Pl's Ex. 20.) The State sought to use it for several purposes on redirect, to which Millennium objected. (U. Tr. 10:20-21:1, Nov. 8, 2005 PM.) One such purpose was to demonstrate that there existed non-lead paint which was as durable as lead paint. Id. at 50:22-52:9. Millennium argues that the content of that exhibit was not within the scope of its own cross-examination of Dr. Girard, which dealt only with whether lead in water caused childhood lead poisoning. However, while that issue was *Page 75 
not brought out directly by Millennium's cross-examination, the cross-examination conducted by other counsel was directed at issues common to all Defendants. (Off. Dr. Tr. 37-45, Nov. 8, 2005 AM Session.)[60] That cross-examination was clearly calculated to demonstrate that lead-containing paints were superior to non-leaded paints. Therefore, the Court finds that Plaintiff's Exhibit 20 was properly used to show the existence of a paint which purported to exceed the durability of lead-containing paints.
All Defendants objected to the use of Plaintiff's Exhibit 22, which contains portions of a deposition of Dr. John Heitmann, a SW expert who did not testify at trial. Similarly, the relevant excerpts dealt with durability. The State sought to admit portions of the deposition against SW during redirect, to show that Dr. Girard relied on the deposition in preparation for his testimony. (U. Tr. 55:9-61:3, Nov. 8, 2005 PM Session.) Dr. Girard concluded that "there wasn't a significant difference in durability between leaded and non-leaded pigments."Id. at 56:16-18. Again, while SW's counsel did not cross-examine Dr. Girard with the Heitmann deposition, the issue of durability was fairly raised during cross-examination conducted by NL's counsel. Therefore, the Court finds that it was proper to permit the State to clarify the bases for Dr. Girard's conclusions on durability.
Finally, the Court notes that all Defendants were given an opportunity to conduct a further cross-examination of Dr. Girard. (U. Tr. 61:6-17, Nov. 8, 2005 PM Session.) Therefore, although the Defendants argue that they were "sandbagged," there was no unfairness from the fact that the State had two opportunities to examine Dr. Girard. *Page 76 
 b. Use of Exhibit 80: Study Comparing Fingerstick and VenousTests
The Defendants object to the use of Plaintiff's Exhibit 80 during redirect examination as being beyond the scope of the cross-examination. (Off. Dr. Tr. 51:23-62:22, Dec. 2, 2005 AM Session.) This exhibit is a study comparing the reliability of fingerstick tests and venous tests, which are both methods of testing for lead in blood. The Defendants cross-examined Dr. Nolan heavily on the reliability of fingerstick tests. (Off. Dr. Tr. 41:15-61:23, Nov. 28, 2005 AM Session.)[61] The State used this study to rebut the Defendants' contention that fingerstick tests were unreliable, and that the State's data on childhood lead poisoning should not be trusted because it relied upon fingerstick tests. The record does not indicate that an objection on this ground was timely raised, so it is therefore waived. However, the Court also finds that Exhibit 80, which examines the reliability of fingerstick tests, was properly raised on redirect in response to the Defendants' cross-examination.
 c. Question of Ms. Cassani and Dr. Rosner Reaffirming Opinions on Redirect
State's counsel concluded its examination of Ms. Bonnie Cassani with a question asking whether anything she was asked on cross-examination changed the opinions that she gave on direct examination, and she answered no. (Off. Dr. Tr. 54:9-55:8, Jan. 10, 2006.) The State then immediately concluded its examination of the witness. Similarly, the State asked Dr. Rosner about the nature of his opinions regarding the Defendants, and he stated that he "strongly held" those opinions. (Off. Dr. Tr. 73-74, Jan. 20, 2006 AM Session.) When State's counsel persisted in this line of questioning, the Court caused *Page 77 
counsel to approach, and that line of questioning ceased. Id. The Defendants now object that this testimony was beyond the scope of cross-examination and requires a new trial.
The rules concerning the scope of redirect examination are aimed at protecting witnesses, conserving time, and ascertaining truth. These questions were somewhat necessary for the State to rehabilitate its witnesses' testimony, and took up very little time. Moreover, the Defendants were given ample opportunity to cross and re-cross-examine these witnesses, so no prejudice could result. Therefore, the Court finds these objections to be without merit.
 d. Testimony of Pre-1950 Reports of Lead Poisoning
The Defendants have objected to the redirect testimony of Dr. Michael Kosnett. Dr. Kosnett's direct testimony consisted of several opinions based upon pre-1950 literature to the effect that the presence of lead in paint in homes places children at risk. (U. Tr. 2:7-3:2, Nov. 17, 2005 PM Session.) Certain testimony related to pica, a condition where children tend to chew on certain objects in the household.[62] The Defendants objected to the State's treatment of pica during redirect.
The Defendants' cross-examination suggested that the primary cause of lead poisoning in children was pica — the implication being that children without pica were not unusually susceptible to lead. (U. Tr. 6:3-7:15, Nov. 21, 2005 PM Session; Off. Dr. Tr. 30:17-33:23, Nov. 22, 2005 AM Session.) The State' redirect examination, therefore, appropriately clarified whether the pre-1950 medical literature contained instances of children who did not have pica, and who were diagnosed with lead poisoning. (U. Tr. 36:19-38:2, Nov. 22, 2005 PM Session.) Again, each Defendant was given an *Page 78 
opportunity to re-cross-examine Dr. Kosnett. Id. at 47-48. Therefore, this objection is without merit.
 e. Question to Dr. Rosner about Warnings for Lead Pigment
The Defendants finally allege that certain questions to Dr. Rosner inappropriately addressed matters outside of the scope of their cross-examination. Dr. Rosner had testified that his research revealed no indication that the Defendants had issued any warnings about harmful effects of lead in their products. (Off. Dr. Tr. 21:24-22:6, Jan. 18, 2006 AM Session.) Dr. Rosner's cross-examination was intended to demonstrate that his opinion was faulty, and that there actually were warnings issued about lead. Id. at 18-32.
The Defendants contend that the State's redirect examination "went beyond the scope of cross-examination because Defendants did not cross-examine Dr. Rosner regarding warnings." (Defendants' Brief 165.) Therefore, they object to the State's question on redirect as to whether members of the lead pigment industry warned consumers that lead was poisonous. (Off. Dr. Tr. 33:12-19, Jan. 20, 2006 PM Session.) However, as noted above, the Defendants' testimony dealt with that issue extensively on the morning of January 18, 2006. Moreover, the Defendants did not raise a timely objection based upon the scope of the redirect examination. Id. Therefore, the objection is waived, but even if it were not waived, the objection is wholly without merit.
 f. Conclusion as to the State's Redirect Examinations
As demonstrated above, the scope of the redirect examination was fairly limited to the scope of the cross-examination, and the Defendants were given ample opportunity *Page 79 
for re-cross-examination after the State's redirect testimony. Therefore, their contention that the State "sandbagged"[63] the Defendants by raising new issues on redirect examination is wholly without merit, and the Court will not order a new trial on that basis.
 6. Specific Objections to Certain Testimony
The Defendants' Brief provides a bulleted list of approximately eighty errors of law concerning testimony that was either admitted or excluded adversely to the Defendants. (Defendants' Brief 159-161, 165-184.) From a cursory review of the transcripts, it appears that the Defendants allege error in nearly every objection by the Defendants which was overruled, and every objection by the State which was sustained. Moreover, it appears that several of the objections raised herein were not raised at trial.
At the outset, the Court questions whether this is a proper (or effective) way to present a motion for a new trial. Obviously, the Defendants have a right to advocate their case, as well as to preserve possible grounds for appeal. See Amica Mut. Ins. Co., 703 A.2d at 97
(stating the rule that alleged errors of law must be raised in a motion for a new trial or be waived on appeal, so that a trial justice may "first address" the error and obviate any need for appeal).
However, as the Court is obliged to assess whether a given error was either prejudicial or harmless to a party in ruling on a motion for a new trial, it seems that the Defendants themselves should also make that assessment when presenting grounds for a new trial. See McBurney LawServs. v. Apex, Inc., 771 A.2d 911, 911-912 (R.I. 2001) ("An aggrieved party challenging the ruling of the trial justice. . . bears theburden of *Page 80 
establishing that the excluded evidence was material and that its exclusion had an improper prejudicial influence on the factfinder") (citing Graff v. Motta, 748 A.2d 249, 252 (R.I. 2000) (emphasis added). In general, most of the alleged grounds for a new trial fail to include an argument — much less a compelling argument — that any alleged error was wrongfully prejudicial and affected the outcome of the trial.
Simply incorporating every adverse evidentiary ruling into a new trial motion, and expecting the Court to sift through each issue for any possible prejudicial effect, does not provide the Court with a sufficient basis upon which to render a decision. See CrellinTechnologies v. Equipmentlease Corp., 18 F.3d 1, 13 (1st Cir. 1994) ("We, therefore, eschew the temptation to rummage through Rhode Island's jurisprudence. In our estimation, litigants have an independent responsibility to do their homework.").
Therefore, the Court will only address those grounds which make a reasonable argument that the Defendants were wrongfully prejudiced by the allegedly erroneous ruling.
 a. Objection to Feasibility Question of Dr. Girard
The Defendants claim that it was error to sustain the State's objection when SW's counsel asked whether or not it was feasible to identify the manufacturer of a sample of paint taken from a Rhode Island home. (Off. Dr. Tr. 92:7-94:12 Nov. 8, 2005 AM Session.) The court sustained the objection on relevancy grounds, and does not find error in that decision.
The State did not attempt to prove its case by linking specific samples of paint with specific manufacturers. This Court has found that there were other ways for the State to prove its case. If it was technically feasible to identify the manufacturer of *Page 81 
certain paint, then that might cast some doubt about the State's decision to use other means to prove its case. However, such questioning would stray far from the content of Dr. Girard's testimony on direct examination, and the relevance of feasibility to the existence of a public nuisance in Rhode Island is at best marginal.
 b. Dr. Girard's Opinion Regarding the Cause of Lead Poisoning in Children
The Defendants object that Dr. Girard was not qualified to render an opinion that lead pigment was the primary source of lead poisoning in children. (U. Tr. 60:15-61:3, Nov. 8, 2005 PM Session.) They argue that it was prejudicial to admit this opinion because the Defendants were denied discovery of individual Rhode Island properties and children. However, the Court finds that the Defendants had ample opportunity to present evidence that the cause of lead poisoning was other than lead pigment. Moreover, the opinion rendered by Dr. Girard was merely cumulative of opinions offered by other witnesses such as Dr. Nolan. Therefore, even if the opinion was erroneously admitted, there was no prejudicial effect. However, the Court finds that Dr. Girard, who was admitted as a chemist with expertise in the deterioration of paint, was sufficiently qualified to give the opinion.
 c. Dr. Rosner's Market Share Testimony
Dr. Rosner testified, over the Defendants' objection, that the market share of the four Defendants for white lead was approximately 50 to 75 percent of the market, and for lead-in-oil was between 70 and 80 percent. (Off. Dr. Tr. 24:22-25:19, Jan. 12, 2006.) He also testified that there were thousands of paint manufacturers in the country, but only "a handful" of lead pigment manufacturers. Id. This testimony was based upon his *Page 82 
research of documents obtained from a Federal Trade Commission investigation. Id. at 20:19-21:5.
The Defendants object to the use of this testimony as a basis for liability, relying inter alia upon Gorman v. Abbott Labs., 599 A.2d 1364
(R.I. 1991). In Gorman, our Supreme Court indicated in a one-page order that it would not adopt the "market share" theory of liability for products liability cases. Id. The Court stated that "[w]e are of the opinion that the establishment of liability requires the identification of the specific defendant responsible for the injury. Gorman v. AbbottLabs., 599 A.2d 1364 (R.I. 1991). Therefore, evidence that a particular manufacturer had, for example, 90 percent of the market share for a certain product would not be competent to establish that a particular manufacturer's product caused harm to that particular plaintiff.
While Gorman states the applicable law when an individual plaintiff sues a product manufacturer on a products liability claim, it does not apply to a public nuisance case where the plaintiff is the State, and not an individual. Rather, the causation standards contained in Restatement (Second) of Torts § 834 are the proper standards, as stated in this Court's previous decision. State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 95, (June 3, 2005). The standard is whether or not a Defendant substantially contributed to the creation of the public nuisance, and the market share testimony as a whole was probative of that issue. Therefore, it was properly admitted.
The Defendants also object to the form of the questions because the questions grouped together the market shares of four Defendants to reach the total market share numbers. This issue was addressed in a sidebar during trial, where there was disagreement among the Defendants as to whether testimony of individual shares should *Page 83 
be allowed. (Off. Dr. Tr. 21:12-24:19, Jan. 12, 2006.) The Court allowed the collective question to establish the nature of the Defendants' participation in the national market for lead pigment. The Defendants now argue that such testimony caused prejudice among the Defendants because liability must be based upon each Defendant's individual activities. However, the market share percentages merely served as an introduction to a series questions by the State, which established that each Defendant was one of only "a handful" of lead pigment manufacturers. See id. at 25:12-26:16. Moreover, each owned a lead mine and sold lead pigment to paint manufacturers, of which there were thousands. See id. However, the testimony as a whole was competent evidence of each Defendant's individual participation in the national market, which as noted above in Part II, was probative of whether each Defendant substantially contributed to the public nuisance in Rhode Island.
The Defendants later moved to strike the market share testimony. Weeks after Dr. Rosner's testimony, and after all parties had rested, the Court held that the activities of Anaconda Lead Products Company (ALPC) could not be attributed to ARCO. (U. Tr. 36:20-38:23, Feb. 2, 2006 AM Session.) In response to that ruling, the Defendants moved to strike the market share testimony, and now assert that the denial of that motion was error. (U. Tr. 1:22-3:13, Feb. 2, 2006 PM Session.)[64] Their argument was that the FTC materials on which the testimony was apparently based included the market share of ALPC which could not be attributed to any Defendant.[65] Therefore, the Defendants argue that the market share testimony had been shown to be without a proper basis in fact. The Defendants relied upon United States v. Sepulveda,15 F.3d 1161, 1183 (1st *Page 84 
Cir. 1993) for the proposition that expert opinions may be stricken from the record if it is later found that the opinion was so lacking in foundation that the opinion should be excluded from evidence. In that case, the trial judge stopped testimony in the middle of cross-examination, ordered the purported expert's testimony be stricken, and instructed the jury to disregard that testimony. Id.
In response to the motion, the State submitted materials which, if relied upon by Dr. Rosner, would have provided a basis for his testimony that did not include ALPC's market share. (Pl's Ex. 219.) The State represents that he relied on those materials, although they were not introduced into evidence during Dr. Rosner's testimony.
The Court denied the motion to strike. (Off. Dr. Tr. 4:14:21, Feb. 6, 2006.) The Court was and remains concerned about the proposition of striking testimony weeks after the jury heard that testimony. If it was erroneous and should have been stricken, then the time to raise that issue had long since passed. United States v. Sepulveda, 15 F.3d 1161,1185 (1st Cir. 1993) ("Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony.") The Defendants had ample opportunity to cross-examine Dr. Rosner as to the foundations for his testimony, and could have brought a timely motion to strike during the cross-examination as was done in Sepulveda. See id. at 1183.[66]
However, regardless of the procedural issue, the denial was proper because the Defendants failed to demonstrate that the testimony lacked a foundation. As a factual matter, the foundational materials provided a sufficient basis for the testimony he gave because ALPC was not included in the market-share calculation. See Pl's Ex. 219 *Page 85 
(noting that the FTC findings were based only upon International Smelting Refining market shares, which could be attributed to ARCO). Therefore, those materials would provide an adequate basis in fact for the testimony. Of course, Dr. Rosner never stated that he relied upon those specific materials in forming his opinion, but the time to do that would have been during a redirect examination in response to a timely motion to strike.
 d. Dr. Rosner's "Sold and Promoted Opinion"
As noted in Part II of this decision, Dr. Rosner gave the opinion that each Defendant sold and promoted lead pigment in Rhode Island. (Off. Dr. Tr. 76:16-78:5 Jan. 13, 2006.) Millennium objected to that testimony on the grounds that it lacked foundation.[67] For the reasons stated in Part II, which describes the various bases for that testimony, the Court finds that there was a sufficient foundation for that opinion.
 G. Alleged Errors in Instructing the Jury
Following the close of evidence on January 26, 2006, the Court held a series of hearings which, in addition to the Defendants' various Rule 50 motions, addressed the content of the jury instructions. The Court delivered those instructions on February 13, 2006. Defendants have now alleged that the inclusion of various instructions, and the exclusion of their proposed instructions, were erroneous. They further allege that the various errors had the effect of directing a verdict for the State. As noted above in Part III.B, the Court will not consider such objections if their substance is merely to relitigate issues upon which the Defendants were heard prior to trial. However, the Court will address objections which are based upon grounds which could only have been brought at trial. *Page 86 
In considering the effect of the Court's instructions upon the jury, the Court will adhere to the well-settled rule that a trial justice must instruct the jury with "preciseness and clarity so that the jury is neither misled nor confused." McKinnis v. Women Infants Hosp.,749 A.2d 574, 576 (R.I. 2000) (internal quotations omitted). In doing so, the Court must consider the instructions as a whole, rather than "in piecemeal fashion." Id.; see Parrella v. Bowling, 796 A.2d 1091, 1101
(R.I. 2002) (noting that instructions are to be considered "in their entirety to ascertain the manner in which a jury of ordinarily intelligent lay people would have understood them.") (internal quotations omitted). Finally, where the record in this case "is totally bereft" of evidence that the jury could not or did not follow the Court's instructions, the Court will "assume that the jury properly followed the. . . instructions as they were given." See State v.Figueroa, 673 A.2d 1084, 1091 (R.I. 1996) (citations omitted).
The Court will address the following groups of objections: elements of a public nuisance action (Part III.G.1); causation (Part III.G.2); lead from other sources (Part III.G.3); products liability defenses (Part III.G.4); membership in trade associations (Part III.G.5); burden of proof (Part III.G.6); delay (Part III.G.7); and miscellaneous (Part III.G.8). In doing so, the Court will address many of the Defendants' objections which were phrased as violations of their due process rights, but which overlap with the objections to jury instructions.
 1. Elements of Public Nuisance
The Defendants allege several grounds of error based upon the elements that the State either was or was not required to prove in order for the jury to find that a public nuisance existed. The Court will address the following issues as to the public nuisance *Page 87 
elements: (a) instruction that the State was not required to show tortious conduct in order to find a public nuisance; (b) instruction on the legality of the presence of lead in Rhode Island; (c) instruction on Defendants' control of either the property or the product in order to impose liability; and (d) instruction on unreasonable interference with a public right.
 a. Requirement of Tortious Conduct
The Defendants object to following jury instructions on the nature of the Defendants' conduct: "The act or failure to act by a Defendant need not be intentional or negligent to impose liability for creating a public nuisance." (Jury Instructions 14.) Similarly, the Defendants argue that it is a violation of due process not to require tortious conduct as a prerequisite for public nuisance liability. This Court disagrees, for the reasons expressed in its prior rulings. (Off. Dr. Tr. 8:13-10:18 (Oct. 31, 2005.) (citing State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 95 (Jun. 3, 2005)). Instead, the State need only have shown that the Defendants substantially participated in activities which proximately caused the public nuisance. See id.; see also supra Part II.C. While crafted as an objection to this Court's jury instructions on causation and tortuous conduct, this objection merely seeks reconsideration of decided issues, and the Court declines to do so.
 b. Legality of the Presence of Lead and Defendant's Conduct
The Defendants have argued that State statutes affirmatively authorize the continued presence of lead, so that finding public nuisance liability on the basis of its presence would violate Separation of Powers principles. See supra Part III.E.2. (citing prior rulings which have found that the LPPA does not authorize the continued presence *Page 88 
of lead). They therefore object to the Court's instruction that the LPPA does not preclude the State's action. (Jury Instructions 9-10.) Similarly, they object to non-inclusion of Defendant's Proposed Jury Instructions #17 and #18. For the reasons described above, this argument is without merit.
Defendants also argue a slightly different nuance of this argument — that because the sale of lead pigment was not illegal when it was sold, a finding of public nuisance here would violate due process. Therefore, they object to the Court's instruction that "the fact that the conduct which caused the public nuisance otherwise is lawful or has not been made unlawful does not preclude liability where that conduct nevertheless results in the public nuisance." (Jury Instructions 14.) The Defendants rely on Restatement (Second) of Torts § 821B to argue that this instruction prevented the jury from considering whether their conduct was legal at the time it occurred.
In order to prove a public nuisance, a plaintiff must show that there was an unreasonable interference with a public right. Restatement (Second) of Torts, § 821B(1). The Restatement provides three categories of "circumstances that may sustain a holding that an interference with a public right is unreasonable." Id. § 821B(2). Those categories include
 "(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
 (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
 (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." Id." *Page 89 
The Court instructed the jury that a "threatened harm may be unreasonable if the condition is of such permanent or long-lasting consequences [sic] as to have a substantial effect upon the public health, safety, peace, comfort, or convenience." (Jury Instructions 12.) The jury could consider a number of factors "including the nature of the harm, the extent of the harm, the permanence of the injuries and the potential for likely future injuries or harm." Id.
The Court's instructions clearly track the language of § 821B(2)(a) and (c), while omitting text similar to § 821B(2)(b). This is for good reason. It appears uncontradicted that the sale of lead pigment was not proscribed by any statute, regulation, or ordinance during the relevant time periods. Therefore, the jury could not possibly have rested a finding of public nuisance on § 821B(2)(b). That subsection stands for the proposition that conduct which is proscribed by a statute, etc., isunreasonable. However, the converse is not necessarily true. Merely because conduct is not proscribed does not make that conductreasonable. The Court's instruction — that the legality of the sale of lead does not preclude liability — was entirely consistent with § 821B.
While § 821B(2) provides three (non-exclusive) ways to find conduct unreasonable, this Court's instructions only provided two means.See Restatement (Second) of Torts, § 821B, com. e (noting that the list of "three sets of circumstances for determining whether an interference with a public right is unreasonable. . . are not conclusive tests. . . . They are listed in the disjunctive; any one may warrant a holding of unreasonableness"). If anyone should be objecting to the non-inclusion of that section, it would be the State and not the Defendants, because the instructions limited the number of ways for the jury to find in favor of the State. *Page 90 
Merely instructing the jury that the lawfulness of the activity would not preclude a finding of a nuisance did not prevent the Defendants from arguing, or the jury from considering, that the sale of their products was not illegal, and therefore, reasonable.[68] The jury simply concluded that the Defendant's conduct was unreasonable under § 821B(a) or (c). Moreover, the Court's instructions were consistent with its prior rulings that reasonableness was a question uniquely within the province of the jury. See, e.g., State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *27 (Apr. 2, 2001). Therefore, the Court finds that the instructions, considered as a whole, were adequate to inform the jury on the factors they could consider. See Contois v. Town of W. Warwick,865 A.2d 1019, 1022 (R.I. 2004) (noting that the "charge given by a trial justice need only adequately cover the law") (internal quotations omitted).
 c. Control of Instrumentality
The Defendants argue that the State must demonstrate that the Defendants control the alleged nuisance — either the property or the product — in order to be held liable. They argue that failing to require control as an element of public nuisance violates their due process rights. Consequently, they object to the Court's instruction on the subject:
 "The Defendant that participates to a substantial extent in the activity that causes a public nuisance is liable for the nuisance even after it has withdrawn from or stopped the activity and even if it is not in a position to stop the harm or abate the condition." (Jury Instructions 14.)
This instruction is drawn from Restatement (Second) of Torts § 834, com. e, and is consistent with the Court's prior ruling found at 2005 R.I. Super. LEXIS 95 (Jun. 3, *Page 91 
2005). The Court has consistently rejected the proposition that control of specific property is required to find liability, so long as it can be shown that the Defendants substantially participated in the activities which caused the public nuisance, and that public nuisance causes continuing harm. See Restatement (Second) of Torts § 834 (noting that liability for a continuing nuisance continues for the person who substantially participated in its creation). Therefore, this objection is without merit.
 d. Unreasonable Interference with Public Rights
The Defendants have made several arguments with respect to the unreasonableness of the interference with a public right, which is an element of public nuisance. They first allege that the State admitted that "compliance with the requirements of the [LPPA] does not impose any harm that property-owners and lessors ought not have to bear, as those terms are used in public nuisance law." (Defendants' Brief at 33.) Therefore, they argue that the jury should have been instructed that compliance with the LPPA does not impose upon property owners and lessors any burden that they ought not to have to bear.
However, the proper question for the jury to consider is whether or not an unreasonable intereference with a public right has occurred.See State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *25 (Apr. 2, 2001) (collecting cases for the proposition that the State must show unreasonable interference with the health, safety, peace, comfort or convenience of the general community.) The jury was so instructed that an unreasonable interference is one that affects the public health, safety, peace, comfort, or convenience. (Jury Instructions 11.) The Defendants requested instruction is too narrow because a public right involves more than merely property-owners and *Page 92 
lessors. It involves burdens that all citizens of Rhode Island have to bear. For that reason, the Defendants' proposed instruction was properly denied.
Similarly, the Defendants object to the Court's instruction on public rights:
 "A right common to the general public is a right or an interest that belongs to the community-at-large. It is a right that is collective in nature. A public right is a right collective in nature and not like an individual right that everyone has not to be assaulted, or defamed, or defrauded, or negligently injured." (Jury Instructions 11.)
This instruction is drawn almost verbatim from Comment g. of the Restatement (Second) of Torts, § 821B. The Defendants object to the non-inclusion of this passage from Comment g: "A public right is common to all members of the public." However, the Court did instruct the jury that a public right is "collective in nature" and belongs "to the community at large." The Court finds that including the Defendants' proposed language would merely have been surplusage. Therefore, there was no error in its exclusion.
Finally, the Defendants contend that the Court's instruction was erroneous because it did not include the following phrase from Comment g: "[c]onduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons" and because the Court instructed the jury that it could consider the "numbers of the community who may be affected by it." (Jury Instructions 12.) They contend that such an instruction effectively directed a verdict for the State on the public right issue because the alleged nuisance was a "cumulative presence," which would imply a large number of persons affected. However, this objection is without merit.
Merely instructing the jury that it could consider the number of persons affected, as one of several factors, did not require the jury to find that the alleged public nuisance *Page 93 
unreasonably interfered with a public right. See Jury Instructions 12 ("when you consider the unreasonableness of the interference, you may consider a number of factors including the nature of the harm, the numbers of the community who may be affected by it, the extent of the harm, the permanence of the injuries and the potential for likely future harm.") The jury could have accepted the Defendants' position that only deteriorating lead pigment, and not all lead pigment, caused or was likely to cause harm. It could have further concluded that the number of persons affected by the presence of lead was relatively small, and that any harm was due to the neglect of property-owners. If so, it could then have concluded that lead pigment, while cumulatively present on a large number of buildings, nevertheless had little effect on public rights. That the jury found a public nuisance simply means that it rejected the Defendants' arguments, not that the jury instructions required that result.
 2. Causation and Liability for Extra-Territorial Conduct
The Defendants argue that a due process violation would occur if public nuisance liability were found against them without proof that the Defendants' conduct caused the nuisance and resulting injury. Similarly, they argue that liability for conduct occurring outside of Rhode Island cannot be imposed without evidence that their conduct actually affected Rhode Island. The Court agrees with these general propositions, and notes that the jury's instructions included several pages of instructions on causation. (Jury Instructions 12-14.) The Defendants' due process argument is without merit, and merely represents disagreement as to whether the State introduced sufficient evidence on causation. See supra Part II.C (finding sufficient evidence to support the State's burden on causation). However, at no time was the State ever relieved of its burden to prove *Page 94 
causation. In addition to the due process argument, the Defendants also raise certain objections to the form of the causation instructions.
 a. Substantial Contribution
The Defendants have raised objections to the instructions on substantial contribution:
 "You need not find that lead pigment manufactured by the Defendants, or any of them, is present in particular properties in Rhode Island to conclude that Defendants, or one or more of them, are liable for creating, maintaining, or substantially contributing to the creation or maintenance of a public nuisance in this case nor do you have to find that the Defendants, or any of them, sold lead pigment in Rhode Island to conclude that the conduct of such Defendants, or of any of them, is a proximate cause of the public nuisance." (Jury Instructions 14.)
The Defendants argue that the instruction allowed the jury to find liability without sufficient evidence of substantial contribution. If the above instruction was the only instruction given, then perhaps the Defendants' objections would be well taken. However, prior to the above instruction, the Court informed the jury that
 "You are asked to decide whether the actions of any of these Defendants, either alone or in combination with others, substantially contributed to the creation of a public nuisance in this State.
 A Defendant is liable for a public nuisance if the public nuisance is caused by its activity or by an activity in which it participated to a substantial extent. When a Defendant is only one of several actors participating in carrying on an activity that causes a public nuisance, its participation must be substantial before it can be held liable for the resulting public nuisance." Id. at 13; see Restatement (Second) of Torts § 834.
Moreover, following the portion to which Defendants object, the Court noted that "[y]ou must consider the totality of each Defendant's conduct individually in order to determine *Page 95 
whether such Defendant is liable for a public nuisance as herein defined." Id. at 14. Therefore, the objection is without merit.
The Defendants also argue that the Court should have included the following instruction on substantial contribution, which is based upon § 433 of the Restatement (Second) of Torts:
 "In determining whether the actor's conduct was a `substantial factor' in creating the public nuisance as previously described in these instructions, you should consider the following:
 (a) The number of factors that contribute to the alleged harm and the extent of the effect that each factor has on the harm;
 (b) Whether the defendant's conduct created a force or series of forces that are in continuous and in active operation up to the time of the harm or whether the defendant created a situation that was harmless unless acted upon by other forces for which the defendant is not responsible; and
 (c) lapse of time." (Defendant's Proposed Jury Instruction #23.)
The absence of such an instruction was not prejudicial. Parts (b) and (c) above are covered by the Court's instructions on superseding cause and proximate cause, respectively. Moreover, substantiality is a factor largely within the discretion of the trier of fact, and the jury was capable of determining the substantiality of Defendants' conduct on the instructions given. See Restatement (Second) of Torts § 834; see alsoRiley v. Stone, 900 A.2d 1087, 1092 (R.I. 2006) (requiring that instructions "reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to support") (citations omitted). Therefore, the objection is without merit. *Page 96 
 b. Proximate Causation
The Defendants object to the Court's "two step" proximate causation analysis. They allege that the following two instructions misstated the appropriate causation standard:
 "[a] defendant is liable for a public nuisance if the public nuisance is caused by its activity or by an activity in which it participated to a substantial extent. . . .
 . . .
 Liability for public nuisance arises when the Defendant's acts set in motion a chain of events which proximately cause the public nuisance." (Jury Instructions 13-14).
They argue that the instruction improperly allows the jury to find liability by finding that the "chain of events," rather than the Defendant's acts, were the proximate cause of the nuisance. Even if that instruction was subject to such an ambiguity, however, the jury was also instructed that "in order to prove. . . proximate causation, the State must establish two things: (1) that each Defendant's conduct was a substantial cause of the public nuisance alleged by the State and (2) that the public nuisance was a substantial factor in causing injury or harm to the public." (Jury Instructions 12). Moreover, this proximate causation analysis is entirely consistent with Restatement (Second) of Torts § 834, which requires that one is liable for nuisance when he substantially participates in activities which cause a public nuisance — which then causes harms.
The Defendants argue that the instructions allowed the jury to improperly find them liable without showing evidence that their conduct affected Rhode Island. However, the public nuisance was defined as the cumulative presence of lead pigment in Rhode Island. This "two-step" causation analysis allowed the jury to find that the Defendants substantially participated in activities — the sale and promotion of lead *Page 97 
pigment — which proximately caused the public nuisance in Rhode Island. That public nuisance was then found to be a substantial factor in causing harm to the public in Rhode Island. The Court finds that this argument merely represents disagreement as to whether the State provided sufficient evidence on causation. However, the instructions on the subject adequately stated the law, and the Court will not order a new trial on that basis.
 3. Lead from Other Sources
The Defendants have objected to the following jury instruction:
 "Because the State's public nuisance claim concerns only lead pigment contained in paints and coatings in or on buildings throughout the State, you should not take into account lead from other sources in determining whether such public nuisance exists." (Jury Instructions 10.)
The Defendants assert that the Court essentially directed a verdict for the State with the above instruction by preventing the jury from considering the possibility that lead from other sources could have caused the harms at issue. It is ironic that, in fashioning this portion of the instructions, this Court was responding to the Defendants' position that lead pigment in paints and coatings was only one potential source of lead in the environment. Through this instruction, the Court intended to advise the jury that they could not find liability in this case predicated upon any source of lead other than lead pigments found in paints and coatings. The Court realizes, however, that it matters not what the Court intended. Instead, the Court must look to what a jury composed of ordinarily intelligent lay people would have perceived when hearing and reading that instruction. See Parrella, 796 A.2d at 1101. It is arguably possible that the jury could have discerned from that instruction the meaning suggested here by the Defendants. *Page 98 
However, the Court also finds that the instructions must be read as a whole. The sentence immediately following the allegedly erroneous sentence reads:
 "If you determine that the cumulative presence of lead pigment in paints and coatings throughout Rhode Island constitutes a public nuisance, you will be asked whether each Defendant. . . is responsible. . . ." (Jury Instructions 10.)
The juxtaposition of these two sentences should have made abundantly clear to the jury that a finding of public nuisance could be based only upon lead pigment found in paints and coatings on buildings, and that evidence of other sources of lead could be used to rebut the existence of a public nuisance. Therefore, the Court finds this objection to be without merit.
 4. Products Liability Claims and Defenses
The Defendants argue that their requests for jury instructions on various products liability defenses were improperly denied. They list the following defenses which they claim are relevant to this case, and for which instructions were denied: failure to warn; immunity statute; manufacturers are not insurers; state of the art; product alteration; failure to maintain the product; assumption of risk.[69]
This Court has ruled previously that, despite the Defendants protests to the contrary, the State's claim is not a products liability claim.See Off. Dr. Tr. 23:2-7, Oct. 5, 2005 (granting State's motion to strike various affirmative defenses based upon products liability theories);State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 95, *3-*4 *Page 99 
(Jun. 3, 2005) (finding that the State's case is not a products liability case); State v. Lead Indus. Ass'n, 2004 R.I. Super. LEXIS 191 (Nov. 9, 2004).
The Defendants object to the non-instruction on failure to warn because of their position that "knowledge" evidence was not relevant.See supra Part III.F.2. The State has presented such evidence to show that the Defendants knew of the potential harms that may arise from lead pigment in paint, but did not warn consumers of that knowledge. That such evidence is admissible as part of the State's public nuisance claim — demonstrating the unreasonableness of the interference with a public right — does not transform their claim into a failure to warn / products liability claim. Therefore, the instruction was properly denied. Similarly, the objections to the Court's non-instruction on manufacturers-are-not-insurers, state of the art, product alteration, failure to maintain the product, and assumption of risk defenses are similarly without merit.
As this Court has ruled in the past, the immunity provision contained in § 9-1-32(b) is not applicable. That statute provides protection for manufacturers and sellers of products which are subsequently altered or modified. In a bench ruling, this Court denied motions for partial summary judgment by certain Defendants which were based upon this statute. (Off. Dr. Tr. 11:25-13:2, Oct. 5, 2005 (finding that the damages sought were not for personal injury, death, or property damage as contemplated by the statute, but rather for "monies spent resulting from the alleged public nuisance to ameliorate the effects thereof and presumptively for abatement purposes")). The Court relies upon the reasoning articulated in that decision as applied to all Defendants in the present motions.
In addition, the Court notes that because that immunity statute applies only to damage claims, and not to any abatement remedy, that statute no longer has any *Page 100 
applicability to these proceedings since the damage claims have been dismissed. See § 9-1-32(b) (stating that no "manufacturer or seller of a product shall be liable for product liability damages. . . .") (emphasis added).
 5. Membership in Trade Associations
The Defendants object to the Court's instruction on membership in a trade association because they allege that it was insufficient to preclude the jury from considering the LIA evidence improperly. The Court ruled on January 12, 2006 that the Lead Industries Association was not the agent of any of the Defendants, so that liability could not be found on that basis. The Court then instructed the jury consistent with its ruling.[70] Then, immediately prior to deliberations, the Court instructed the jury pursuant to its earlier ruling on agency and its First Amendment findings, that "mere membership in a trade association is not sufficient to impose liability on any Defendant herein." (Jury Instructions 15.) Immediately preceding that instruction, the Court instructed the jury that "you must consider the totality of each Defendant's conduct individually in order to *Page 101 
determine whether such Defendant is liable for a public nuisance as herein defined." Id. at 14.
The Court has ruled above on the specific objections to the State's evidence and concluded that each was either admitted for a proper purpose, such as demonstrating knowledge by an individual defendant, or that erroneously admitted evidence was harmless. The Defendants object generally that the Court did not repeat its curative instruction on agency at the close of evidence. However, the Court finds that its earlier instruction, combined with the later instruction on membership in a trade association, was adequate to prevent any improper consideration of the LIA evidence.
 6. Burden of Proof
The Defendants argue that a new trial is required because the State should have been required to show the existence of a public nuisance by clear and convincing evidence, as opposed to a preponderance of the evidence.[71]
Generally, the default standard in a civil action is proof by a preponderance of the evidence. See Cannone v. New England Tel. Tel.Co., 471 A.2d 211, 214 (R.I. 1984) (stating that the "burden in a civil case is a preponderance of the evidence"). Therefore, the Court will examine the three cases set forth by Defendants which arguably support the higher standard in this case.
The first case relied upon is Otto Seidner, Inc. v. Ralston PurinaCo., 67 R.I. 436, 451, 24 A.2d 902, 909 (1942), which states that "to justify an injunction, in a cause of the character of the instant one, the evidence must show clearly and convincingly that substantial damage" will occur. However, that case did not present the question of *Page 102 
whether a present condition constituted a nuisance. Rather, the question in that case was whether the Court should uphold an injunction of an "anticipated nuisance." Id. at 67 R.I. 449, 24 A.2d at 909. The plaintiff sought and received an injunction against an alleged nuisance that had not even been constructed. Therefore, the Court found that a higher standard was necessary in order to prevent the proposed operation of a certain business. Id.; see Berberian v. Avery, 99 R.I. 77, 81,205 A.2d 579, 582 (1964) (similarly requiring a higher burden for an anticipated nuisance). Neither case relied upon has application to the nuisance alleged here by the State. The State did not allege merely an anticipated or proposed nuisance — it alleged that such a nuisance does presently exist.
Finally, the Defendants rely upon Pine v. Kalian, a case of some relevance to the issues in this case. 723 A.2d 804, 805 (R.I. 1998). InPine, the Supreme Court upheld the issuance of a mandatory injunction which ordered a landlord to abate all lead hazards in its residential rental property. The Defendants rely upon the statement of the Court that the "findings of the trial justice clearly support the issuance of a mandatory injunction" in support of a requirement for clear and convincing evidence. See id. This Court does not find in that statement a requirement of clear and convincing evidence in order to find a public nuisance. However, even if such a requirement could be attributed to that statement, Pine involved the issuance of a preliminary injunction before a full hearing on the merits. Therefore, even if a higher standard was required at the preliminary stage, it does not follow that such a standard would be required after a full determination on the merits. *Page 103 
The Court finds that the authority set forth by the Defendants has no application to this case, and therefore that it did not err by requiring the State to prove its case by a preponderance of the evidence.
 7. Delay in Bringing Suit
The Defendants allege that the Court should have instructed the jury on what they argue was an unjustified delay by the State in bringing this suit. While labeled as an objection to the jury instructions, the substance of this objection is to ask the Court to reconsider its rulings on affirmative defenses based upon statutes of repose or limitations, and laches. In addition, the Defendants make reference to its objections to the Court's instructions on causation and substantial contribution, addressed above.
The Court need not reconsider its previous rulings on the affirmative defenses. Moreover, the Defendants have not cited any other authority which would support an instruction on delay alone. Therefore, the Court finds this objection to be without merit.
 8. Miscellaneous
The Defendants have included in their brief a bulleted list of twenty-one objections to jury instructions. However, the substance of all of these objections has been covered in the other parts of this decision, and the Court will not separately address them.
 9. Conclusion as to Jury Instructions
Our Supreme Court has remarked in another context that "we are quite certain that any good lawyer can pick lint off any Government procurement." Blue Cross Blue Shield v. Najarian, 865 A.2d 1074, 1084
(R.I. 2005). Likewise, this Court has no doubt that the many skillful lawyers involved with this case can read error and ambiguity *Page 104 
into any one of the Court's jury instructions, especially when read in isolation. However, the Court finds that the instructions, when read as a whole, render Defendants' objections to be without merit. Therefore, the Court will not order a new trial on the basis of the jury instructions.
 H. Alleged Misconduct by the State's Attorneys
The Defendants raise various allegations of misconduct by the State's attorneys at trial, and argue that those acts of misconduct, individually and taken as a whole, wrongfully prejudiced the jury and require a new trial. The State responds by denying the allegations of misconduct. Additionally, they argue that any acts of misconduct were cured by the Court's instructions, and, therefore, there is no prejudicial effect warranting a new trial.[72] The alleged misconduct includes: 1) misconduct during opening statements; 2) testimony implying that the Defendants were racists; 3) newspaper articles regarding hospitalization of children; 4) an improper question during the testimony of Dr. Nolan; 5) closing arguments that exceeded permissible bounds of argument; and 6) misconduct involving statements to media prior to trial.
Therefore, the Court will examine whether, in hindsight, a mistrial should have been granted and, therefore, whether a new trial is now appropriate. A trial justice must first assess whether the improper conduct was so prejudicial that it would "inflame the passions of the jury as to prevent their calm and dispassionate examination of the evidence." Frias v. Jurczyk, 633 A.2d 679, 681 (R.I. 1993).Id. Then, the justice must determine whether that effect can be cured by an instruction. Id. *Page 105 
 1. Alleged Misconduct During Opening Statements
The State presented opening statements from three attorneys on November 1, 2005. Prior to and during the statements, the jury was instructed that opening statements were not evidence, and that it may only consider the evidence admitted at trial as a basis for liability.See, e.g., Off. Dr. Tr. 5:19-6:23, Nov. 1, 2005 AM Session. At the conclusion of the first and third opening statements, the Court held a sidebar conference to address various objections and mistrial motions by the Defendants. (Off. Dr. Tr. 43-62, Nov. 1, 2005 AM Session; Off. Dr. Tr. 1-17, Nov. 1, 2005 PM Session.) The Defendants have incorporated those objections into the motion for a new trial.
Pursuant to objections raised during the opening statements, the Court reminded the jury at the conclusion of the statements that it could only consider the Court's instructions on the law, and not any inadvertent references to statements of law by counsel. (Off. Dr. Tr. 63:10-17, Nov. 1, 2005 AM Session.) The Court also reminded the jury that the jury is to determine which evidence was "serious and what is not serious," and that counsel should not state his or her own views. Id. at 63:20-64:1. The Court will first examine whether or not counsel's statements were improper, whether or not an instruction was sufficient to cure any improper statement, and therefore whether a mistrial should have been granted.
 a. "Fair Share" Theme
The Defendants first object to the State's "fair share" theme, which was repeated numerous times throughout the opening statement as well as the entire trial. See, e.g., id. *Page 106 
at 8:9-10 ("If you help make a mess, you have to help clean it up.")[73] They argue that the State seeks to force the Defendants to abate all lead, so to refer merely to a "fair share" is improper. However, the State's position has been that it has incurred costs and has suffered harms due to lead pigment, and that many of those harms will go uncompensated. Therefore, it is not improper to refer to a "fair share."
Part of the objection, which will be explained below in conjunction with Dr. Nolan's testimony, is that there had been settlement discussions of which the State was aware, at least with respect to SW. Therefore, SW argues that to imply that it had not taken any action to remedy the alleged nuisance was both factually inaccurate and improperly made reference to settlement offers. However, the Court finds no merit in the Defendants' arguments on this point. Even if there have been attempts at settlement, which obviously have not been successful, the existence of such discussions would not make the State's "fair share" theme improper. The State still had a reasonable basis in fact for the use of the "fair share" theme because of its evidence that it had suffered burdens as a result of the public nuisance.
 b. Dismissed Claims
The Defendants next object to the State's statement that the Defendants had never issued a product recall. They also object to statements that the Defendants had failed to warn consumers, and that the Defendants "banded together" to combat substitutions in the marketplace. Because products liability and conspiracy claims were dismissed from *Page 107 
the case prior to trial, they argue that such references were improper at trial.[74] However, the Defendants have not demonstrated that the State's statement lacked a factual basis. Moreover, if proved, the statements would have been relevant — though not conclusive — in determining whether their actions substantially contributed to a public nuisance or unreasonably interfered with a public right. Therefore, even though products liability and conspiracy claims were dismissed from the case, references to a product recall were not improper because such evidence was still relevant to the claim that did remain in the case.
 c. Alleged Misstatements of Law
The Defendants have raised certain objections to statements that allegedly misstated the law. The Defendants object to the State's references to "business ethics." E.g., id. at 41:4-7, ("many companies in this company do the right thing. When they make a mess, they help fix it.")[75] The Court finds that such comparisons are within the realm of common experience and would not be perceived as statements or misstatements of the law. Such comparisons and rhetoric did not invite the jury to decide the case on anything other than the evidence that would be presented.
Similarly, they object to counsel's statement that the Defendants "contributed" to the public nuisance, as opposed to saying "substantially contributed." Id. at 13:24-25, 80:19-20. The Court does not find that this statement would be perceived as a statement of the law to be applied. Moreover, the Court's repeated admonitions, that only the Court's instructions contained the applicable legal standards, were sufficient to cure any possible confusion by the jury, and, therefore, any prejudicial effect on the Defendants. *Page 108 
 d. Burdens on Taxpayers
The Defendants also object to several references to burdens on taxpayers as a result of the alleged public nuisance. E.g., id. at 42:11-13 ("[Defendants are] responsible to the people, to the taxpayers of Rhode Island, to help pay for the past expense that the State has incurred dealing with lead.")[76] However, where an element of public nuisance is that the State has suffered harms that it ought not have to bear, such statements were appropriate and not unduly prejudicial. They did not improperly invite the jurors to decide the case based upon self-interest rather than the evidence. Therefore, the objection is without merit.
 e. Demonstratives Not Later Admitted into Evidence
The Defendants object to the use of Plaintiff's Exhibits 4 and 87, for identification, as demonstratives during opening statements. The Court notes initially that the jury was instructed that demonstratives used during opening statements were not evidence, even if they might later be introduced as evidence. Id. at 3:21-23.
Exhibit 4 was an excerpt from a medical journal. Id. at 83:11-18, 94:8-15. That exhibit was never subsequently introduced into evidence. However, the parts that counsel read during his statement merely indicated the difference between primary and secondary prevention efforts. This theme was a major theme during the State's case and had ample support in the evidence.[77] Therefore, the statements read by counsel could not have caused any wrongful prejudice to the Defendants. *Page 109 
Exhibit 87 is a 1900 document entitled "Thoughts" produced by the Acme Company, which was subsequently acquired by SW. The State noted that the document referred to areas where people work with white lead as "white cemeteries." Id. at 27:22-28:3. Defendants object to the use of that exhibit because SW did not acquire the company until after 1900. Therefore, SW argues that it was not relevant to demonstrate knowledge by SW at that time. However, there was ample other evidence in the record to demonstrate SW's knowledge of the harmful effects of lead during that time period. Therefore, there could have been no prejudicial effect from the use of this exhibit as merely a demonstrative.
 f. Massachusetts Legislation
The Defendants object to the State's references to a document which involves Massachusetts legislation in 1933:
 "In 1933 while these defendants were funding the LIA, the LIA convinced the State of Massachusetts not to establish regulations limiting the use of lead paint because they were afraid of the snowball effect it might have. Let's look at one document where they suggest why it was good to have stopped Massachusetts from regulating lead. It was particularly important to obtain a hearing and settlement in Massachusetts. Otherwise, we might've been plagued by an extension of similar restricted [sic] painting legislation in other states affecting the use of white lead." Id. at 6:23-7:9
At trial, the Court denied the Defendants' objection and motion for mistrial "predicated on the fact that what was shown on the screen was not the legislation but an indication of the reason that there was concern by the author of that document." Id. at 53:3-6. The Court finds that its earlier ruling was sound, and will not disturb it on the motion for a new trial. *Page 110 
 g. Seven Children Projected on Screen
During the trial, the State made reference to the fact that seven children had been hospitalized due to lead poisoning. Id. at 21:20-22:2. During that presentation, the State displayed a demonstrative of seven children which apparently were not the actual seven hospitalized children. The Court does not find that the use of those pictures was an implication by the State that the actual seven children were hospitalized. Even so, the use of that demonstrative was not prejudicial and was apparently disclosed to the Defendants the day before opening statements. Therefore, the objection is without merit. Id. at 59:3-17.
 h. Miscellaneous Objections
The Defendants object to several inadvertent references by State's counsel to the Defendants collectively. The Court denied the mistrial motion and denies the new trial on this ground. The Court did, however, admonish counsel to be more specific when referring to multiple Defendants or the LIA. Id. at 61:2-7.
During the trial, the State made reference to loan programs related to lead paint which are funded by taxpayers, the evidence of which was excluded from trial as a basis for calculating damages. The Court finds, however, that the reference to the loan programs were permissible to show that the State has suffered harm, even if the evidence was not competent as a basis for the computation of damages. (Off. Dr. Tr. 1-3, Nov. 1, 2005 PM Sidebar Session).
Finally, the Defendants object to the State's recitations of harms from lead, including death and encephalopathy, in conjunction with a chart that referenced the year *Page 111 
1993. Their argument is that no evidence at trial was adduced that any child had died since that year, so that the State's opening statement was misleading. During the opening statement, counsel stated that since the 1990s, tens of thousands of children had been poisoned. (Off. Dr. Tr. 68:20-69:8, Nov. 1, 2005 AM Session). He then stated that children were "at risk of suffering a variety of ailments" including brain-swelling and death from lead exposure. See id. The Court finds that there was factual support for both statements individually. Moreover, the juxtaposition of the two sentences does not imply that children had suffered those ailments since 1993. Therefore, the Court finds that the statements did not mislead the jury or unduly prejudice the Defendants.
 i. Conclusion as to Opening Statements
For the reasons stated herein, the Court does not find error in the denial of the various objections and motions for mistrial because of the opening statements, and it will not order a new trial on that basis.
 2. Evidence Referring to Race, Ethnicity
The Defendants have objected to certain testimony that the State elicited from Dr. Markowitz:
 Q . . . in the mid 1950's, did the LIA identify who it believed was primarily affected by lead poisoning?
 A Yes. They said it was slum children.
 Q Okay. And in that same time period, did they say who they believed the slum children were?
 A Yes. They identified those slum children as primarily black and other minority children. *Page 112 
 Q And did they ever identify in those documents in the mid 1950's a solution as to how to prevent lead poisoning in light of their belief?
 A Yes. In those documents they say that the solution to this problem was to get rid of the slums and to educate the parents.
 Q And did the LIA say that those solutions were achievable?
 A No. In fact, they said that those solutions were not achievable.
 Q Why?
 A They said that it was impossible to clean up the slums, and it was impossible to educate those parents." (U. Tr. 56:18-57:15, Dec. 12, 2005 AM Session.)
The Defendants also object to the admission of Plaintiff's Exhibit 113, which is addressed earlier in this decision, for similar reasons.
As noted above, the document and related testimony was admitted to show the state of knowledge among the leaders of the LIA, as well as its members, on the causes of lead poisoning. The Defendants allegations of misconduct are based upon the premise that there was no proper purpose for admitting the document. If there were no proper purpose, then clearly it would be objectionable to introduce testimony and exhibits which could have no effect other than to inflame the passions of the jury. See Frias, 633 A.2d at 681. However, the Court finds that there was a proper purpose for the admission of the testimony and related exhibit as noted above in Part III.F.4.k. Therefore, the introduction of the document and related testimony does not constitute misconduct by the State. *Page 113 
 3. Evidence about Death, Hospitalization of Children
Defendants argue that the State's introduction of Plaintiff's Exhibits 197, 199, and 200, combined with their use during closing argument, constitutes grounds for a new trial. These exhibits are newspaper articles from 1949 and 1954 about the death and hospitalization of Rhode Island children due to lead poisoning. The Defendants argue both that the evidence was erroneously admitted, and that the State committed misconduct as to these exhibits. The admissibility objections are based upon the grounds that the probative value of the evidence is substantially outweighed by its prejudicial effect under R.I.R. Evid. Rule 403. Defendants also argue that the documents are hearsay.
These articles were admitted during the redirect testimony of Dr. Rosner. (U. Tr. 41:16-51, Jan. 20, 2005 PM Session.) The unofficial transcript does not indicate that any timely objection was made to the introduction of these exhibits. However, the documents were admissible to demonstrate that reports of harmful effects of lead were public knowledge during the relevant time periods. Moreover, they are admissible under the ancient documents exception to the hearsay rule, and in any event, were admissible for non-hearsay purposes. Therefore, the admissibility objections are without merit.
The Defendants allegations of misconduct, based upon the way these documents were argued during the State's closing argument, are also without merit. (Off. Dr. Tr. 176:1-19, Feb. 9, 2006.) *Page 114 
 4. Misconduct During Examination of Dr. Nolan
On November 15, during the State's examination of Dr. Patricia Nolan, State's counsel asked the following question of the witness:
 "Doctor Nolan, to your knowledge have any of the defendants here, either the Atlantic Richfield Company, NL Industries, Sherwin-William — Sherwin-Williams, or Millennium contributed any funding or other support to any state programs in the state of Rhode Island to address the poisoning from lead paint (sic) in paint?" (Off. Dr. Tr. 47:6-23.)
Counsel for several of the Defendants, if not all, immediately objected to this question. Shortly thereafter, each joined in motions for a mistrial. They claimed that the question was leading, irrelevant, and unfairly prejudicial. The Court requested briefs on the motions and dismissed the jury for the day. On the following morning, the Court held hearings on the mistrial motions. The Court also held a closed hearing on the mistrial motion due to unique and sensitive issues raised by SW's brief, which was filed under seal.
The Court sustained the objections to the State's question, but denied all of the motions for a mistrial, including SW's, relying uponFrias v. Jurczyk, 633 A.2d 679, 681 (R.I. 1993). The Defendants have renewed their objections to the State's question of Dr. Nolan as grounds for a new trial. Therefore, the Court will examine whether, in hindsight, a mistrial should have been granted and, therefore, whether a new trial is now appropriate.
This Court explained in its earlier decision that it found the question objectionable and that it should not have been asked. (U. Tr. 2:9-8:8, Nov. 16, 2006 PM Session.) The question violated several rules of evidence and was therefore prejudicial, because it *Page 115 
invited the jury to base a verdict upon improper bases. However, the Court also noted that any wrongful or unfair prejudice that occurred could be cured by an instruction to disregard the question, because the comments were not so "ineradicable or inexpiable" that a jury could not disregard them. See Frias, 633 A.2d at 681. The Court then gave such an instruction as soon as the jury returned.[78]
Hindsight has not convinced this Court that its earlier ruling, denying the motion for a mistrial, was erroneous. In all trials, but especially in protracted ones, the Court must presume that the jury is capable of giving heed to the Court's instructions. See Figueroa,673 A.2d at 1091 (noting that the Court must assume that the jury properly followed the instructions as they were given). Therefore, the Court finds that any prejudicial effect from the inappropriate question to Dr. Nolan was cured by its instruction.
As the SW issue was not public at the time, the Court indicated that it would render a written ruling in the future explaining its reasoning specific to SW, and it does so here. The unique circumstances involving SW relate to settlement negotiations that had transpired in a February, 2003 meeting between the Attorney General, counsel for SW, the CEO of SW, and several other affiliated individuals. (Aff. of Paul Michael Pohl, *Page 116 
Ex. B to SW's Mem. Supp. Mot. for Mistrial, Nov. 15, 2006.) Mr. Pohl, counsel for SW, explained that SW was "interested in exploring . . . whether there could be some kind of cooperative, voluntary programs of the type that [SW] was developing and supporting elsewhere. . . . We discussed the status of a cooperative effort that [SW] was engaged in with a working group of Attorneys General." Id. ¶ 5. Counsel states that the Attorney General had agreed to keep such discussions confidential.Id. Therefore, SW contends that by raising the issue of whether SW had contributed funds in support of State lead programs, not only did the question seek irrelevant testimony, but it sought to elicit misleading and/or false testimony regarding SW's settlement efforts.
The Court now finds that the facts alleged by SW do not affect the Court's conclusion on this issue for the simple reason that the jury did not know about the additional facts. In ruling on whether to pass the case, or whether to grant a new trial, the Court must focus on whether a jury "composed of laypersons would. . . have been prejudiced by such a remark." Frias, 633 A.2d at 682 (R.I. 1993). Perhaps the facts alleged by SW, if proven, would subject the Attorney General to disciplinary sanctions from the bar. The Court notes also that conduct by the Attorney General has been the subject of two contempt proceedings. However, the sole question here is whether the conduct so polluted the jury's consideration of the evidence and the law of public nuisance that the Defendants would be deprived of a fair trial. The Court concludes that the question did not do so, in light of the curative instruction given when the jury trial resumed, so it will not order a new trial. *Page 117 
 5. Misconduct during the State's Closing Argument
The State delivered its closing argument during the afternoon of February 9, 2006 and concluded its arguments in the morning of Friday, February 10, 2006. Within moments of its conclusion, counsel for some of the Defendants moved orally for a mistrial based on alleged improper statements of counsel during the State's closing argument. The Court conducted a sidebar conference in chambers, but on the record, to address the motion.[79] While the Court had planned to charge the jury during that afternoon, instead the Court dismissed the jury for the weekend to give the parties a chance to review the record and fully address the grounds of the motion for mistrial.
Over the weekend, and in the midst of a blizzard, the Court received briefs from each party for its consideration.[80] At that point, each of the four Defendants on trial had joined in the motions for mistrial, and additionally had requested that the State's claims be dismissed with prejudice as a sanction for the alleged misconduct during closing arguments. On Monday, February 13, mere minutes before the jury was to return to receive its instructions and begin deliberations, the Court announced that it would deny the Defendants' motions because it found that, while errors were committed on both sides, those errors did not rise to the level necessary to declare a mistrial or dismiss the State's claims as a sanction. (Off. Dr. Tr. 105:8-110:6, Feb. 13, 2006.) The Court also *Page 118 
made several modifications to the jury instructions, in light of the objections made to the closing arguments. Id.
The Court briefly stated its reasoning for denying the motion, but also stated that it would in due course render a written decision on the motion to more thoughtfully explain its reasoning. The present motions for a new trial similarly allege that the argument by counsel exceeded permissible bounds. Therefore, as indicated above, the Court will now speak as to whether, in hindsight, a mistrial should have been granted and, therefore, whether a new trial is now appropriate.[81]
 a. Standards for Evaluating the Conduct of ClosingArguments
For all practical purposes, the standard for determining whether to declare a mistrial prior to a verdict appears to be the same as whether to grant a new trial after the verdict. Prior to the verdict, the Court analyzed whether counsel's argument was improper, the extent of the probable prejudicial effect of any improprieties, and whether any prejudice may be cured by instruction.
At this stage, the Court similarly must analyze whether counsel's argument was improper, and if so, whether the instructions given were sufficient to cure any unfair prejudice caused by improper argument.[82] However, since it is improper in most cases to consider evidence of what actually occurred in the jury room, the Court can only speak in terms of probable effects on the jury; therefore, the mistrial analysis will necessarily be the same as the new trial analysis.See 11 Wright, Miller, Kane, Federal Practice *Page 119 Procedure § 2810 (noting that the ability of a juror to testify to impeach his verdict is very limited). In its consideration of this issue, the Court relies on arguments presented both in conjunction with the mistrial motion during trial, and in conjunction with the present motions.
The purpose of a closing argument is "to sharpen and clarify the issues for resolution by the trier of fact." State v. Boillard,789 A.2d 881, 885 (R.I. 2002) (addressing improper closing argument in a criminal case) (citations omitted). Only after all the evidence is presented may counsel for each side capably "present their respective versions of the case as a whole." Id. In doing so, counsel is permitted to "argue the inferences to be drawn" from the evidence and to "point out the weaknesses of their adversaries' positions." See id.
Determining whether argument has exceeded its permissible scope involves the balancing of two diametrically opposed policy concerns. In order to give counsel the opportunity to provide the highest quality advocacy for its client, counsel is given "considerable latitude."Id.[83] Counsel is not limited to the dry and passionless recitation of facts, but rather all the "weapons of wit and satire and of ridicule are all available to him so long as he keeps within the record."State v. Schimmel, 409 N.W.2d 335, 342-343 (N.D. 1987). For example, counsel may properly use references to history, literature, personal experiences, and matters of common knowledge in order to present his or her *Page 120 
client's case. Jacob A. Stein, Closing Arguments: The Art and theLaw, § 1.14 at 1-33 to 1-34 (2d. ed. 2005) (Stein, ClosingArguments).
In spite of that latitude, there must be bounds to the matters which counsel addresses during closing argument because the opposing side has a right to a fair trial. Counsel's remarks must pertain in some way to the evidence admitted at trial, and reasonable inferences from that evidence or those remarks are improper. Id. § 1.14 at 1-34. While there is no bright line or precise formula that indicates when counsel has crossed the line to improper argument, the Court must examine whether the probable effect of the misconduct is to wrongfully prejudice the jury. See Boillard, 789 A.2d at 885. If the remarks are "totally extraneous to the issues in the case and tend to inflame and arouse the passions of the jury" then wrongful prejudice obviously has occurred.Id.
When the Court finds that misconduct has occurred, the Court must then examine whether a new trial is necessary. If the conduct is such that it can be cured by an instruction to the jury, and the Court gave such an instruction, then no new trial is necessary. See id. at 883.[84] If, however, no instruction was given in response to wrongfully prejudicial misconduct, or the remarks are so egregious that the probable effect would be so prejudicial that no jury instruction could possibly have sufficed to remedy that effect, then a new trial must be ordered. Because the Court's task is to evaluate the probable effect of a remark on the jury, the context in which the remarks were made during this protracted trial is crucial to evaluating both the existence and degree of any prejudicial effect upon a jury. Based on the standards outlined above, the *Page 121 
Court will first address the alleged misconduct applicable to all Defendants and to each specific Defendant.[85]
 b. The Court's Introductory Instructions Regarding ClosingArguments
Before taking up the various alleged improper arguments, several aspects of the trial must be noted to provide an overall context for the arguments and the Court's decision to deny Defendants' motions. The arguments by each of the Defendants and by the State consumed two and a half days. Each of the various Defendants presented closing arguments beginning on February 8-9, 2006 and then the State's three counsels presented arguments on February 9-10, 2006. During the course of those arguments, this Court instructed the jury repeatedly regarding the proper role of closing argument in a trial, and the purposes for which the jury should consider the arguments:
 "[A]s I have told you on a number of occasions, during the course of closing argument, counsel are free to give you their impressions of what the evidence is. However, as I also told you after the parties had rested, all of the evidence in this case was before you at that time. And I tell you that things that counsel have indicated to you during the course of closings is not evidence. You have heard that before. Just as I have told you that if counsel suggests to you what the law is, your duty, your oath, requires you only to apply the law that the Court ultimately will give you." (Off. Dr. Tr. 24:22-25:8, Feb. 10, 2006 Morning Session.)
On the final morning of argument, counsel for the State argued for an hour and a half,[86] and at the conclusion of his argument, the Defendants brought the motion for mistrial. *Page 122 
The Court will now take up the various categories of alleged misconduct during the State's closing argument.[87]
 c. Alleged Misstatements of the Law
The Defendants first argue that the State's counsel improperly waged arguments based upon "business ethics," and that those arguments presented an improper legal standard for the jury's consideration. For example, counsel urged that
 "[i]f you make a product that hurts people, then you should stop selling it. And if after you stop selling it, so that it doesn't get any worse, you should go back and you should help take care of any of the damage you've already caused.
 You know, ladies and gentlemen, that is such a basic business ethic that they don't even have to teach you that in business school anymore. That is how business in America is supposed to work. That is what we expect in America from corporations." Off. Dr. Tr. 26:15-24, Feb. 10, 2006 (Morning Session) (emphasis added).
Defendants point out several other instances where counsel raised what it deemed a "fictitious legal standard" for consideration by the jury. The Court finds, however, that these statements do not purport to be statements of the law on which the jury should rely. They were not an invitation to the jury to apply anything other than the Court's instructions on the law. Rather, the remarks were within the bounds of permissible comment on the evidence based upon personal experience and common knowledge.
Similarly, the Defendants object to the manner in which counsel argued Plaintiff's Exhibit 170, the 1939 NPVLA document. Counsel argued that: *Page 123 
 "Let's look very closely at what [SW] and NL were told in 1939.
 First, they were told that lead in paint was a toxic material. . . .
 . . . .
 Then they were told by their colleagues that, `A manufacturer who puts out a dangerous article or substance without accompanying it with a warning as to its dangerous property is ordinarily liable for any damage which results from such failure to warn.'
 . . . .
 . . . It tells them that `A manufacturer . . . must know the qualities of his product and cannot escape liability on the ground that he didn't know it to be dangerous.'
 . . . .
 But even if they convince you that they didn't know . . . this tells them that it doesn't matter, you have an obligation to your product. . ." (Off. Dr. Tr. 40:12-41:19, Feb. 10, 2006.) (Emphasis added.)
As noted above, this evidence was admitted for the purpose of demonstrating knowledge of the harmful qualities of lead by the Defendants against whom it was admitted. Counsel's argument is consistent with this purpose.
The Defendants argue, however, that it could have confused the jury because it made reference to a legal standard — that liability without knowledge could occur. However, the document demonstrates that, in 1939, SW and NL Defendants were told that they could still be subject to liability regardless of whether they had knowledge of the ill effects of lead. Therefore, the State argues that even if they did not know of those effects, they should have investigated and discovered those qualities of lead. The Court finds that this use of the evidence was proper. The argument does not depend upon *Page 124 
whether the statement of law was correct — that liability could be imposed with or without knowledge. Regardless of the veracity of that statement, the Defendants were told that and were therefore put on notice that, if they did not know of the toxic qualities of lead, they should investigate. Therefore, the Court finds this objection to be without merit.
Moreover, even if these examples could be construed as misleading to the jury, the Court's repeated instructions as to the jury's oath were adequate to prevent those arguments from prejudicing the jury.See, e.g., Jury Instructions 1 (instructing the jury that it was "duty-bound . . . to follow the law as [the Court] instruct[ed]. . . and to apply that law to the facts as you find them to be from the evidence which has been presented during the trial.")
 d. Accusatory Statements Toward the Defendants and TheirCounsel
The Defendants argued that the State had exceeded the bounds of proper closing argument by vilifying the Defendants and their counsel. For example, the Defendants vigorously object to the following analogy by the State's counsel which compared the Defendants to arsonists:
 "The entire defense in this case, Ladies and Gentlemen, you know what it's like, what it reminded me of, it's like the arsonist who starts a fire. And then they blame the fire department for not getting there quick enough or not doing enough to put out the fire. Or worse, the arsonist blaming the homeowners for not having a smoke detector. That's what their defense is. None of these actions, none of them, even if true, issue [sic] relieve the arsonist of responsibility for starting the fire. The arsonist started the fire just like these defendants started the public health tragedy and set it in motion by selling and promoting poisonous lead when they knew better in the first place." (Off. Dr. Tr. 69:7-22, Feb. 10, 2006 AM Session.) *Page 125 
The Defendants also object to the use of a fire-related analogy at a time when the Station Fire tragedy was a focus of the local news. The analogy as a whole appears calculated to discredit the Defendants' argument that some other person or entity — i.e. property-owners — are solely responsible for the cumulative presence of lead pigment in Rhode Island. As such, it is within the bounds of proper argument.
However, the State did exceed the boundaries of permissible comment in several other instances, where its remarks tended to attack defense counsel personally, as opposed to the arguments made or the Defendants whose conduct they defended. For example, the State argued that "[e]ven today, here in Rhode Island in this courtroom in 2006, the defendants are incapable of doing the right thing." Id. at 64:23-25. In addition, the State argued that
 "it is shameful, it is absolutely shameful that these defendants chose as a trial strategy to try and bring down the credibility of two of the world's leading experts in the area of the history of our public health. . . . [The jury should] [t]hank [the witnesses] for subjecting [themselves] to the personal attack of these — by these defendants' attorneys." (Off. Dr. Tr. 47:17-48:15, Feb. 10, 2006.)[88]
To the extent that those remarks attempted to portray counsel as dishonest, or punish them merely for defending their case, those remarks were improper. For that reason, the Court provided a curative instruction as described below. However, in light of that instruction, the Court does not find that the remarks were so inflammatory that the jury was incapable of basing its verdict solely on the evidence and the Court's instructions. *Page 126 
 e. First Amendment Arguments
The Defendants object to the manner in which certain evidence of the LIA was utilized during closing arguments. They argue that it sought to impose liability based upon protected speech or lobbying activities, and interfered with its freedom of association with the LIA. For example, the Defendants object to the following argument: "The primary reason that lead paint remained legal for as long as it did was because economic forces fought hard to keep it legal." (Off. Dr. Tr. 36:12-14, Feb. 10, 2006.)
The Defendants have identified several other instances where the State allegedly argued an improper basis for liability. Id. at 47:1-6 (referring to combating labeling regulations); 55:23-56:1 (arguing that the Defendants' scheme and plan was to sell lead for as long as they could); 56:4-13 (NL and Glidden were told that "sick kids were seen as a public relations problem and not as a public health problem"), 70:9-13 ("state and federal agencies specified lead in paint because the defendants made and promoted it as a good and safe product. You know, all government decisions are influenced by private industry."); 71:18-23 (noting that the defendants convinced the government to specify lead in paint, did not tell anyone that it was poisonous, and then blamed the government for requiring lead in paint).
The Defendants argue these were attempts to impose liability based upon protected speech activities in violation of theNoerr-Pennington doctrine. However, the context of the arguments indicate that the LIA lobbying activities were not used as a basis for liability on any Defendant. The jury was well informed that the LIA activities could not be attributed to any Defendant because of the agency ruling. However, the evidence demonstrated that the particular Defendants had knowledge of the LIA's lobbying *Page 127 
activities; had knowledge of the harmful effects of lead, and continued to sell and promote lead. As noted above, such evidence is relevant to the unreasonableness of the interference with a public right that the jury was asked to find as an element of public nuisance.
It is of note that the Defendants, in their closing arguments, repeatedly noted that lead was not proscribed. See, e.g., Off. Dr. Tr. 39:4-7, Feb. 8, 2006 (ARCO's counsel argued that "[Providence Mayor Ciccilline] admitted the presence of lead isn't banned or prohibited in Providence, and we know from other witnesses the presence of lead isn't banned anywhere else in the state.") Where the Defendants had made the legality of lead an issue in closing arguments, the Court finds that the State was within proper bounds with its response to those arguments.
Similarly, the Defendants' argument regarding membership in the LIA does not warrant a new trial. The Court instructed the jury that "mere membership in a trade association is not sufficient" to impose liability. (Jury Instructions 15.) The Defendants argue that liability was imposed specifically because the Defendants were members of that organization. See, e.g., Off. Dr. Tr. 49:9-23, Feb. 10, 2006 (remarking that the Defendants remained members of the LIA but took no action to remedy the harmful effects of lead pigment). However, the Court finds that the State's argument was generally directed at the knowledge obtained by the Defendants, through their membership in the LIA, about the effects of lead. In light of the evidence that the Defendants sold and promoted lead pigment with that knowledge, that type of argument was proper. *Page 128 
This is not to say that State's counsel was completely blameless. Some of counsel's statements regarding membership in the LIA were improper, such as the statements that the Defendants should have stopped paying dues, attending meetings, and funding programs. Id. However, in light of the Court's instructions regarding membership in a trade organization and the purpose of closing argument, the Court does not find that these transgressions were sufficient to warrant a new trial
 f. Defendants' Failure to Call Witnesses — The "Empty Chair" Rule
The Defendants allege that the State committed misconduct by noting that the Defendants did not call any witnesses. See, e.g., Off. Dr. Tr. 73:23-74:1, Feb. 9, 2006 ("Now, defendants gave a lot of explanations for why they didn't call any witnesses in this case. But don't you think if they had a witness to contradict these things they would've called them to the stand?") The State's argument prior to that statement referred to, inter alia, whether lead in paint was the primary source of harm to children, or whether lead from some other source was to blame. The Court overruled the objection which was made during argument.Id. at 73:23-74:3.
The empty-chair doctrine allows a trial justice to "charge a jury that it may draw an inference from a litigant's unexplained failure to produce an available witness who would be expected to give material testimony on the litigants['] behalf." State v. Taylor, 581 A.2d 1037,1038 (R.I. 1990). The Court did not so instruct, but clearly the State's argument asked the jury to draw such an inference.
It is not clear to the Court that the State's argument, in response to the Defendants' contention that the State failed to prove its case, was improper. While an accused in a criminal case certainly has a Constitutional right not to testify, it does not *Page 129 
follow that a civil litigant cannot comment upon an adversary's decision to rest without presenting any evidence whatsoever. See Stein,Closing Arguments, § 1.52 (noting the varying circumstances under which such arguments are proper and improper).[89] Defendants have not cited any authority in their briefs to guide the Court in this regard.
However, following the closing arguments, the Court modified its jury instructions to make clear to the jury that the Defendants should not be penalized merely for not presenting a case. (Off. Dr. Tr. 1:23-2:15, Feb. 10, 2006 Sidebar; Jury Instructions 5.) The Court finds that the instructions were sufficient to cure any possible unfairness stemming from the remarks by State's counsel.
 g. "The Other 34,000 Children"
During the State's closing argument, counsel argued that the Defendants had relied upon a Brown University undergraduate study to show that there were 2,644 children poisoned in Rhode Island from 1,374 poisoned homes. (Off. Dr. Tr. 115:24-117:18, Feb. 9, 2006.) She argued that the Defendants had relied on that study to demonstrate that a small number of homes in Rhode Island were the cause of childhood lead poisoning and, therefore, that there is no public nuisance.Id. She then argued that the jury should disregard that study because State's evidence demonstrated that over 37,000 children had been poisoned over the last ten years. Id. Therefore, that study was missing lots of data — "how about the other 34,739 children," she argued.Id. at 117:4.
The Defendants object to this argument because they argue that they were deprived of "property-specific" discovery. Therefore, they argue that they were *Page 130 
precluded from obtaining data as to "the other 34,000 children." The Court finds this argument to be without merit. The State was entitled to argue unreliability based upon the discrepancy between the statistics cited. Therefore, the question was permissible comment upon the evidence and an appropriate manner of closing argument.
 h. "Do the Right Thing"
The Defendants object to the last portion of the State's closing arguments in which counsel made the following statements, interalia:
 "Ladies and Gentlemen, we're here because each of these defendants sold lead pigment that ended up on the walls here in Rhode Island. If they had not set this in motion, enforced by selling and promoting lead pigment, there would not be a public nuisance today. . . .
 We're here because we want you to make the defendants stop doing the wrong thing and finally do something right. . . .
 . . . .
 It's not too late, ladies and gentlemen, to make the defendants do the right thing so that the children no longer have to suffer under this threat. The remedy you render today, it can once and for all permanently solve the number one health problem facing Rhode Island children. Imagine that power that will be put into your hands shortly. You have the power to solve the number one health problem for Rhode Island children.
 . . . But here in this courtroom, you have been given such a unique opportunity, a once in a lifetime opportunity to help the kids and to rid our state of this toxic substance. . . ." (Off. Dr. Tr. 79:10-82:13, Feb. 10, 2006.) (Emphasis added.)
The portions to which the Defendants object are emphasized, with the other portions repeated to put the statements in context. *Page 131 
The Defendants argue that the State's emotional closings to "do the right thing" amounted to a request for the jury to base its decision on something other than the law on which the Court would instruct and the facts derived from the evidence. However, the Court finds that counsel's flowery rhetoric, which was the summation of an hour and a half of argument based upon the evidence, did not arise to the level of impropriety necessary to require a new trial. Moreover, as it was the last of the closing arguments, the Court immediately reminded the jury of its duty to consider only the evidence and the law on which the Court instructed. Id. at 82:15-83:1.
 i. Curative Instructions Following Closing Argument
The Court rendered its ruling on the mistrial motion minutes prior to delivering the jury instructions for the entire case. The Court made the following changes/additions to the jury instructions as a result of the mistrial proceedings following closing arguments.
First, the Court clarified that each Defendant was to be given separate consideration and that they were sued as pigment manufacturers. (Off. Dr. Tr. 108:22-109:1, Feb. 13, 2003.) The second change reiterated that the jury was to base its conclusion only on the evidence and the jury instructions, and not the contents of closing arguments.Id. at 109:13-17. Finally, the Court added an instruction to the jury that it was counsel's duty to defend its clients, and that no client should be penalized for having defended a claim waged against it.Id. at 109:22-110:4. *Page 132 
 6. Misconduct Prior to Trial
In the part of Defendants' brief which was filed under seal, the Defendants argue that various public statements by the Attorney General prior to trial should result in a new trial. Some of these allegations have been the subject of contempt proceedings and are addressed in other decisions of this Court. Despite the Defendants' assertions to the contrary, there has been no showing that any of these instances affected the jury, who was repeatedly instructed not to view media coverage of this case. Therefore, the Court finds that these grounds are inappropriately raised in a motion for a new trial, and the Court will not address them here. See Rule 59(a) (referring to "error[s] of law occurring at the trial") (emphasis added).
 I. Miscellaneous Grounds for a New Trial 1. State's Use of Contingent Fee Counsel
The Defendants argue that the State's use of contingent fee counsel is improper. Not only has this Court had opportunity on several occasions to address this issue, (State v. Lead Indus. Ass'n, 2003 R.I. Super. LEXIS 109 (Aug. 29, 2003) (granting Defendants' motion to bar the use of contingent fee counsel unless the State adhered to certain conditions), but even our Supreme Court has issued a written ruling on the issue. Consequently, the Court will not address it here. State v. Lead Indus.Ass'n, 898 A.2d 1234 (R.I. June 2, 2006) (declining to rule on ripeness grounds). *Page 133 
 2. Failure of the Trial Justice to Recuse Himself
The Defendants allege that the trial justice has an interest in the outcome of this litigation arising from the fact that he lives in a home built prior to 1978. This issue was addressed prior to trial, and the Court will not revisit its ruling here. State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 127 (Aug. 11, 2005).
 3. Use of Alternate Jurors
The Defendants allege that the use of six alternate jurors in this case was a violation of State statute, and that the resulting prejudice requires a mistrial. When a jury trial is likely to be a protracted one,
 "the court may . . . direct the calling of one or two (2) additional jurors, to be known as alternate jurors. Alternate jurors shall be drawn from the same source, and in the same manner, and have the same qualifications, as regular jurors, and be subject to examination and challenge as such jurors. . . . The alternate jurors shall take the proper oath or affirmation and shall be seated near the regular jurors with equal facilities for seeing and hearing the proceedings in the cause and shall attend at all times upon the trial of the cause in company with the regular jurors. They shall obey all orders and admonitions of the court. . . ." G.L. 1956 § 9-10-13.
The Court will assume arguendo that it had no inherent power to expand the number of alternate jurors, and abused its discretion to impanel six alternates even when faced with the prospect of a trial lasting for several months. Even so, the Defendants have not shown that the inclusion of such alternate jurors caused any prejudice to the Defendants. The Defendants posit that just as "the Court would not have allowed four people off the street to interact with the jury" it should not have allowed the additional alternate jurors to do so. (Defendants' Brief 145.) However, the alternate jurors were subject to the *Page 134 
same oath to refrain from discussing the case with outsiders and with other jurors. Therefore, the likelihood of any improper conduct among the alternates was no greater than that of improper conduct among the actual jurors. Therefore, any error was a harmless one, and this argument is without merit.
 4. Standing of the State to Pursue this Claim
The Defendants have argued that the State lacks standing to assert the interests of individuals, but rather may only assert sovereign interests. This argument has been addressed in several prior rulings, and the Defendants have not shown cause for the Court to reconsider it here. (Off. Dr. Tr. 10:23-11:24 Oct. 5, 2005); State v. Lead Indus.Ass'n, 2001 R.I. Super. LEXIS 37, *6-12 (Apr. 2, 2001). While this argument may have some applicability in the development of a remedy, it does not constitute grounds for a new trial and the Court will not reconsider its prior ruling.
 5. Trial Plan
The Defendants raise several objections to the manner in which the trial was conducted. Their objection is based upon the facts that the Court set forth in its April 25, 2005 decision. State v. Lead Indus.Ass'n, 2005 R.I. Super. LEXIS 55, (Apr. 25, 2005). In that decision, the Court responded to the Defendant's motion "for an order confirming that the September 7, 2005 trial will not be a trial of damages or remedies" and the State's objection to that order. Id. at *1. The Court found that, based upon the hearing that was conducted on March 3, 2004, that it was clearly contemplated that a trial on all issues would occur in April, 2005 (subsequently postponed until September, 2005).Id. at *5. The Defendants claim that they were prejudiced by the decision to conduct a trial on *Page 135 
all aspects of the State's claims, including liability and remedies, at the last minute. This prejudice is magnified by what the Defendants allege to be erroneous jury instructions on the law of public nuisance.
As the Court noted in its earlier decision, however, such a trial was clearly contemplated by the parties as early as March 2004. "[W]hat had been bifurcated was put back together." State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 55 (Apr. 25, 2005). Therefore, Defendants had at least thirteen months to prepare for this type of trial when they made their original motion in the Spring of 2005. Since jury selection did not actually commence until October 2005, they had additional time to prepare. The Defendants have not set forth cause for the Court to revisit its April 25, 2005 ruling, upon which this Court now relies in concluding that the Defendants had adequate time and notice to prepare a defense.
 J. Cumulative Prejudicial Effect of Alleged Misconduct andErrors at Trial
When they argued the motions for mistrial following closing argument, the Defendants argued that the sheer number of instances of misconduct during closing argument could cumulatively require a mistrial, even where the same type of transgressions, in isolation, would not otherwise require a mistrial. See, e.g., Whitehead v. Food Max, Inc.,163 F.3d 265, 278 (5th Cir. 1998) (noting that the Court "need not find that each statement, taken individually, was so improper as to warrant a new trial" but rather "taken as a whole, these comments prejudiced the jury's findings"). The State responded that there is not "a totality situation if each of the individual subparts underneath each of the building blocks doesn't have any merit." (Off. Dr. Tr. 41:3-5, Feb. 13, 2006 AM Session.) The State relied upon Belanger v. Silva, 120 R.I. 19,26, *Page 136 384 A.2d 605, 609 (1978) ("we are unable to comprehend how several rulings which individually are not erroneous can cumulatively constitute prejudicial error.")
The Defendants now allege the accumulation of many alleged errors or misconduct now requires a new trial. The Court finds that this "cumulative error" argument is an additional nuance of the "harmless error" analysis, and that it is applicable not only to closing arguments, but to the entire Rule 59(a) motion based upon errors of law occurring at trial. As noted above, the Court must assess whether each error, in isolation, is harmless. However, it may be that several errors, while possibly harmless in isolation, can combine with each other in a way cumulatively requires a new trial. See State v.Pepper, 103 R.I. 310, 318 (R.I. 1968) ("Even if we assume that none of the rulings . . . standing alone, constituted prejudicial error, we are of the opinion that there is a reasonable probability that the totality of the errors complained of influenced the verdict, thereby depriving defendant of the fair trial.")
Of course, in order to even engage in this analysis, the Court must first find that errors or misconduct have occurred. As the Court noted with respect to the closing arguments, errors were made on both sides. (Off. Dr. Tr. 107:23-25, Feb. 13, 2006 AM Session.)[90] While the hundreds of pages of briefs in this case give the appearance of an incalculable number of errors, the Court finds only the following issues have merit: the improper question to Dr. Nolan; accusatory statements in closing directed at Defendants' counsel; and statements in closing implying that the Defendants should have quit the LIA. In addition, despite best efforts to the contrary, reference was made on occasion to the Defendants collectively, when fewer than all Defendants were actually at issue. *Page 137 
However, each instance was the subject of a curative instruction. The jury was instructed to disregard the unanswered question to Dr. Nolan. It was repeatedly instructed that closing argument was not evidence, and that it should follow only the Court's instructions on the law to be applied. Finally, the jury was given curative instructions following the closing arguments regarding membership in a trade association and accusations towards counsel. The jury was also instructed that each Defendant was to be given individual consideration, and the evidence was sorted in a way such that the jury could properly identify each piece of evidence with a particular Defendant during deliberations. Therefore, the Court does not find that there exists a cumulative effect of prejudicial error which would require a new trial.
 K. Conclusion as to Errors of Law or Misconduct at Trial
For the reasons set forth above, the Court finds that most of the grounds asserted by the Defendants for a new trial are either inappropriate in a Rule 59 motion, are without merit, or have been waived. Further, the errors that did occur at trial were harmless, both individually and cumulatively. Therefore the Court will deny the Defendants' motions for a new trial on the basis of errors of law occurring at the trial. *Page 138 
 IV Defendants' Supplemental Motions for New Trial, Pursuant to Rules 26(e), 59 and 60, Relating to Evidence Not Produced at Trial
While the post-trial motions described above were pending, SW filed its Supplemental Motion, pursuant to Super. R. Civ. P. Rules 26(e), 59, 60(b)(2), and 60(b)(3), relating to the State's failure to produce certain data. Millennium and NL joined "in the relief sought" by SW's motion. (Joinder of Millennium and NL in Supplemental Mot. for New Trial, June 14, 2006).[91] The State responded by objecting to this motion and by moving for sanctions against SW and its attorneys, claiming that this motion was frivolous.[92] Various briefs were filed and hearings were held on this issue in conjunction with the pending Rules 50 and 59 motions addressed above.[93]
Understanding the basis for the Supplemental Motion requires a detailed discussion of the Lead Elimination Surveillance System (LESS database) which is maintained by the Rhode Island Department of Health. During the trial, the State relied upon the LESS data from the 1993-2004 calendar years in arguing that a public nuisance existed. However, the Defendants argue that complete LESS data for the 2005 year became available to the State during trial, and that it should have been produced to the Defendants. The Court will address both the Supplemental Motion and the motion for sanctions. *Page 139 
 A. Facts and Travel
The trial in this case began on November 1, 2005 and concluded on February 22, 2006 when the jury returned its verdict. During the trial, the State utilized the LESS data for the calendar years prior to and including 2004 — the last complete year when the trial began — in order to demonstrate the existence of a public nuisance. For example, the State noted in closing argument that 1,167 children became diagnosed with elevated blood levels (EBLs) of lead for the first time in 2004. (Off. Dr. Tr. 80:3-7, Feb. 9, 2006.) This number was based upon the 2004 data from the LESS database, as introduced during the testimony of Dr. Patricia Nolan. (Off. Dr. Tr. 70:3-21, Nov. 14, 2005 AM Session.)
Based upon this data and similar data for prior years, the State argued its "plateau" theory at trial: "Ladies and gentlemen, we've reached a plateau. We've gone as far as the secondary measures of enforcement and the screening program can take us." (Off. Dr. Tr. 173:7-9, Feb. 9, 2006.) The State's argument has two components. The first is that the alleged public health threat still exists and is unlikely to go away, which supports the existence of a public nuisance.See id. at 83-86. The second component is that, because the effectiveness of the State's "secondary" prevention efforts are insufficient to eliminate the public health threat, there needs to be "primary" prevention efforts. Primary prevention efforts include such measures as detecting and removing lead in all homes, and the need for those efforts affects whether the Defendants should be ordered to abate the nuisance. Id., see Jury Verdict Form, Question 3.
Before it may address the merits of the motions, the Court must first describe the two methods for testing children for lead poisoning, and how that information is then collected and stored in the LESS database. The Court will then describe the *Page 140 
communications about the LESS database that transpired between the parties before and during the trial. The Court will then describe significant events which occurred after the trial that gave rise to the present motions.
 1. How Children are Screened for Lead Exposure
At trial, Dr. Patricia Nolan testified as to how children are tested for lead in Rhode Island. (Off. Dr. Tr. 59-65, Nov. 14, 2005 AM Session.) Beginning in the late 1990s, pediatricians were required to screen children, between the ages of 6 months and 6 years, for the presence of lead in their blood. Id. at 59:21-60:7.[94] There are two methods for pediatricians to conduct such tests: a capillary test, also known as a "fingerstick" test, and a venous test. Id. at 60:11-24. While the venous test simply involves the drawing and testing of blood, the fingerstick test requires puncturing a finger with a small pin and collecting the droplets of blood. Id.
The venous test is more reliable than the fingerstick test, because the fingerstick test is subject to contamination from the environment.Id. at 60:24-61:4. Dr. Nolan explained that the fingerstick test is
 "less reliable than the venous blood test and it's more likely to say that a child has an elevated blood lead level when the child's level may not be above 10 but it's unlikely to miss a child who has an elevated blood lead level. In other words, if the child's real blood lead level is 15, it's unlikely that a capillary test would report that it was 9. Therefore, it's a good screening test, but it may detect children who actually don't have elevated blood lead levels and needs to be followed up in those cases." Id. at 61:8-18.[95] *Page 141 
Her testimony indicates that, while a fingerstick test is unlikely to understate a child's blood level, it may overstate that level.[96]
Therefore, there exists a protocol for confirming high fingerstick tests with venous tests.
The results of these tests dictate the responsive actions that the State health officials will take to a particular case of lead exposure.See, The Numbers, 2005 at 9 (defining three categories of responsive actions for blood lead levels between 10-14, 15-19, and greater than or equal to 20). A child is considered to be lead poisoned in Rhode Island if it has an EBL — a blood level greater than 10. See id. at 8 (explaining that "for surveillance purposes in Rhode Island" any child under age 6 with a blood lead level greater than 10 "is considered lead poisoned").[97] At a level higher than 20, a child is considered to be "significantly lead poisoned." (Off. Dr. Tr. 68:20-25, Nov. 14, 2005 AM Session.)[98]
Prior to July 1, 2004, if a child had a blood lead level greater than 20, the physician was contacted and encouraged to conduct a confirmatory venous test on that child before most responsive actions were taken.The Numbers, 2005 at 6. ("old" screening methodology). However, from July 1, 2004 onward, that threshold for performing a confirmatory venous test was lowered from 20 to 10 "in an effort to increase the rate of confirmatory venous testing throughout the state." Id. ("new" screening methodology). *Page 142 
 2. The LESS Database: How Lead Exposure Data is Compiled and Reported
While an individual child's blood lead level shapes the response to that individual's treatment, that response is not the only use of the blood lead level information. Since 1993, blood lead levels have been reported to the State by its own laboratory and by private laboratories, who are required by law to report the information. (Off. Dr. Tr. 64:3-20, Nov. 14, 2005 AM Session.) That data is then assembled in the State's LESS database, which contains a variety of information on individual children, including both capillary and venous test results.Id. at 65:20-24.
The LESS data is then compiled and reported annually by the Rhode Island Department of Health. See, e.g., id at 65:24-66:10; The Numbers,2005. These annual reports include two related statistics which are particularly relevant to this motion: the incidence of lead-poisoning and the prevalence of lead poisoning. The incidence measures how many children under the age of six were newly identified as having an EBL in a given year, and who had never previously been identified with an EBL.The Numbers, 2005 at 14. Prevalence, however, measures how many children in a given year have an EBL, regardless of whether they were first identified in that year. Id. at 19. Both incidence and prevalence can be measured as a percentage of the children screened.[99] Finally, one last statistic measures the incidence of lead poisoning in individual Rhode Island cities and towns. Id. at 16. *Page 143 
 3. Counting Methodology for Incidence and Prevalence
The methodology for counting the incidence and prevalence is significant to the outcome of this motion. In their initial motions, the Defendants argued that the decline from 1,167 to 621 children represented a 47% decrease in the incidence of lead poisoning from 2004 to 2005. They argue that such a sharp decline supports their positions that no public nuisance exists, that abatement is unnecessary, and because the State failed to disclose that data, they are entitled to a new trial. However, the State points out that at least part of the reason for the decline in incidence (and prevalence) was that the State had changed its counting methodology for the 2005 data.
For the years between 1993 and 2004, the State included in the incidence data any child identified with a blood lead level greater than 10, regardless of whether it was ascertained with a fingerstick or venous test. See The Numbers, 2006 at 11 (noting that years prior to 2005 are based upon "all venous and capillary tests").[100] (the "old" counting method). However, as noted above, the State issued new guidelines in July, 2004, which recommended confirmatory venous tests for any fingerstick result of 10 or greater, as opposed to the former threshold of 20 or greater. This change in screening guidelines would result in a greater number of confirmatory venous tests being performed.
By the end of 2005, the "new" screening methodology had been in place for over a year. Therefore, effective in 2005, the State determined that even if a child had been identified with a blood level greater than ten, that number would not be counted in the annual incidence data unless that EBL was confirmed with a venous test which also *Page 144 
exceeded 10. Id. (the "new" counting methodology). The changed methodology has the effect of reducing the number of children that would be identified with an EBL as compared to the "old" counting methodology.
For example, in 2004, 1,167 children were identified with EBLs based on the highest result of any test taken — either fingerstick or venous. However, if the "new" counting methodology were applied to that year, two types of data would be excluded. First, any "false positives" would be excluded — high fingerstick results whose confirmatory venous tests turned out to be less than 10 — which would improve the accuracy of the incidence data. However, the new methodology would also exclude children correctly identified with an EBL but who, for whatever reason, did not receive a confirmatory venous test.[101] Therefore, the reliability of the "old" counting method depended upon how many of the unconfirmed fingerstick results are false positives.
The result of the change in counting methodology is that the incidence and prevalence data for 2005 are not directly comparable to the data from prior years — a classic "apples and oranges" problem.
 4. Use of the LESS Data at Trial
At trial, the State introduced the incidence and prevalence data, from 1993 to 2004, through the testimony of Dr. Nolan. (U. Tr. 1-6, Nov. 14, 2005 PM Session.) Using Plaintiff's Exhibit 32, which are reports derived from the LESS database, the State *Page 145 
illustrated the effect of including and excluding fingerstick data.[102] The exhibit and related testimony reveals that from 1993 to 2004, 37,363 children were identified as having a blood level greater than 10 with either fingerstick or venous tests.[103] If only venous tests are included, however, then only 20,236 children had confirmed EBLs. For the other 17,000 children, since they did not have confirmatory venous tests, it is not known how many of those are false positives, and how many were actual positives that simply were not given venous tests. Prior to July 1, 2004, the screening guidelines did not recommend confirmatory venous tests unless the fingerstick result exceeded 20.
Based upon The Numbers, 2005, Dr. Nolan also testified that the incidence of lead poisoning in 2004 was 1,167 children. (Off. Dr. Tr. 70:3-21, Nov. 14, 2005 AM Session.) This reflected 3.7% of children tested in 2004, which happened to be equal to the incidence rate for 2003. The Numbers, 2005 at 13. In that same year, the prevalence was 1,685 children, or 5.0% of those tested in that year. Id. at 19.
The Defendants argued at trial that the State's incidence and prevalence data is unreliable because it included fingerstick data and, therefore, allegedly overstated true extent of lead poisoning.See Off. Dr. Tr. 70:22-23, Nov. 14, 2005 AM Session (noting that the 2004 incidence of 1,167 includes both capillary and venous tests). Indeed, the Defendants pressed this issue on cross-examination:
 "Q. Okay. And that's because the capillary or fingerstick test is not considered reliable enough to be a diagnostic test, correct?
 A. Not exactly. *Page 146 
 . . . .
 Q. Are [the fingerstick tests] unreliable in diagnosing childhood lead poisoning?
 A. They are not reliable for making a diagnosis of childhood lead poisoning. They are a reliable screening test.
 Q. They're a reliable vehicle, screening tool — tool, correct?
 A. Correct.
 Q. But in terms of diagnosing children with lead poisoning, the only reliable test to do so is a venous test, correct?
 A. The — the practical and reliable blood test is the venous test, yes." (Off. Dr. Tr. 43:15-45:8, Nov. 28, 2005 AM Session.)
Dr. Nolan confirmed that the number of false positives contained in the 17,000 unconfirmed fingerstick tests was unknown. (Off. Dr. Tr. 59:24-60:3, Dec. 2, 2005 AM Session.) However, during redirect examination, the State introduced evidence of a study which indicated that fingerstick tests, properly administered, yield at worst a 91% accuracy rate. Id. at 57:13-24; Pl's Ex. 80. From this exhibit, and Dr. Nolan's related testimony, the jury could have concluded that the potential for false positives was sufficiently low to rely on the fingerstick data. Therefore, it could have reached the corresponding conclusion that a high percentage of the 17,000 children were accurately identified with EBLs. In combination with the 20,000 children whose EBLs were confirmed with venous tests, this evidence could have contributed to the jury's finding of a public nuisance. *Page 147 
During cross-examination, Dr. Nolan also testified that the State's "elimination goal," for purposes of seeking a grant from the Centers for Disease Control, was
 "to decrease the proportion of new cases incidence of lead poisoning defined as a blood lead level of 10 micrograms or more in children under 6 years of age to less than 5 percent in all Rhode Island communities without decreasing the availability of lead-safe, affordable housing." (Off. Dr. Tr. 38-39, Nov. 28, 2005 AM Session.)
She then testified that the State had very nearly reached that goal.Id.
As noted above, the Defendants did not call any witnesses. However, they did retain the services of Dr. Phillip O'Dowd to analyze the LESS data for them. He was deposed on November 1, 2005 — the same day that opening statements began in the trial. (O'Dowd Deposition, Nov. 1, 2005, Ex. F to Pl's Obj. to Def's Supplemental Mot., Jun. 21, 2006.) (O'Dowd Dep.) Dr. O'Dowd expressed the opinion that fingerstick tests in Rhode Island were unreliable, based upon his review of the LESS data.Id. at 71:16-24 and Ex. 2 to Deposition ("the capillary [fingerstick] data are unreliable for both 2004 and 2005.") He also calculated an incidence rate based upon the nine months of 2005 data that the State provided to the Defendants. Id. at Ex. 2 to Deposition ("The 2005. . . incidence is estimated to be approximately 2.7% statewide even before correcting out all the erroneous capillary values.") Indeed, the counsel for ARCO made reference to the 2.7% incidence rate during his opening statement that day. (U. Tr. 10:2, 15:10, Nov. 1, 2005, PM Session.) Dr. O'Dowd also testified at his deposition that the statewide incidence rate was falling substantially every year. O'Dowd Dep. at Ex. 2;see also The Numbers, 2006 at 17 (containing a chart with incidence rates for the years 1996-2005). This was also a recurring theme at trial for the Defendants. *Page 148 
With this background in mind, the Court will now examine the communications between the parties during the trial, as well as certain post-trial developments, which are relevant to this motion.
 5. The Case Management Order and the Communications Between Parties
Because of the complexity of this case, the Court entered several case management orders which governed the scheduling of discovery, dispositive motions, and other related matters. The Court ordered that, with certain inapplicable exceptions, factual discovery was to be closed on June 30, 2005, a few months before the scheduled trial date. (Second Supplemental Pretrial Case Management Order, ¶ 1(A), (C), Feb. 17, 2005 (CMO)). The CMO also stated that:
 "No other fact or expert discovery will be permitted beyond the deadlines set forth supra, except by stipulation of the parties, or by order of the Court upon good cause shown by the party requesting the discovery." (CMO, ¶ III.)
It appears that the State had provided at least one version of the LESS database to the Defendants prior to May 30, 2005. (Letter of Michael Rousseau to Nancy Milburn, Oct. 3, 2005, Ex. C to State's Obj. to Def's Supplemental Mot., Jun 21, 2006.)
On or about September 27, 2005, an attorney for a Defendant asked State's counsel to supplement its production of the LESS database:
 ". . . if the State intends on presenting any testimony or other evidence at trial concerning any more current data than is contained in the version of the LESS database that you produce to us in response to this letter, we ask that you produce that data to us as well in advance of the trial." (Letter of Milburn to Rousseau, Sept. 27, 2005, Ex. B to State's Obj, Jun. 21, 2006.) *Page 149 
State's counsel originally indicated that it would not provide an updated database, and that the State did not intend to rely on data after June 1, 2005, but after further urging by the Defendants, he later complied with the request. The State forwarded an updated copy of the database "as a courtesy only, and. . . not to be interpreted as a waiver of the discovery deadline in the CMO." (Letter of Rousseau to Milburn, Oct. 13, 2005, Ex. E to State's Obj., Jun 21, 2006.)
During trial, on January 10, 2006, approximately two weeks prior to the date on which the State eventually rested its case, the Defendants made another request for an updated LESS database via e-mail. Hours later, the Defendants received the following e-mailed response:
 "[N]ot only is this a [sic] overly burdensome request to comply with while in the midst of a trial, but discovery has also been closed for over 8 months. In addition, it is the State's position that in presenting evidence, both parties must be working with numbers from the same time period. Therefore, the State declines your invitation to provide you with yet another copy of the L.E.S.S. database at this time." (Email of Rousseau to Milburn, Jan. 10, 2005, Ex. E. to Def. SW's Supplemental Mot. for New Trial, Jun. 7, 2006.)
No further action was taken with respect to the LESS database. No motion to compel production was brought. The State rested its case, as did the Defendants, and the jury returned its verdict on February 22, 2006.
 6. Significant Events After the Conclusion of the Trial
After trial, two significant events occurred. The first was the publication of the Report of the [Rhode Island] Interagency Council on Environmental Lead to the Governor on March 17, 2006. (Ex. F. to Def. SW's Supplemental Mot. for New Trial, Jun. 7, 2006.) (March 17 ICEL Report.) An appendix to this document, dated January *Page 150 
31, 2006, is entitled "Draft — Eliminating Lead Poisoning in Rhode Island." Id. at 10. (January 31 Appendix.) Notably, it reflects that in 2005, 621 new cases of lead poisoned children were identified.
The second event was the publication of The Numbers, 2006 on the website of the State Department of Health.[104] That document indicates that the incidence of lead poisoning had dropped from 1,167 (3.7%) in 2004 to 621 (2.0%) in 2005. (Childhood Lead Poisoning in RhodeIsland: The Numbers, 2006 Edition, Ex. 1 to Pl's Opp. to Supplemental Mem. of Def. Millennium, Aug. 25, 2006.) (The Numbers, 2006.) Similarly, the prevalence dropped from 1.685 (5.0%) to 981 (3.0%). Id. at 20. This document also confirmed that the "new" counting methodology was used to reach the 621 incidence number. Finally, the document indicated that the State had reached its "elimination goal" of an incidence less than 5% in every Rhode Island community.
These documents are significant because they illustrate that, during the trial, some employee or officer of the State knew, as early as January 31, 2006, that the incidence of new cases of lead poisoning was 621 in 2005.[105] They also indicate that a decision was made to utilize a new counting method in the report of the 2005 data. On the basis of these publications, Defendant SW brought its Supplemental Motion. Shortly thereafter, NL and Millennium joined with their motions, filing a separate brief.
 C. Analysis
It has been said that there are three types of lies: lies, damn lies, and statistics. Before addressing the alleged lies and statistics, however, the Court must first determine *Page 151 
the applicable Rule of Civil Procedure. Defendants have moved under both Super. R. Civ. P. Rule 59, relating to new trials, and Rule 60(b), relating to relief from judgments. Rule 60(b) states, in pertinent part, that
 "the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; . . ." Super. R. Civ. P. Rule 60(b) (emphasis added).[106]
Because of the unique circumstances involving the abatement remedy, which will be addressed below, it appears that no judgment has yet been entered pursuant to the jury verdict of February 22, 2006. Therefore, the Court will treat the Defendants' Supplemental Motion as merely additional grounds for their previous Rule 59(a) motion which was filed previously and which the Court decides herein. See Super. R. Civ. P. Rule 59(a) (allowing new trials "for any of the reasons for which new trials have heretofore been granted in the courts of this state")[107]
On the basis of the facts stated above, the Defendants have alleged three grounds for their motions for a new trial: 1) newly discovered evidence, 2) fraud or misrepresentation, and 3) misconduct by the State. The Court discerns three underlying *Page 152 
themes in the law governing such motions. The first is finality: it is in the public interest, as well as that of the parties, that litigation must terminate at some point. The second is diligence: parties to lawsuits have an affirmative duty to investigate the facts when presenting their cases. The third is justice: judgments of this Court should reflect reality, and those judgments should be obtained fairly. With these themes in mind, the Court will consider whether the Defendants have made a sufficient showing on any of the three alleged grounds for a new trial.
 1. Newly Discovered Evidence
Courts in this state have granted new trials on the grounds of newly discovered evidence. See, e.g., Corrente v. Coventry, 116 R.I. 145, 147,352 A.2d 654, 655 (1976). To demonstrate entitlement to a new trial, the moving party has to meet a two "pronged" test:
 "The first prong is a four-part inquiry that requires that the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, (4) of the type which would probably change the verdict at trial." State v. Brown, 798 A.2d 942, 951 (R.I. 2002) (citations omitted).
Once this first prong is satisfied, the trial justice must determine whether the newly presented evidence is "credible enough to warrant a new trial." Id.; see also Crafford Precision Prods. Co. v. Equilasers,Inc., 850 A.2d 958, 963 n. 6 (R.I. 2004) (noting that the Brown standard applies to both civil and criminal cases).[108] *Page 153 
In their initial motions, the Defendants argued that the decline from 1,167 to 621 children represented a 47% decrease in the incidence of lead poisoning from 2004 to 2005. Such a decline would undercut the State's position at trial that a public nuisance exists, and that further measures were needed to eliminate the incidence of lead poisoning — i.e., an order of abatement.
It was then brought to light, however, that part of the reason for the apparent decline was that the State had changed its counting methodology for reporting the 2005 data.[109] Under the "new" counting method, which does not count unconfirmed fingerstick tests, it is undisputed that the 2005 incidence is 621 children, or 2.0% of children tested. (The Numbers, 2006 Edition at 17.) The record does not reveal an incidence number, based upon the "old" counting method, for the entire 2005 year. All that can be conclusively known is that the incidence under the old counting method would be greater than 621 and 2.0%.[110]
However, Dr. O'Dowd's deposition indicates that the 2005 incidence rate was 2.7% based upon nine months of data, which would still indicate a decline from the 2004 data under the old counting method. (Ex. 2 to O'Dowd Dep.).[111] *Page 154 
Therefore, the Court must determine whether either the complete 2005 LESS data or the changed counting methodology constitute newly discovered evidence.[112]
 a. Whether the Changed Counting Methodology Constitutes Newly Discovered Evidence
The Defendants argue that, regardless of the actual incidence data for 2005, the fact that the State changed its counting methodology constitutes newly discovered evidence which would warrant a new trial. The State responds by arguing that the Defendants were told of this new methodology well in advance of trial, and cannot now claim that they were surprised. They rely on a deposition of Dr. Peter Simon on May 3, 2005, and various documents that the State produced during discovery, to demonstrate that the Defendants knew or should have known of the impending change.
The Court has examined the deposition to which the State refers, and it is clear that the Defendants were told of a new methodology — the new screening methodology. (Simon Deposition, 8:13-16, Ex. 5 to State's Opp. to Supplemental Mem. of Millennium, Aug. 25, 2006) (Simon Dep.) The Court finds, however, that deposition does not provide a clear indication that the State would utilize the "new" counting methodology in *Page 155 
reporting the incidence and prevalence data. In fact, when asked whether the State would still count the fingerstick tests in the incidence numbers, Dr. Simon indicated his uncertainty numerous times and that he needed to check with his colleagues, but also stated his belief that the State would retain the old counting methodology. Id. at 7:11-15, 12:1-20 (stating his belief that unconfirmed fingerstick results from 10 to 19 would not be excluded from the reports.)[113] While the State has pointed to other documentary evidence provided during discovery, allegedly giving the Defendants notice of the change, the Court will assume arguendo that the Defendants had no knowledge of the impending change in counting methods.
Even if the Defendants were not given notice of the changed counting methodology, they still are not entitled to a new trial. The Defendants seek to rely on the changed methodology to undermine the State's use of incidence numbers that include fingerstick and venous test results. They argue that the State's subsequent change in counting methodology amounts to an admission that the "old" counting methodology was unsound. Therefore, they seek to impeach the use of the pre-2005 data, and Dr. Nolan's testimony on that data, with the evidence of the changed methodology. However, the law is clear that newly discovered evidence is not grounds for a new trial if it is merely cumulative or impeaching.See Brown, 798 A.2d at 951.
The Defendants had ample opportunity at trial to question the reliability of the "old" counting methodology, for the years 1993 through 2004, without introducing the State's subsequent change in methodology to impeach. As noted above, the Defendants *Page 156 
cross-examination of Dr. Nolan covered the topic. Moreover, the Defendants' expert analyzed the LESS data and concluded it was unreliable in his deposition of November 1, 2005. (O'Dowd Dep. Ex. 2). The Defendants could have presented his opinions to the jury to discredit the use of any data that included unconfirmed fingerstick results.[114] However, they merely chose to rely on their cross-examination of Dr. Nolan to advance their position.
Dr. O'Dowd had the raw data for the LESS database up to September, 2005. Dr. O'Dowd's deposition indicates that he was capable of utilizing that data to produce incidence numbers under either the "new" or "old" counting methodologies, regardless of how the State eventually chose to report it in The Numbers, 2006.[115] He could have calculated incidence and prevalence data for all of the years, under the "new" methodology, and the Defendants could have presented this data.[116]
The jury would then have been able to view the data as the Defendants wanted them to see it.
Therefore, since the changed methodology would only be useful for impeachment purposes, and since the Defendants had an adequate opportunity to question the reliability of the "old" counting method, the Court finds that the change in counting methodology does not constitute newly discovered evidence, and the Court will not order a new trial on this basis. *Page 157 
 b. Whether the Complete 2005 LESS Data Constitutes Newly Discovered Evidence
As to whether the complete 2005 data is newly discovered evidence, there are several reasons why the Defendants are not entitled to a new trial on this basis. First, it is debatable whether this evidence can even be considered "newly discovered." See Prostrollo v. University ofSouth Dakota, 63 F.R.D. 9, 11 (D.S.D. 1974). The LESS database continuously collects new data, and while the Defendants did not know what the data would reveal, the Defendants clearly knew that the data existed because they had received earlier versions of the database, through discovery, which was complete through September 2005. In fact, the Defendants specifically requested the LESS database in the January 10, 2006 e-mail. However, assuming arguendo that it is properly classified as newly discovered, the Defendants did not exercise due diligence to obtain the last three months of data. Further, the data is merely cumulative of issues that the Defendants could have and should have raised at trial.
On January 10, 2006, counsel for one of the Defendants made an e-mail request that the State turn over the data. The State refused to do so. The Defendants contend that because the State had a duty to supplement its discovery responses, the mere sending of that e-mail fulfilled their diligence obligations. Whether the State had such a duty will be addressed below, but regardless of the answer, the Court finds that the Defendants were not sufficiently diligent. When the State clearly refused their request, the Defendants should have made a motion to compel production. See Medeiros v. Anthem Cas. Ins. Group, 822 A.2d 175,178 (R.I. 2003) (finding that litigant should have interviewed a certain individual, and that if that person "proved to be evasive" then the litigant should have issued a subpoena for her because "[d]ue diligence demanded no less"); see also *Page 158 
CMO, ¶ III (providing that no further fact discovery would be permitted "except. . .by order of the Court upon good cause shown by the party requesting discovery.")
The State contended in its e-mail that producing the data would be burdensome, and it almost certainly would have objected to the Defendants' motion. The State would probably also have argued that both sides should be working from the same data. See E-mail of Rousseau to Milburn, Jan. 10, 2006.[117] The Court would then have had to decide whether the benefit of having complete 2005 data before the jury was worth the cost in producing that data. It is unknown and unknowable how this Court would have ruled at that point. However, where the Defendants already had nine months of 2005 data, knew of the existence of the complete 2005 data, had a remedy to obtain its production, and failed to utilize that remedy, they cannot now seek a new trial on the basis of newly discovered evidence. Such a holding would weaken a party's incentive to diligently pursue its case.
Further, the data that the Defendants would have obtained would merely have been cumulative of data that the Defendants already had received and could have presented at trial. The Defendants' expert calculated an incidence rate for the first nine months of 2005 and concluded that it was 2.7%, as compared with 3.7% in 2004. Compare O'Dowd Dep., Ex. 2with The Numbers, 2005 at 14.[118] The Defendants could have presented this computation to the jury to support their argument that incidence was declining, and rebut any contention that the incidence of lead poisoning had reached a "plateau." However, they made a strategic decision not to present this evidence. *Page 159 
Counsel for NL suggested at the hearing that the Defendants were reluctant to present partial annual data because of the following testimony by Dr. Nolan. When asked about the 2005 data, Dr. Nolan stated that "I do not know the year 2005 rates. We generally look at annual rates because across the year there are many things that intervene. You really need a full year's data." (Off. Dr. Tr. 31:17-25, Nov. 28, 2005, AM Session.) Dr. Nolan had testified that because of fluctuations in testing from month-to-month, annual data was more useful in discerning trends.[119]
However, the Court is not convinced that this was a valid reason to hold back the partial 2005 data, and not present testimony from Dr. O'Dowd, which was based on nine months of data and appears to have been very favorable to the Defendants on this point. Nine months might not be as good as twelve months, but would probably be sufficient to mask the monthly fluctuations to which Dr. Nolan referred. Indeed, this argument sounds more like the post hoc rationalization of a strategic decision that, in hindsight, did not pay dividends. Moreover, the testimony of Dr. Nolan regarding annual data would have weighed in favor of an order compelling production of the 2005 data in January, 2006. However, because such a motion was never made, the effect of this data on the jury will never be known. Under these circumstances, the Court cannot order a new trial on the basis of newly discovered evidence.[120] *Page 160 
 2. Fraud and Misrepresentation: Whether the State Made an Assertion Not in Accord with theFacts
Although the changed methodology and complete 2005 LESS data clearly are not newly discovered evidence, this is not the end of the inquiry. The Defendants also contend that the State misrepresented facts surrounding the LESS data to the jury and that a new trial is required.
Courts in this State have granted new trials where parties have made misrepresentations or committed fraud. Misrepresentation is defined as "a manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accord with the facts." Pari v. Pari, 558 A.2d 632, 637 (R.I. 1989). The difference between a fraud and a mere misrepresentation appears to be that fraud occurs when the person making the false statement had, or should have had, knowledge of the falsity. Id. A misrepresentation, however, can reflect several states of mind "including negligent and innocent misrepresentation." Id. The Defendants contend, and this Court agrees, that even an innocent misrepresentation can form the basis for a new trial. See Lett v. Providence Journal Co., 798 A.2d 355, 365 (R.I. 2002).
If fraud or misrepresentation has occurred, however, the Court must also analyze the effect on the trial, had the fraud or misrepresentation not occurred. The Defendants contend that, unlike with newly discovered evidence, they need not show that the outcome of the trial would have been different had the misrepresentation not occurred. See Anderson v.Cryovac, Inc., 862 F.2d 910, 924 (1st Cir. 1988) (comparing the standards for newly discovered evidence with the standards for misrepresentation and misconduct, and concluding that when "wrongful secretion of discovery material makes it *Page 161 
inequitable for the withholder to retain the benefit of the verdict, the aggrieved party should not be required to assemble a further showing.") However, the Court should not lightly disturb a verdict. Id. Therefore, although the Defendants need not conclusively show that the outcome at trial would have changed, they still must show "by clear and convincing evidence that the alleged fraud" prevented them from fully presenting their case. Northeastern Elec. Co. v. American Capital Corp.,492 A.2d 829, 832 (R.I. 1985) (stating in dicta that even if an intentional misrepresentation had been proven, the moving party was not prevented from presenting its case since the inaccuracies had been brought to light on cross-examination for the jury's consideration).[121]
It is fairly clear that as of January 31, 2006, somebody at the State — the identity of whom is unknown — had compiled the 2005 LESS data and determined that the incidence number was 621. See January 31 Appendix. Moreover, to reach the number 621, whoever compiled that data had to consciously decide to use the "new" counting methodology. Given the similarities of the January 31 Appendix to the introduction in TheNumbers, 2006, it can reasonably be inferred that, by January 31, someone had either decided or at least suggested that a change in the counting methodology should occur. Compare January 31 Appendix toThe Numbers, 2006 at 5. The change in methodology was eventually adopted and incorporated into The Numbers, 2006. Therefore, the Court concludes for purposes of this motion, that by January 31, 2006, some person or persons affiliated with the State had decided to change its counting methodology. Similarly, some person or persons had knowledge that the 2005 incidence number was 621 (2.0%) *Page 162 
under this "new" counting method. This is days after both parties had rested, but prior to the jury beginning its deliberations.
It is not known whether or not counsel for the State had actual knowledge of these facts, but the Defendants do not appear to argue that any individual knowingly made a false statement. However, they do allege that the totality of the State's conduct amounts to an assertion not in accord with the facts — even an innocent one — which would be sufficient to order a new trial. Therefore, the Court will analyze whether the following statements during trial with respect to the LESS database constitute misrepresentations by the State: (1) use of the "old" counting methodology during trial; and (2) various statements by witnesses and counsel invoking the "plateau" argument.
 a. Alleged Misrepresentations to the Jury Regarding Counting Methodology
With regards to the counting methodology, the Court cannot find that a misrepresentation has occurred. The State always referred to pre-2005 data at trial, and that data was computed using the "old" counting methodology. The Defendants have not pointed to any instance in which the State misrepresented how the pre-2005 data was computed. While the State vigorously asserted that the methodology was reliable, the Court does not find that the subsequent change in methodology necessarily means that the pre-2005 data was necessarily unreliable. The change may simply represent a conclusion that the "new" methodology ismore reliable, especially since it was the first full calendar year in which the new screening policy had been in place. This new policy should have caused more confirmatory venous tests to be performed, which would reduce the need to rely on fingerstick data. *Page 163 
Whether the pre-2005 data was reliable, and for what purposes it should be relied upon, is a question upon which reasonable minds can differ. The State presented a reasonable basis for the jury to conclude that the "old" counting method was reliable to find a public nuisance, and the jury had an adequate basis upon which to reach their decision. Therefore, the Court cannot find that a misrepresentation occurred with respect to the change in counting methodology
 b. Misrepresentations to the Jury Regarding the PlateauArgument
The Defendants argue that the 2005 LESS data conclusively reveals that the State's "plateau" argument was false. Therefore, they argue that the use of that argument at a time where the State had access to, and knowledge of, the 2005 data amounts to "an assertion not in accord with the facts" under these circumstances.
As described above, the "plateau" means that efforts in preventing lead poisoning through secondary preventive means — i.e. identifying poisoned children and cleaning up the environment that caused that poisoning — are inadequate.[122] For example, State's counsel stated to the jury that "[l]adies and gentlemen, we've reached a plateau. We've gone as far as the secondary measures of enforcement and the screening program can take us." (Off. Dr. Tr. 173:7-9, Feb. 9, 2006.) While the incidence of lead poisoning had reflected a decline in incidence over the last fifteen to twenty years, the "plateau" is a prediction that mere secondary prevention measures will not be sufficient to eliminate *Page 164 
lead poisoning entirely. Therefore, the State argued that primary prevention measures were necessary.[123]
The "plateau" is not a fact, at least not in the way that the number 621 is a fact (the incidence of lead poisoning in 2005 under the "new" counting method). The "plateau" is an argument — an invitation by the State to the jury to draw certain inferences from the facts which the State presented. The Defendants seem to define the "plateau" as an assertion by the State that the 2005 incidence (and prevalence) data would not decline. For example, in 2003 and 2004, the incidence data remained the same at 3.7%. (The Numbers, 2005 at 14.) Therefore, the Defendants seem to argue that since the incidence rate did decline in 2005,[124] and since the State either did or should have known of the decline, any reference to a "plateau" is a misrepresentation. However, the Court does not take such a restrictive view of the plateau.
Even though the Court assumes that the State had knowledge of the 2005 data, the Court cannot find that the use of its "plateau" argument constituted a misrepresentation. In order to find "an assertion not in accord with the facts" the Court would have to find that it is a conclusive fact that the "plateau" argument is invalid and lacked any factual basis. In other words, the Court would have to find, as the Defendants advocate, that mere secondary preventive measures to eliminate lead poisoning are sufficient, and that further measures are unnecessary. Only then could it be said that the State's arguments to *Page 165 
the contrary amounted to "assertions not in accord with the facts." The Court will not make such a finding here.
It is true that the 2005 data tends to negate the position that a plateau has been reached. However, the State based its theory upon more than merely the LESS data when it argued that primary prevention techniques are required to completely eliminate lead poisoning. The Court finds ample evidence in the record to support the State's use of that argument, even with the knowledge that the incidence rate declined in 2005. For example, Dr. Michael Shannon testified that
 "From — from about 1985 until just about 2000, there was a further fall, not as significant, but a further fall which was the result of secondary preventions; starting to find the children who had been lead-poisoned, identifying the source, eliminating the source. There has been very much a plateau since 2000. It does continue to fall, but it's not falling to zero as we'd hoped and even in healthy people." (Off. Dr. Tr. 87:6-8, Jan. 23, 2006, AM Session.)
His testimony was based upon his experience that nationally there were still hundreds of thousands of poisoned children, and that he had a clinic that dealt with over 500 cases of lead poisoning per year.Id. at 89:3-9. Moreover, the 2005 incidence rate did not decline to zero, and it is unknown whether future incidence data will bear out a decline.
While the Court does not find a misrepresentation here, even if the circumstances surrounding the LESS database could somehow be considered a misrepresentation, the Court finds that the Defendants were not prevented from presenting data of a decline in the 2005 incidence rate. The Court's earlier discussion with respect to Dr. O'Dowd's deposition and the Defendants' diligence applies equally here, and demonstrates that the Defendants could have presented evidence to rebut the "plateau" argument. *Page 166 
Finally, the Court cannot overlook the fact that the State's position regarding the LESS data appears to have been consistent throughout the course of the trial. As early as October 3, 2005, the State indicated that it would not present LESS data "that post-dates June 1, 2005." (Letter of Milburn to Rosseau, Sept. 27, 2006; Letter of Rousseau to Milburn, Oct. 3, 2005, Exhibits B and C to State's Obj., June 21, 2006.) It made that representation in response to the Defendant's request that, if the State was to present such data, it needed to produce it to the Defendants prior to trial. Id.
The record is clear that the State never misrepresented the hard facts surrounding the LESS database. When it presented numbers and testimony, it consistently made clear the source of that testimony. The Defendants have not pointed to any evidence otherwise. Therefore, the Court cannot find that the State's presentation of its "plateau" argument, under the circumstances described herein, constituted an assertion not in accord with the facts requiring a new trial.
 3. Misconduct
Courts have also ordered new trials in this State on the basis of misconduct by a party other than fraud or misrepresentation. The Defendants allege that the discovery rules imposed a duty upon the State to disclose the complete 2005 LESS data, and that the failure to do so constitutes misconduct requiring a new trial. See Anderson v. Cryovac,Inc., 862 F.2d 910, 923 (1st Cir. 1988) ("Failure to disclose or produce materials requested in discovery can constitute `misconduct' within the purview of [Rule 60(b)].") Therefore, the Court must look to the discovery rules, as well as the February CMO, to determine the nature of the State's obligations. The Court will then determine if the State breached those obligations. Finally, as with misrepresentations, the Defendants *Page 167 
must also show "by clear and convincing evidence" that the alleged misconduct "prevented" them from fully presenting their case.Northeastern Elec. Co. v. American Capital Corp., 492 A.2d 829, 832
(R.I. 1985).
In general, the discovery rules provide a party with broad authority to propound discovery. However, the Court has the authority to limit that ability for the reasons described in Super. R. Civ. P. Rule 26(b)(1) and (c). This Court entered the case management order in February, and discovery was essentially closed after June 30, 2005.See CMO ¶ III. (stating that, other than certain inapplicable exceptions "[n]o other fact or expert discovery will be permitted beyond the deadlines set forth supra, except by stipulation of the parties, or by order of the Court upon good cause. . .")
However, while the case management order limited the parties' ability to make new discovery requests, it is inconclusive on the duty of a party to supplement prior discovery responses. See CMO ¶ 1.C. (requiring that, by "May 30, 2005, the State [must] supplement its production of documents" covering documents produced prior to May 1, 2005). No other provision seems to address supplementation of other documents. Therefore, it seems that the relevant provisions of Rule 26 are controlling:
 "(2) A party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which (A) the party knows that the response was incorrect when made, or (B) the party knows that the response though correct when made is no longer true or complete and the circumstances are such that a failure to amend the response is in substance a knowing concealment." Super. R. Civ. P. Rule 26(e).[125] *Page 168 
As described above, the State provided the Defendants with the first nine months of the 2005 LESS data, and there is no allegation that the State's production was deficient at the time — indeed, the production may have exceeded its obligations. Therefore, the Court will address whether the State's refusal to supplement the LESS database with the last three months of data "is in substance a knowing concealment."See Rule 26(e)(2)(B).
The "knowing concealment" clause has been interpreted to "protect a party who reasonably believes that the change that has made [an] answer no longer accurate is known to the opponent or that it is a matter of no importance." Poulin v. Greer, 18 F.3d 979, 984 (1st Cir. 1994) (internal quotations omitted). Although the State did not disclose the complete 2005 data to the Defendants when it was requested, it is difficult to see how that constitutes a concealment — knowing or otherwise.
Both parties knew of the existence of the LESS database and that it was updated on a continual basis. Once the trial extended into 2006, both sides knew that a new year of data was available. In this case, the State's original production became incomplete only because of the lapse of time and all parties were aware of it. The State clearly stated its position that the Defendants were not entitled to the LESS database, and its position that production would be too burdensome was a reasonable one. Whether or not that position would have survived a timely motion to compel is a separate question, but in this case the Court cannot find that a knowing concealment occurred.
Finally, even if the Court assumes the worst case scenario: that the State knew the content of the 2005 LESS data; believed that it would destroy their case; and consciously took a frivolous position to ignore a properly interposed discovery request, the Court still could not find that a new trial was warranted. Of course, the Court does not find that *Page 169 
those circumstances occurred here, but even if they had, those actions still would not have prevented the Defendants from "fully presenting their case" because the Defendants had a remedy and did not avail themselves of that remedy.
The Defendants have suggested that the Rules of Civil Procedure were intended to dispense with a "sporting theory of justice." However, while the discovery rules exist to provide a level playing field for litigants, we are still operating in an adversary system which imposes obligations of diligence upon the litigants. As the Court has noted above, the Defendants did not exercise due diligence. Therefore, the Court will not order a trial on the basis of a violation of the duty to supplement discovery responses.
 D. Motion for Sanctions
Despite this Court's conclusion to deny the Defendants' motion based upon the LESS database, the Court will not impose sanctions upon SW or its counsel. At first glance, the facts underlying the Supplemental Motions could give rise to an inference that a new trial is warranted. It goes without saying that, merely because a position taken in litigation does not prevail, that failure does not automatically give rise to an award of sanctions.
Based upon the data, the timing of the release, along with the change in methodology, the Court cannot find that the motion was wholly without facts to support the interpretation given by SW, such that a sanction would be appropriate. Moreover, the Court cannot find that it was interposed merely for purposes of delay or to increase the cost of litigation. In this Court's view, an award of sanctions here would cause an undue chilling effect upon the ability and willingness of parties and counsel to vigorously advocate their case. Therefore, while the Court disagrees with the overall conclusions *Page 170 
reached by the Defendants in their Supplemental Motions, the Court will deny the motion for sanctions against SW.
 E. Conclusion as to the Supplemental Motions for New Trial
While the Court finds that neither party's conduct with regard to the LESS data was wholly immune to criticism, the Court does not find circumstances which would warrant a new trial. Therefore, the Supplemental Motions for New Trial by Defendants SW, NL, and Millennium are denied. The motion for sanctions against SW is also denied. *Page 171 
 V Abatement as a Remedy for the Public Nuisance Found by theJury
The jury found that "the cumulative presence of lead pigment in paints and coatings on buildings throughout the State of Rhode Island" constitutes a public nuisance. (Jury Verdict Form, Question 1, Feb. 22, 2006.) The jury found that three of the Defendants "caused or substantially contributed" to the creation of that public nuisance, and that those three Defendants "should be ordered to abate the public nuisance." Id. at Questions 2, 3. The jury was instructed that "abatement means the public nuisance is to be rendered harmless or suppressed" and that "if you decide that abatement shall take place, it will be for the Court to determine the manner in which such abatement will be carried out." (Jury Instructions 16.)
Following the jury verdict and a conference in chambers, the Court directed the parties to file "position papers" on the subject of abatement as a remedy for the public nuisance found by the jury.[126]
The State urges the Court to appoint a Special Master to design an abatement plan "consistent with the evidence in this case and the public health needs." (Pl's Position Paper 2.) It suggests that an abatement plan could include, inter alia, "education, prevention, identification, hazard reduction, and monitoring" and that empowering a qualified expert in public health with the powers of a special master could *Page 172 
best achieve the formation of an abatement plan. See id. The Defendants argue that such an appointment is premature because several legal issues require briefing and decision and, if decided in the Defendants favor, those issues would preclude an abatement remedy. Therefore, Defendants urge that it would be inappropriate for the Court to consider appointing a special master at this point. In addition to addressing the substantive issues of law involved in crafting a remedy, the parties' papers also raise practical concerns of how best to conduct the litigation from this point onward. With the preceding in mind, the Court will proceed to address the parties' specific contentions in turn.
 A. Equitable Concerns and Whether the State Has an Adequate Remedy at Law
Characterization of the State's request for relief, as either an equitable or legal remedy, has been and continues to be the subject of intense dispute. Defendants now argue, as they argued prior to trial, that abatement and any other form of equitable relief is inappropriate for various reasons. The State responds that the abatement issue has been conclusively decided; that the jury has ordered abatement, and that the only remaining step is for the Court to appoint a special master to begin implementing an abatement order. This is not a new debate, and its consideration of this argument requires reference to earlier pre-trial proceedings.
Prior to trial, on October 12, 2005, the Court entertained two related motions in limine. The first was to determine Defendants' right to a jury trial on Plaintiff's claim for future relief, which involved both a claim for future damages and a claim for the equitable remedy of abatement. (Off. Dr. Tr. 7:11-9:4, Oct. 17, 2005.) Previous to that hearing, this Court had left "open for determination at the end of trial the issue of whether *Page 173 
equitable relief may be appropriate." State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 55, *7-*8 (April 25, 2005). However, for both practical and due process reasons, the Defendants urged the Court to determine the jury's role in any abatement decision. (Off. Dr. Tr. 7:17-24, Oct. 17, 2005.) Therefore, this Court announced that both damages and "the question of whether defendants or any of them shall be required to abate or to otherwise provide non-monetary relief as prayed by the plaintiff shall be determined by the jury." Id. at 8:17-23. This Court further stated that "[i]n the event that such [equitable] relief is ordered by the jury, this Court will conduct appropriate hearings, if necessary, from time to time and fashion such orders as under the circumstances might be appropriate in order to implement any judgment of abatement rendered by the jury." Id. at 8:24-9:4.
The second motion in limine was aimed at precluding the jury's consideration of "future damages," or damages to compensate the State for harms that may be sustained in the future — as opposed to damages to compensate for harms already sustained (past damages). See id. at 9:5-10:8. The State indicated in its discovery responses that it had spent approximately $58 million on various programs related to lead — its past damages — for harm already incurred. (Pl's Further Supp. Ans. to Interrogatories 1, May 27, 2005.)[127] It also calculated that the costs of remediation for lead contamination in Rhode Island homes — its future damages — would range between $1.37 billion and $3.74 billion. Id. at 2.
The Defendants argued that such future damages were too speculative, and that future damages for a continuing nuisance could only be recovered in future litigation *Page 174 
under the doctrine of toties quoties.[128] This Court agreed and ordered that any evidence with respect "to the dollar value proposed or otherwise of any future damages" should be excluded from the trial. (Hr'g Tr. 9:25 — 10:2, Oct. 17, 2005.) However, that did not preclude
 "appropriate evidence that would go to the issue of the remedy that the jury is to be asked to order of abatement. But, nothing with respect to the magnitude of dollars implicated is to come before this jury." Id. at 10:3-8.
The Defendants now argue that the Court should not order abatement because of the toties quoties doctrine. Defendants argue that not only does the toties quoties doctrine preclude an award of future damages, but because the State may bring future actions, Defendants argue that the State has an adequate remedy at law which would preclude an equitable remedy such as abatement.[129] Therefore, the Court will examine whether bringing future actions toties quoties is "adequate" under Rhode Island law.
At the outset, the Court notes that while many of the cases cited by the Defendants support the notion that future damages are unrecoverable in a continuing nuisance action, they do not provide any authority for the proposition that such actions constitute an adequate remedy at law precluding injunctive relief. See, e.g., Lonsdale Co. v.Woonsocket, 25 R.I. 428, 431, 445, 56 A. 448, 450, 455 (1903) (noting that actions for future damages may be maintained toties quoties, and at the same time ordering an injunction); Baker v.Burbank-Glendale-Pasadena Airport Authority, 39 Cal. 3d 862, 868 *Page 175 
n. 6 (Cal. 1985) (injunctive relief not considered by court because preempted by federal law).
Whether there exists an adequate remedy at law is also sometimes formulated as a requirement that a Plaintiff demonstrate "irreparable harm." Rhode Island Turnpike Bridge Auth. v. Cohen, 433 A.2d 179, 182
(R.I. 1981). One situation in which courts find irreparable harm, which is most applicable in this case, is the situation where damages would be difficult to measure. See Cohen, 433 A.2d at 182 (noting that "[i]nadequacy of the legal remedy may also be shown when a party is entitled to damages but the court is not capable of measuring those damages"). The Defendants have argued vehemently, and the Court has agreed, that the future damages related to the lead paint nuisance were too speculative to be recoverable in this action. (Hr'g Tr. 9:25 — 10:8, Oct. 17, 2005.)
The thrust of the Defendants' position is that the State should have to foot the bill up front for the costs of abatement and then bring future actions to recover damages. However, this Court does not find it "adequate" after over six years of litigation for the non-liable party to have to take primary responsibility for abating the nuisance, for which other parties have been found liable, and then be required to engage in more litigation to recover its costs. See Dobbs, Law ofRemedies, § 5.5 at 513 (2d ed., Hornbook Series 1993) (Dobbs,Remedies) (noting that courts have found the remedy at law inadequate where multiple or repeated trespasses were likely and damage claims would involve a multiplicity of suits). While the State may elect to bring actions for damages in the future, equitable principles do not make such actions the sole remedy for the continuing nuisance which was found in this action. *Page 176 
The Court notes that if it did adopt the Defendants' position that future damage actions were adequate and the sole remedy available to the State, it is doubtful that such abatement would ever be performed. While theoretically possible, the State's limited resources raise serious practical barriers that would hinder its ability to bring successive lawsuits to recover those costs, even if the preclusive effect of this lawsuit may to some extent streamline future litigation. In this Court's view, such a procedure would not be an "adequate" remedy and would be inconsistent with the jury's conclusion that Defendants are liable for, and should render harmless, the cumulative presence of lead pigment in paint on Rhode Island buildings. Therefore, this Court finds that because future damages are immeasurable and therefore unavailable for the continuing nuisance found by the jury, that nuisance is a type of irreparable harm for which injunctive relief is appropriate, and for which legal damages would be inadequate.
 B. Costs and Liability of Other Responsible Parties
The Defendants have argued that any consideration of an equitable remedy must take into consideration the roles of non-defendants — i.e. the State, property-owners and other paint manufacturers — in contributing to the lead nuisance that the jury found to exist. They argue that some apportionment of liability is required. However, the Court finds that their arguments do not preclude this Court from proceeding with an abatement remedy at this point.
To the extent that participation in an abatement remedy occurs without the participation of these unidentified liable parties, the Defendants should seek future actions for contribution, toties quoties, against those parties. As Defendants' counsel aptly stated, "Of course, you don't know what it's going to cost until you've done it. . . *Page 177 
[o]nce you've done it, there's a price to it." (Off. Dr. Tr. 13:6-11, October 12, 2005.) The Court sees no reason to delay the formation of a remedial plan merely because there may exist other liable parties somewhere. If the goal was to ascertain every possible party who contributed to the public nuisance found by the jury, before commencing an abatement plan, then abatement would never occur. While this delay may suit Defendants' interests, it is not consistent with the jury's verdict that the Defendants are liable for the nuisance and ought to abate it.
If the Defendants feel that it is an appropriate time to prosecute their third party complaint, they may take appropriate steps leading to a trial. To the extent that such other contributors are found liable, Defendants can seek an appropriate modification of any remedial order prior to or during the implementation of the remedy to incorporate other liable parties, who will then participate on the same basis as the three currently liable defendants.
 C Injunctions for the Payment of Money Damages
While the Court agrees with the Defendants' contention that it cannot order an injunction for the payment of money damages, see,e.g., Jaffee v. United States, 592 F.2d 712, 715 (3d Cir. 1979), it is not persuaded that the State's entire requested relief is merely a veiled request for such an injunction. Defendants argue that because they are not accustomed to performing lead abatement, they will have to hire somebody to perform those abatement services which will in turn cost money. Therefore, the State's requested relief is really a request for damages, Defendants argue, regardless of the State's characterization of its request for relief. *Page 178 
Certainly, at times the State's requests for relief have been articulated as requests for funding. For example, the State has suggested that Defendants be ordered to fund a lead testing and monitoring program, or a public education campaign. See, e.g., Pl's Second Am. Compl. 24. However, an injunction could simply order the Defendants to conduct a testing and monitoring program, or to conduct a public education campaign.
Such an injunction would probably be described as a "structural" injunction akin to those used in school desegregation cases. Structural injunctions involve "a cycle in which the court issues a general injunctive decree, which is followed by [alleged] disobedience or unsatisfactory compliance, which is followed by further hearings, and a supplemental decree stating in more detail what is required of each defendant. The cycle is then repeated several times, with each decree becoming more precise in its demands." Dobbs, Remedies, § 7.4(4) at 642.
Both sides comprehend that performing abatement will likely cost substantial amounts of money, but it is not enough for Defendants to simply show that compliance with an injunction will cost money.Jaffee, 592 F.2d at 715 (noting that "the creation of expense does not necessarily remove a form of relief from the category of equitable remedies"). If that were the test, very few courts could ever order injunctions. The Court notes that Defendants are not human beings, but legal entities who can only act through their officers, directors, and employees, most of whom receive payment for their services. For the Defendants to take any action costs money in some manner, so this cannot be the test for whether a remedy is legal or equitable. Therefore, the Court finds that this argument does not preclude the consideration of an abatement remedy at this point. At *Page 179 
most, it merely informs the Court's discretion as to the nature of the remedy to be ordered.
 D. Practicality of the Requested Abatement Remedy
The Defendants have argued that, for various reasons, any relief other than the payment of damages would be impractical. See Cohen,433 A.2d at 182 (directing the trial judge to examine the practicality of imposing injunctive relief). The main reason asserted is that, because Defendants do not have access to the premises of homeowners, they cannot implement any abatement remedy. In addition, the Defendants argue that an abatement remedy is impractical because it would constitute an order for Defendants to run the State's abatement programs.
While the Defendants do not have a right simply to enter properties and abate lead, they could be ordered to provide notice to the various affected property owners that lead inspection and abatement services are available if desired. They could also be ordered to provide lead abatement services to those property owners who voluntarily permit them to enter. The Court is not convinced at this stage that the accessibility issue identified by the Defendants would be insurmountable.
Nor does the Court find that an injunction would improperly require the Defendants to run the State's lead abatement programs. The nature of the Defendants' concern is not exactly clear to the Court. The Court would not be appointing the Defendants, or their principals, as the head of any State agency in charge of lead abatement. Rather, the Defendants would essentially be implementing their own abatement program, to supplement those of the State, in a manner that complements the efforts already undertaken by the State. *Page 180 
A necessary implication from the jury verdict is that the cumulative presence of lead pigment in paint imposes a burden on the State that it ought not have to bear. (Jury Instructions 11.) Therefore, to the extent that an abatement remedy relieves the State of some of its burden, the Court does not see how that relief would be improper.[130] However, given the magnitude of the nuisance found by the jury, the Court finds that the priority of any abatement remedy should not be to duplicate programs run by the State, but rather to focus on areas in which the State's programs are inadequate and need supplementation.
While there may be other practical barriers to implementation, which the Court will evaluate at the appropriate time, the Court finds that, at this time, the Defendants have not identified a practical barrier which would preclude an abatement remedy.
 E. Role of the Jury in Ordering an Abatement Remedy
The Defendants finally argue that the jury could not have ordered abatement because only a court of equity may order a mandatory injunction, and for this Court to order abatement at this stage would be to abdicate its judicial function. The Defendants rely, inter alia, onBendick v. Cambio, 558 A.2d 941, 945 (R.I. 1989), for the proposition that a jury cannot order injunctive relief.
To put the Defendants' argument in context, the Court again makes reference to the October 12, 2005 hearing,[131] and this Court's subsequent decision,[132] in which the *Page 181 
roles of the jury and the Court were at issue. In that hearing, the Defendants requested that the Court clarify the roles of the Court and the jury in this case. In reaching its decision, this Court relied onHudson v. Caryl, 44 N.Y. 553, 555 (N.Y. 1871). The Hudson court found that, as a historical matter, where a nuisance action was brought for the dual purposes of abating a nuisance (an equitable action not giving rise to a jury-trial right) and for recovering damages for that nuisance (a legal action giving rise to a jury-trial right), a jury trial was required. Id. at 554-55. Moreover, once the jury found for the plaintiff, "the execution which followed the judgment directed the sheriff to remove the nuisance and collect the damages." Id. at 555. Therefore, this Court found that the Defendants had a right to a jury-trial, and that the jury would decide whether to order abatement in the first instance, but that the Court would decide the form of that abatement.[133] The Court's decision on the motion in limine was consistent with its earlier April 25, 2005 decision,[134] and with its later charge to the jury.[135]
In light of the Court's findings that future actions totiesquoties are not an adequate remedy, and that a complete assessment of practicality should be deferred, the Court now finds Defendants' argument regarding the jury's role to be of no avail. Defendants have identified no other equitable concerns that might preclude an abatement remedy, and cannot seriously comprehend that after a finding of liability by the jury, the "form" of abatement ordered by this Court would be no abatement at all. Therefore, it is *Page 182 
little more than semantics to argue that the jury could not have ordered a mandatory injunction.
Obviously any abatement remedy in this case would be more complex than the "assize of nuisance" remedy in Hudson, which merely ordered the sheriff to take down a dam from across a stream. See 44 N.Y. at 555. For that reason, this Court has always retained its ability to assess the practicality of any requested remedy consistent with its role as a court of equity, and it still intends to do so. Part of the duty of this Court is to define a remedial order with sufficient specificity that the Defendants will know what is expected of them and be able to satisfactorily comply with that order.
While it is theoretically possible that most or all of the State's proposed abatement measures would be so impractical as to preclude any order of abatement, at this stage the Court will not lightly dismiss the possibility of abatement as the Defendants request. The Court is aware of its institutional limitations, and reiterates that it does not intend to become a "super-administrative agency." State v. Lead Indus.Ass'n, No. 99-5226, 2005 R.I. Super. LEXIS 55, *7 (Apr. 25, 2005). However, since the jury has found the Defendants liable on the State's public nuisance claim, the Court finds that a good faith effort to develop an abatement plan with some specificity is necessary in order for the Court to assess whether such a remedy would be practical and otherwise appropriate. Therefore, the Court finds that the Defendants have not identified an impediment to abatement, and will direct that a judgment of abatement enter in favor of the State and against NL, Millennium, and SW. The Court will now turn to the State's request for the appointment of a special master to assist with implementing the judgment of abatement. *Page 183 
 F. Authority and Discretion to Appoint a Special Master
The State seeks the appointment of a special master "who is charged with designing an abatement plan that is consistent with the evidence in this case and the public needs." (Pl's Position Paper 2.) The Defendants oppose the appointment of a special master and argue that it would be inappropriate and unprecedented for the Court to appoint a special master to both create and administer a remedy, and that the Court would be abdicating its judicial function as a result.
Under our Rules of Civil Procedure, the Court may "appoint a special master in any appropriate action" which is pending before it.See Super. R. Civ. P. Rule 53(a); see also Hart v. Community SchoolBd., 383 F. Supp. 699, 764 (D.N.Y. 1974) (finding that the federal courts have an inherent power to appoint experts). A "master" is an individual or entity, such as a referee, auditor, or examiner, who possesses "such special expertise sufficient to serve the purpose or purposes for which a master may be appointed." Id. In jury actions, a master may be appointed to assist the jury with investigations of account or other complicated issues. Id. However, in actions tried without a jury, the Court may appoint a special master over the objection of a party only "upon a showing that some exceptional condition requires it." Id. Rule 53(b)(2). The powers of a special master are broadly defined and include the power "to do all acts and take all measures necessary or proper for the efficient performance of the master's duties under the order" appointing the master, but may also be limited by that order. Rule 53(c).[136] Upon completion of his *Page 184 
duties, the master files a report addressing the matters specified in the order appointing the master. Rule 53(e).
The Court must first address whether this is an "appropriate action" under Rule 53(a). A related question is whether this case involves "exceptional circumstances." Since there is objection to the appointment of a special master, the Court can only appoint a special master when "exceptional circumstances" justify the appointment. See Rule 53(b)(2). Therefore, the Court will look first to circumstances in which other courts have utilized special masters. Then it will determine if the circumstances of this case are sufficiently "appropriate" and "exceptional" to appoint a special master.
Courts have appointed special masters for a variety of circumstances, and it is not unprecedented for courts to utilize expert masters to assist with the development of a remedial plan. The Court findsReed v. Cleveland Board of Education to be particularly instructive on the matter. See 607 F.2d 737, 740 (6th Cir. 1979); see also Hart,383 F. Supp. at 767 (setting forth an order appointing a special master and describing his duties); Swann v. Charlotte-Mecklenburg Board ofEducation, 306 F. Supp. 1299, 1313-1314 (D.N.C. 1969) (vacated on other grounds, 431 F.2d 138, 146 (4th Cir. 1970)) (appointing a consultant to prepare plans and recommendations for desegregation of schools).
In Reed, a school desegregation case, the trial court "appoint[ed] a special master to assist it in the prudent exercise of its equitable jurisdiction to remedy the constitutional violations found herein."Id. (citing the trial court opinion). After liability was found, *Page 185 
the court appointed a disinterested attorney as special master, and in addition, indicated its intention to appoint an expert advisory panel "so that input may be received from legitimately affected interest groups." See id.
Later, the trial court entered an order containing "guidelines and instructions" for the master to oversee the formulation of desegregation plans, including the practicability and constitutional sufficiency of those plans. Id. at 741. That order defined the scope of the master's fact-finding ability and his ability to communicate with attorneys for the parties. Id. Finally, the court emphasized that the parties, and not the experts, were primarily responsible for the formulating of remedial plans. Id.
The Court finds that, in this case, the scale and complexity of any abatement remedy sufficient to render harmless the nuisance found in this case weighs heavily in favor of seeking expert recommendations from a special master. The State has set forth the concept of a multi-faceted approach to abatement that involves testing for the presence of lead, education of the persons affected by the presence of lead, and the physical measures necessary to reduce the threat of lead to the health of Rhode Island residents. Rule 53's exceptional circumstances test is met when:
 "a court is faced with a polycentric problem that cannot easily be resolved through a traditional courtroom-bound adjudicative process. . . . Any solutions will involve a multitude of choices affecting . . . other resources, and each choice will affect other choices. Such many-centered problems call for informal consultations and weighing of complex alternatives using a managerial decision-making process. . . . A skilled master, with expertise in [the issues raised in the case,] to coordinate the efforts of the parties, is crucial if a just and workable remedy is to be devised." Hart at 766-767. *Page 186 
In assessing the practicalities of any order that this Court might make, it will be essential for the Court to have expert assistance to "bridge the gap between the court as impartial arbiter of plans placed before it and advocates protecting their clients' positions that are often narrower than that of society at large." See id. at 764.
A court abuses its discretion when the appointment of a special master would amount to abdication of its judicial role. See La Buy v. HowesLeather Co., 352 U.S. 249, 256 (1957) (noting that "the use of masters is to aid judges in the performance of specific judicial duties . . . and not to displace the court.") In that case, a federal district judge, when faced with the possibility of a six-week trial, referred the entire case sua sponte to a special master for trial. The court of appeals issued a writ of mandamus vacating the orders of reference, and the Supreme Court upheld the court of appeals. The Court ruled that mere complexity of issues and a congested trial calendar were insufficient to arise to the level of "exceptional circumstances" which are required to appoint a master.
The Court is mindful of Defendants' concerns that empowering a special master, with sweeping investigative and judicial powers, could prejudice the Defendants by usurping powers that are properly exercised only by this Court and by depriving them of the ability to meaningfully participate in the design of an abatement remedy. However, except for decrying the appointment of a special master, the Defendants have set forth few practical solutions to the problems they raise, and those problems are amenable to solution. In contrast to La Buy, the justification for the appointment of a master is not merely complexity of issues or congestion of a calendar, but the level of expertise required in order to manage those issues in an expedient manner. Further, by adequately *Page 187 
defining the master's duties and powers prior to the appointment, and then by subjecting the master's recommendations to review after the appointment, the concerns of abdicating the Court's judicial role should be assuaged.
The Court finds that the appointment of a special master is appropriate in this action, and that exceptional circumstances exist which justify the appointment, for the purpose of assisting the Court with the development and evaluation of a remedial order and perhaps for monitoring the implementation of that order. While the Defendants' arguments do not preclude the appointment of a special master, they do inform the Court as to how best to proceed with the appointment of a special master. The order appointing a special master should carefully describe his duties and powers so as not to usurp this Court's role.
While the Court has focused on its ability to appoint a special master, the Court also notes that it has the ability to appoint an expert witness, under R.I.R. Evid. 706, who would perform a similar advisory function for the Court.[137] Such experts are capable of giving depositions and evidence like any other witness, but do not have the adjudicative powers of a special master. See R.I.R. Evid 706;see also Hart, 383 F. Supp. at 762-67 (comparing expert witnesses with expert masters). However, the Court finds that in order to be of meaningful assistance, an expert must be able to do more than just give testimony. The Court will seek input from the parties on the necessary extent of the fact-finding and adjudicative powers which the Court shall confer upon the expert master.
Therefore, the Court will direct the parties to submit proposed orders consistent with Rule 53, which, at a minimum, shall address the following issues: *Page 188 
 • Suggestions as to the identity of an appropriate special master to provide recommendations to this Court;
 • Procedures for the submission of a final remedial order or orders to the special master for evaluation, including procedures relative to timing, modification, and submission to this Court for review and approval;
 • Procedures for amendment and periodic review by this Court, following the implementation of the final remedial order adopted pursuant to that order;
 • Scope of the special master's fact-finding powers consistent with Super. R. Civ. P. Rule 53;[138]
 • Assessment of costs for the special master;
 • Such other matters as any party may deem appropriate under the circumstances.
 G. Proceedings Before the Master
In order to facilitate the proceedings before a special master, the Court provides the following as additional guidance on issues raised by the various parties:
 1. Submission of Plans to the Special Master
The Court will appoint a special master for the purpose of providing recommendations to the Court on specified questions. However, it is the State's responsibility to design and put forth a remedial plan in the first instance — hopefully with the cooperation of the Defendants — and not the responsibility of that special master. The Court considers the role of a special master at this stage to be an advisory role, because the Court lacks the degree of expertise in public health issues that is necessary to properly evaluate any remedial plan. *Page 189 
The State has presented various conceptual versions of an abatement plan in its Second Amended Complaint, in various discovery responses, and at trial. E.g., Second Amended Compl. at 24; Pl's Ans. to Def's Interrogatories (Served on Nov. 30, 2004), Resp. to Interrogatory # 2, Mar. 14, 2005.) At this stage, those concepts need to be developed into a concrete plan, in a form suitable to enter as an order of this Court.[139] The State should then present that plan to the Defendants and to the special master who, after hearing any objections from the Defendants, any recommendations from the Defendants, and conducting any other necessary fact-finding procedures, will make a recommendation to this Court which addresses the concerns outlined above.
 2. Special Master for the Purpose of MonitoringImplementation
The Court recognizes that there may be a need for the continued use of the same or a different special master in order to monitor the implementation of any abatement plan. The Defendants have argued that to appoint a special master for the purposes of both creating and implementing a remedy is without precedent and would be an abdication of the Court's authority.
Courts have appointed special masters to function as monitors while equitable decrees are implemented. See, e.g., Gwinnett County v.Vaccaro, 376 S.E.2d 680, 682 (Ga. 1989) (upholding the trial court's discretion to appoint a monitor to enforce injunction ordering the clean-up of a nuisance); see also State v. Patrick, 1990 Tenn. Crim. App. LEXIS 425 (Tenn.Crim.App. 1990) (noting that the criminal court, which *Page 190 
has the equitable powers of a chancery court, could have appointed a master to monitor the operation of a park after finding it constituted a nuisance).
Where there is authority for using a special master for either creating or implementing a remedy, the Court sees no barrier to appointing a special master for both purposes. In fact, if a special master will be needed to monitor the implementation of a remedy, it may be very useful for that special master to be involved early in the developmental stages of the abatement process. However, the Court finds that the implementation/monitoring issue should be addressed at a later date based on the plans submitted by the parties, and after consideration of the special master's recommendation.
 3. Property-Specific Abatement and the Need for FurtherDiscovery
The Defendants raise various arguments with respect to property-specific issues involved with an abatement remedy. Their basic argument is that the State cannot request, and the Court cannot order, "property-specific" abatement because the State did not present evidence of specific properties at trial under its "cumulative presence" theory. Therefore, they argue now that to order property-specific abatement would violate its right to a jury trial and that extensive, further discovery is needed on such issues before a special master may be appointed. The State responds that the Defendants are attempting to avoid the burden of performing testing, which they argue should form a part of the abatement remedy. The State further argues that it is advocating a plan which does not require differing abatement strategies for different properties. In essence, they argue that an abatement order will be a "one-size-fits-all" proposition that adequately addresses the cumulative presence of lead found by the jury — i.e. all lead painted windows are treated *Page 191 
alike, all doors are treated alike — and does not require a property by property examination.
The Court notes that "property-specific" issues have been a point of contention numerous times throughout this trial. The Court consistently held that property-specific discovery was inappropriate, even if feasible, because property-specific evidence was not relevant to whether the cumulative presence of lead pigment constituted a public nuisance.[140] When the Court suggested that the parties could engage in discovery of a statistically significant sampling of properties, no party accepted the Court's invitation to do so. See, e.g., State v. LeadIndus. Ass'n, 2004 R.I. Super. LEXIS, *3 to *4 (Nov. 9, 2004).
The Court is open to the possibility that additional property-specific fact-finding is necessary in order for the special master to evaluate the State's proposed remedial plan. However, to the extent that such fact-finding is now required, at the remedial stage, it should be done at the behest and under the authority of a special master and only if the master determines that it is necessary. Therefore, the parties should address that question to the special master, and if the master so recommends, then the parties may make application to this Court for permission to conduct additional property-specific discovery.
 4. Other Arguments with Respect to Abatement
The Defendants have raised various other arguments, with respect to an abatement remedy, which they contend make the appointment of a special master premature. The *Page 192 
Court notes that, in general, these are arguments that have been raised repeatedly throughout the course of this litigation and have been decided against the Defendants.
For example, Defendants argue that the State's parens patriae standing limits the relief the State can seek to interests apart from that of particular private parties. In its ruling on Defendants' initial motion to dismiss under Super. R. Civ. P. Rule 12(b)(6), this Court found that the doctrine allowed the Attorney General to bring a suit to vindicate its "quasi-sovereign" interests apart from those of individual persons.State v. Lead Indus. Ass'n, No. 99-5226, 2001 R.I. Super. LEXIS 37, *10 to *12 (Apr. 2, 2001). Defendants now argue that because an abatement remedy would benefit individual property owners, it is not permitted and is inconsistent with the State's standing. However, the mere fact that a remedy might have an incidental benefit to someone other than the Plaintiff does not preclude that remedy, so long as the remedy addresses the violation found by the jury. Therefore, the Court finds this argument to be without merit.
Similarly, the Defendants argue that the State is seeking an unreasonably high abatement standard — "lead free" as opposed to "lead safe"[141] — which is inconsistent with State statutes. This argument has also been rejected in the past. See State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 35 (Feb. 11, 2005); State v. Lead Indus. Ass'n, 2003 R.I. Super. LEXIS 50, *4 to *9 (Mar. 20, 2003). However, it is not yet clear to the Court that the abatement remedy sought by the Plaintiff goes beyond making properties "lead safe." Therefore, the Court finds that consideration of this issue is premature. To *Page 193 
the extent that the "lead safe" v. "lead free" issue must be addressed with remedial issues incident to abatement, the Court finds that it involves technical determinations for which a recommendation from an expert master would be useful in deciding. Therefore, the Court will direct the Defendants to address that argument to the special master in the first instance, who will make a recommendation to this Court.
 H. Scope of the Master's Duties
In addition to establishing case management procedures and defining the powers of the special master, the order appointing a special master will also need to address the scope of the duties of the special master, defining specific questions for consideration or tasks to be undertaken, when evaluating the remedial plan(s). See Super. R. Civ. P. Rule 53(c). Based on the above analysis of the issues identified in the parties' position papers, the Court has identified at least the following questions to be addressed by the special master:
 • What practical steps are necessary to carry into effect the State's proposed remedial plan, the purpose of which is to render harmless or suppress the cumulative presence of lead pigment in and on buildings in Rhode Island?
 • Is it necessary to perform additional fact-finding at a number of individual properties in order to design an abatement remedy that can be implemented statewide?
 • What are the practical restrictions on the ability of the Defendants to carry out any of the proposed elements of an abatement plan?
 • What is the cost of implementing each particular element of the plan, and can the goal of that plan element be achieved at less cost?
 • Does the plan, or any element of that plan, duplicate programs currently provided by the State to its citizens?
 • Is the plan consistent with the evidence presented at trial? *Page 194 
 • What level of implementation monitoring is necessary?
The Court will permit, and in fact strongly encourages, the parties to suggest additions or refinements of the preceding questions for inclusion in the order appointing the special master.
 I. Conclusion as to Abatement
Based on the foregoing, the parties have not identified any impediments to the entry of judgment against the Defendants. Therefore, the Court will enter a judgment of abatement. The Court will then appoint a special master for the purpose of assisting the Court in its consideration of the remedial order, and if necessary, any monitoring of the implementation of that order. *Page 195 
 VI Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court denies the Defendants' motions for judgment as a matter of law pursuant to Rule 50. The Court denies the Defendants' motions for new trial pursuant to Rule 59. The Court denies the Defendants' Supplemental Motions for a new trial pursuant to Rules 26(e), 59, 60(b)(2) and 60(b)(3). The State may present an order consistent herewith after due notice to all other counsel of record. The Court shall enter a judgment of abatement in favor of the State against NL, Millennium, and SW. The State shall present a judgment consistent herewith.
The order and judgment referred to in the preceding paragraph shall be presented to the Court by Wednesday, March 7, 2007. If the Defendants have any objections to the form of the order and/or the judgment, they shall make such objection by Friday, March 9, 2007. The Court will then set a hearing on Monday, March 12, 2007 to address the objections.
Based on the foregoing, the Court will appoint a special master for the purpose of assisting the Court in its consideration of a remedial order to implement the judgment of abatement, and if necessary, any monitoring of the implementation of that order. Therefore, the Court will direct each party to submit, within 30 days from the entry of judgment, the name and curriculum vitae of a proposed master to assist the Court. Within 60 days, the parties shall submit an order, or competing proposed orders, addressing the special master's powers and duties consistent herewith. *Page 196 
Following the submission of such orders, the parties may request a hearing which will be granted if the Court deems it necessary. The Court will then enter such orders as are necessary and appropriate to implement the judgment of abatement. *Page 197 
 VII Appendix to Decision: Written Rulings to Date
2001
 • 2001 R.I. Super. LEXIS 37, 2001 WL 345830
(R.I.Super.Ct. Apr. 1, 2001)
2002
 • 2002 R.I. Super. LEXIS 43, 2002 WL 475284
(R.I.Super.Ct. Mar. 15, 2002)
 • 2002 R.I. Super. LEXIS 90, 2002 WL 1804063
(R.I.Super.Ct. July 3, 2002)
2003
 • 2003 R.I. Super. LEXIS 50, 2003 WL 1880120
(R.I.Super.Ct. Mar. 20, 2003)
 • 2003 R.I. Super. LEXIS 109, 2003 WL 22048756
(R.I.Super.Ct. Aug. 29, 2003)
2004
 • 2004 R.I. Super. LEXIS 45, 2004 WL 603354
(R.I.Super.Ct. Mar. 1, 2004)
 • 2004 R.I. Super. LEXIS 56, 2004 WL 603495
(R.I.Super.Ct. Mar. 16, 2004)
 • 2004 R.I. Super. LEXIS 92, 2004 WL 1351367
(R.I.Super.Ct. May 14, 2004)
 • 2004 R.I. Super. LEXIS 123, 2004 WL 1542236
(R.I.Super.Ct. Jul. 2, 2004)
 • 2004 R.I. Super. LEXIS 192, 2004 WL 2851779
(R.I.Super.Ct. Nov. 7, 2004)
 • 2004 R.I. Super. LEXIS 191, 2004 WL 2813747
(R.I.Super.Ct. Nov. 9, 2004)
2005
 • 2005 R.I. Super. LEXIS 17, 2005 WL 374459
(R.I.Super.Ct. Jan. 6, 2005)
 • 2005 R.I. Super. LEXIS 35, 2005 WL 552061
(R.I.Super.Ct. Feb. 11, 2005)
 • 2005 R.I. Super. LEXIS 55, 2005 WL 957724
(R.I.Super.Ct. Apr. 25, 2005)
 • 2005 R.I. Super. LEXIS 79, 2005 WL 1178194
(R.I.Super.Ct. May 18, 2005)
 • 2005 R.I. Super. LEXIS 95, 2005 WL 1331196
(R.I.Super.Ct. June 3, 2005)
 • 2005 R.I. Super. LEXIS 127, 2005 WL 1984443
(R.I.Super.Ct. Aug. 11, 2005)
SUPREME COURT
 • State v. Lead Indus. Ass'n, 898 A.2d 1234 (R.I. June 2, 2006)
* The Court will cite to the Official Draft Transcript (Off. Dr. Tr.) of the trial where available. These transcripts are certified by the Court Reporter, but the pagination is subject to change between now and the production of transcripts for any appeal that might be taken. Where necessary, the Court will cite to the unofficial transcripts (U. Tr.) provided by the parties.
[1] Millennium is associated with the Glidden brand, while NL is associated with Dutch Boy products.
[2] A fourth defendant, Atlantic Richfield Co., (ARCO) was found not to be liable at the trial.
[3] Citations to those rulings may be found in the appendix which follows this decision.
[4] "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Super. R. Civ. P. Rule 50(a)(1). "Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Rule 50(a)(2).
[5] Because of evidentiary shortcomings, these claims were dismissed during trial and the jury never considered the damage claims. The State was precluded from presenting evidence on past damages largely because its witnesses could not differentiate between expenditures attributable to lead pigment, and expenditures for lead from sources other than lead pigment. (Off. Dr. Tr. 2:23-9:3, Jan. 11, 2006 AM Session.)
[6] After the jury returned its verdict, this Court did not immediately dismiss the jury, but instead held hearings on whether a question of punitive damages should be submitted to that jury. The Court ultimately determined that it would not be appropriate to do so.
[7] Although the jury returned a verdict in its favor, ARCO renewed its Rule 50 motion for judgment as a matter of law to the extent that it addressed grounds upon which the Court did not grant its earlier motion. This was done in order to avoid any possible waiver of its arguments in the event that the verdict is not upheld. Obviously, ARCO does not request a new trial. The Court sees no reason to address the additional grounds with respect to ARCO at this time, but will do so if it becomes necessary.
[8] "Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. . . . A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative. If a verdict was returned, the court may, in disposing of the renewed motion, allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as a matter of law. . . ." Super. R. Civ. P. Rule 50(b).
[9] "A new trial may be granted to all or any of the parties and on all or part of the issues for error of law occurring at the trial or for any of the reasons for which new trials have heretofore been granted in the courts of this state." Super. R. Civ. P. Rule 59(a).
[10] "If a renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial. . . . In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered. In case the motion for a new trial has been conditionally denied, the appellee on appeal may assert error in that denial. . . ." Super. R. Civ. P. Rule 50(c)(1)
[11] The Court retains the option of involuntarily dismissing a claim without prejudice, in lieu of granting judgment as a matter of law, if justice so requires. Rule 50(a)(3).
[12] The Court disagrees with the Defendants' argument that no deference whatsoever is owed to the jury verdict.
[13] The Court says "almost certainly" because it is conceivable that the State's evidence on a particular issue, even without any conflicting testimony offered by the Defendants, could satisfy their Rule 50 burden and yet be so lacking in credibility that a jury should properly find for the Defendants.
[14] As noted above, for purposes of evaluating the sufficiency of the evidence under a motion for a new trial, the Court must presume that its instructions to the jury correctly stated the applicable law. Millennium has argued that in reviewing the sufficiency of the evidence under Rule 50, however, the Court must consider the evidence in light of the actual law on an issue, and not on the jury instructions. See, e.g.,Doctor's Assocs. v. Weible, 92 F.3d 108, 115 (2d Cir. 1996). This only matters, of course, if the jury instructions misstate the law. The Court recognizes that the Defendants have numerous objections to the jury instructions, and addresses those objections in the Part III of this decision.
[15] The omitted portion reads: "The act or failure to act by a Defendant need not be intentional or negligent to impose liability for creating a public nuisance. Rather, the fact that the conduct which caused the public nuisance otherwise is lawful or has not been made unlawful does not preclude liability where that conduct nevertheless results in the public nuisance." (Jury Instructions 14.) This Court ruled prior to trial that the Defendants conduct need not be otherwise tortious in order to find public nuisance liability. (Off. Dr. Tr. 8:13-10:16, Oct. 31, 2005.)
[16] Like questions of reasonableness, the question of substantiality is a factual question best left to a jury. See Restatement (Second) of Torts § 834, com. d (noting that "to be a legal cause of harm a person's conduct must be a substantial factor in bringing it about. . . . When there is reasonable doubt, the question is for the trier of fact.)
[17] This should not be confused with the proximate cause issue underlying Question 1 of the Jury Verdict Form, which is whether or not the alleged nuisance proximately caused harm to the public. (Jury Instructions 12.)
[18] For brevity, in this part the Court will refer to the "cumulative presence of lead pigment in paints and coatings on buildings throughout the State of Rhode Island" as simply the public nuisance. (Jury Verdict Form at Question 1.)
[19] Dr. Rosner is a professor of history and of "sociomedical sciences." (Off. Dr. Tr. 5:5-11, Jan. 12, 2006.) His testimony was based upon research conducted in connection with various books written about lead poisoning, and upon records provided by the New York City Law Department in connection with that city's lawsuit against various lead manufacturers. Id. at 7:11-8:24, 16:19-17:13. "The materials were largely minutes of meetings from the lead industry, various members of the lead industry; and they were a collection of internal memos and internal letters and internal reports, all of which were generally unavailable to historians." Id. at 17:16-20. One of his books, which he co-authored with witness Dr. Gerald Markowitz, was entitled Deceit andDenial: The Deadly Politics of Industrial Pollution (2002). The Defendants strongly objected to the State's references to the title of this book. (U. Tr. 16:12-17:15, 36::2-14, Dec. 6, 2005 PM Session.) The Court eventually allowed the State to make reference to the title of that book, so long as it was not unduly emphasized. Id.
[20] Conversely, the knowledge itself would not be a cause of the public nuisance. Even if the Defendants lacked knowledge that lead was harmful, their activities could still have contributed to the public nuisance. Therefore, it cannot be said that "but for" the Defendants' allegedly culpable knowledge, the public nuisance would not have occurred. See Peckham v. Continental Casualty Ins. Co., 895 F.2d 830,836 (1st Cir. 1990) (citing Restatement (Second) of Torts § 432 (1) (1965)) (noting that an act "is a cause in fact of the plaintiffs' harm if that harm would not have occurred `but for' the breach").
[21] In this regard, the State has misunderstood the Court's ruling that it must show activities which "may but need not necessarily include the manufacture or sale or promotion of any lead pigment. . . ."State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 95 * 8 (Jun. 3, 2005). Although this Court declined to hold that such activities were the only way to show that a particular Defendant caused the public nuisance, they are, it seems, the most obvious way to prove its case.
[22] As will be explained below in Part III.F.2, "knowledge" evidence was admitted to show that the public nuisance alleged by the State unreasonably interferes with a public right and creates a "harm or risk to one [which] is greater than he ought to be required to bear under the circumstances." See State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, * 26 (April 2, 2001) and authority cited therein.
[23] See Off. Dr. Tr. 61:2-64:9, Sept. 9, 2005 (granting summary judgment as to ConAgra, Inc. where it was undisputed that none of that company's paint or lead pigment was in Rhode Island).
[24] These stipulations indicate that Millennium's predecessors produced various lead pigments until 1958, NL produced such products until 1975, and SW produced such products as late as 1971. (U. Tr. 43-46, Nov. 16, 2005 PM Session.)
[25] In fact, the Court granted summary judgment in favor of ConAgra, Inc. in part because it found uncontroverted facts that "there is no Fuller or ConAgra paint or pigment that is within the State of Rhode Island." (Off. Dr. Tr. 61:2-11, Sept. 9, 2005.)
[26] There were apparently thirteen companies participating in that campaign. (U. Tr. 9:2-4, Jan. 17, 2006.)
[27] The Defendants' objection to this "market share" testimony is addressed below in Part III.F.6.c of this decision.
[28] In addition, Millennium's re-cross-examination was designed to show that the sales agency agreement, Plaintiff's Exhibit 206, only provided the Massachusetts company with a right to sell goods in Rhode Island — but did not directly prove that such sales took place. (U. Tr. 65:3-68:8, Jan. 20, 2006.) However, Dr. Rosner was entitled to infer, as was the jury, that a sales agreement to sell goods in Rhode Island actually resulted in sales in Rhode Island.
[29] Millennium has objected to the evidentiary foundation for Dr. Rosner's testimony and argues that its admission requires a new trial. For the same reasons, the Court finds that his opinions were admissible and that no new trial is warranted.
[30] However, the Court also noted that for purposes of imposing liability, as opposed to punishment, it is proper to consider out-of-state conduct if that conduct causes harm within the state.See Young v. Masci, 289 U.S. 253, 258 (U.S. 1933) (Brandeis, J.) ("A person who sets in motion in one State the means by which injury is inflicted in another may, consistently with the due process clause, be made liable for that injury whether the means employed be a responsible agent or an irresponsible instrument.")
[31] In comment d. to § 452, the cases in which this subsection can be applied are described as "exceptional."
[32] Evidence on the record indicates that lead paint contained on "friction surfaces" is not considered safe even if it appears intact.See, e.g., Off. Dr. Tr. 45:9-46:22, Jan. 23, 2006 (testimony of Dr. Michael Shannon); Pl's Ex. 1 (stating that lead paint which is chipping, peeling, or flaking, or exists on parts of windows that become abraded or on floors, should always be considered immediate lead hazards).
[33] On cross-examination, the following testimony was elicited:
 "Q. You agree that paint does not last forever, don't you?
 A. I do.
 Q. Although in places like the Sistine Chapel or some of those older churches in Italy or around the world, there is paint that's intact after three or four hundred years, isn't there?
 A. Yes.
 Q. And many of those paints contain lead pigments, don't they?
 . . . .
 A. I assume they do." (U. Tr. 102:10-23, Nov. 8, 2005 AM Session.)
[34] See Jury Instructions 16 (instructing the jury that "if you decide that abatement shall take place, it will be for the Court to determine the manner in which such abatement will be carried out").
[35] For motions for a new trial based on traditional grounds — i.e., whether the verdict is against a preponderance of the evidence — appellate review is on an abuse of discretion standard.Votolato, 747 A.2d at 461. However, for motions addressed to errors of law, appellate review is de novo. Id.
[36] "Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing caseload." McDonough Power Equip.,464 U.S. at 553.
[37] See, e.g., Defendants' Brief 139-43 (alleging error that the trial justice declined to recuse himself, an issue which was the subject of this Court's written decision of August 11, 2005); id. at 47 (contending that the failure to apply G.L. 1956 § 10-1-1 violated the Defendants' due process rights, an issue taken up in this Court's April 2, 2001 ruling); Millennium's Reply Mem. Support of Post-Verdict Renewed Mot. for Judgment as a Matter of Law and in the Alternative Mot. for New Trial 34, Jun. 14, 2006 (arguing that the State's public nuisance action conflicts with the Lead Poisoning Prevention Act, which was addressed in this Court's decision of Apr. 2, 2001).
[38] Of course, the Court will only grant such a motion if the alleged trial error was called to the attention of the Court during the trial by means of a timely objection. See, e.g. Morra v. Harrop, 791 A.2d 472,478 (R.I. 2002) (explaining the "contemporaneous objection" rule).
[39] To the extent that such earlier motions relate to evidence admitted or excluded at trial, the objection should be addressed to that evidentiary ruling, and not the prior in limine ruling.
[40] It appears that Rule 59(e) has not been altered by the 1995 amendments to Rule 59. Super. R. Civ. P. Rule 59, Committee Notes.
[41] The State had moved to strike the Defendants' Brief on the grounds that it sought merely to relitigate old issues. The Court denied the motion to strike the briefs. (Ord., May 30, 2006.) Indeed, upon further review of the Defendants' joint brief, the Court is reevaluating the wisdom of that decision. Not only does the nearly 200 page brief raise issues which are inappropriate for a Rule 59 motion, but it raises those arguments repeatedly, albeit with slightly different labels and nuances. However, the Court finds that the most expedient resolution is to address the grounds raised, even if only to cite to the Court's prior rulings.
[42] Section 10-1-1 states that the attorney general "may bring an action . . . to abate the nuisance and to perpetually enjoin the person or persons maintaining the nuisance and any or all persons owning any legal or equitable interest in the place. . . . The complaint shall be duly sworn to by the complaining party, unless brought by the attorney general, and shall set forth the names of the parties, the object of the action, a description of the place complained of, and a statement of the facts constituting the alleged nuisance." (Emphasis added.)
[43] Super. R. Civ. P. Rule 20(a) provides for the permissive joinder of parties for claims arising out of the same transaction or occurrence, where those claims involve at least one common question of law or fact. If that test is not met, then the Court may sever the claims into a separate action. Even if that test is met, the Court may still order separate trials in order to avoid prejudice or delay to any individual party. Rules 20(b); 42(b).
[44] Concurrently with its denial of Millennium's motion, the Court entertained a similar motion for a separate trial by American Cyanamid. Because much of the State's evidence would be directed "at establishing an agency relationship between [SW, ARCO, Millennium, and NL] and the Lead Industries Association," and because American Cyanamid's relationship with the Lead Industries Association (LIA) was of relatively short duration, the Court granted American Cyanamid's motion. (Off. Dr. Tr. 2:16-3:7, Oct. 20, 2005.)
[45] For example, the following exchange was routine:
 "J. McCONNELL: Your Honor at this time plaintiffs move Exhibit No. 120 against defendants Atlantic Richfield Company, Millennium Holdings, and NL Industries only.
 THE COURT: 120 full as to Atlantic Richfield, NL, and Millennium Holdings." (Off. Dr. Tr. 102:8-13, Dec. 12, 2005 AM Session.)
[46] For example,
 "MR. POHL: Your Honor, I asked for this side bar conference to make an objection to the form of the question in that it lumped together multiple defendants and three decades in there, if it was compound. . . ." (Off. Dr. Tr. 49:25-50:3, Jan. 12, 2006.)
[47] In this regard, it cannot be overlooked that the jury returned verdicts of liability with respect to only three of the four Defendants. The jury found ARCO not to be liable.
[48] Defendants have relied upon Eastern Enterprises, Inc. v.Apfel, 524 U.S. 498 (1998) for their argument that the Takings Clause prohibits the imposition of "retroactive liability." The Court has rejected this argument in its October 31, 2005 ruling, striking that clause as an affirmative defense. In addition, the Court's August 15, 2002 ruling also addressed and rejected this argument.
[49] Of course, even the First Amendment has its limits. For example, in Gentile v. State Bar of Nevada, 501 U.S. 1030 (U.S. 1991), the U.S. Supreme Court upheld the constitutionality of Nevada's version of ABA Model Rule of Professional Conduct Rule 3.6, which regulates attorneys who make extrajudicial statements to the press during pending litigation.
[50] The State also relies upon Cipollone v. Liggett Group, Inc.,668 F. Supp. 408, 411 (D.N.J. 1987) (finding that evidence of protected activities may be admitted, if probative and not unduly prejudicial, if it "reasonably show[s] the purpose and character" of other activities).
[51] The State was precluded from presenting evidence on past damages because their witnesses could not differentiate between lead expenditures for lead pigment, and lead expenditures for lead from sources other than pigment. (Off. Dr. Tr. 2:23-9:3, Jan. 11, 2006 AM Session.)
[52] "No action . . . in tort to recover damages shall be brought against any . . . material suppliers who furnished materials for the construction of the improvements, on account of any deficiency in the design, planning, supervision, or observation of construction or construction of any such improvements or in the materials furnished for the improvements:
 (1) For injury to property, real or personal, arising out of any such deficiency;
 (2) For injury to the person or for wrongful death arising out of any such deficiency; or
 (3) For contribution or indemnity for damages sustained on account of any injury mentioned in subdivisions (1) and (2) hereof more than ten (10) years after substantial completion of such an improvement; provided, however, that this shall not be construed to extend the time in which actions may otherwise be brought under §§ 9-1-13 and 9-1-14." Section 9-1-29.
[53] The Defendants have set forth in their briefs numerous examples of this type of evidence. (Defendants' Brief 153-158.) The Court will consider specific objections below.
[54] Even the Defendants concede that the Defendants' conduct bears upon the unreasonableness of the interference with a public right.See Defendants' Brief 83 (noting that § 821B "sets forth a number of conduct-based factors for determining whether an interference with a public right is "unreasonable").
[55] The proper objection would have been to object that the statement was not based upon personal knowledge, not that it was hearsay, since it was not established that the anonymous author had any competence to testify to the ill effects of lead. See Rule 803, Adv. Comm. Notes (citing Rule 602 and In re King, 445 A.2d 295, 296 (R.I. 1982)). SW may have been entitled at least to a limiting instruction on this basis. However, since SW did not raise this objection, it is waived.
[56] The State alleges that any objection was waived. However, the Court finds that SW's general objection on hearsay and Rule 403 grounds was properly made at sidebar. The Court noted specifically that no objections were waived, permitting the State to use the document without being interrupted during direct examination. (U. Tr. 20:18-22:3, 40:3-19, Jan. 12, 2006 PM Session.)
[57] Contrary to the State's contention, the objections to both of these documents have been preserved. (U. Tr. 34:6-37:7, 40:3-19, Jan. 12, 2006 PM Session.)
[58] SW's objection was preserved at sidebar. (U. Tr. 27:24-33:23, 40:3-19, Jan. 12, 2006 PM Session.)
[59] The Defendants have alleged that the State improperly injected race into this case as an improper basis for the jury to find against the Defendants. The Court addresses this issue below in Part III.H.2.
[60] Millennium noted at the beginning of his cross-examination that "I just have a few questions. And I will try not to repeat what has already been said." (Off. Dr. Tr. 72:19-21, Nov. 8, 2005 AM Session.)
[61] The distinction between these types of tests, which are used to screen for lead poisoning in children, is detailed in Part IV of this decision infra.
[62] Dr. Kosnett testified that pica is "a craving for unnatural articles of food. Pica is the ingestion of nonfood substances." (U. Tr. 22:8-13, Nov. 17, 2005 PM Session.)
[63] See Defendants' Brief 164.
[64] The argument on this motion is found in the AM transcript for February 3, 2006.
[65] These materials are found at SW Exhibits 1009 and 1010.
[66] For example, SW argued that it had materials demonstrating that its market share was less than five percent. (U. Tr. 10:12-15:19, Feb. 3, 2006 AM Session; SW Ex. 1009, 1010.) However, these were not introduced into evidence on Dr. Rosner's cross-examination and the Defendants did not call any witnesses.
[67] The other Defendants did not object to the foundation of this testimony.
[68] For example, counsel for Atlantic Richfield argued in the first of the Defendants' closing arguments that "[Providence Mayor Ciccilline] admitted the presence of lead isn't banned or prohibited in Providence, and we know from other witnesses the presence of lead isn't banned anywhere else in the state." (Off. Dr. Tr. 39:4-7, Feb. 8, 2006.)
[69] In addition, they list the following defenses which are addressed elsewhere in this decision: product identification (Part III.C.1, 3); causation-in-fact, proximate cause, intervening cause, and remoteness; (Part III.G.2); and statute of repose (Part III.F.1).
[70] ". . . I remind you that before the Christmas break I instructed you that the State had not presented any evidence from which you could conclude that the Lead Industries Association or LIA, which you have heard about in this case, acted as an agent for the defendants or any one of them.
At that time I also told you that in connection therewith that the issue of agency would be determined by you at the end of the case only if the Court first found that the State had presented sufficient evidence on this issue.
I am now instructing you that the Court has ruled as a matter of law that the LIA, the Lead Industries Association, was not and did not act as an agent of any of the defendants or their alleged predecessors. Thus, you will not be determining this issue at the end of the case. The issue of agency at that time when you deliberate will not be before you.
Further, you are not to consider any statements or actions of the LIA as statements or actions that were made by, for, or on behalf of any of the defendants. This evidence, however, may be considered for other purposes as may be consistent with instructions that the Court will give to you at the conclusion of the case." (Off. Dr. Tr. 59:1-24, Jan. 12, 2006.)
[71] See Parker v. Parker, 103 R.I. 435, 442, 238 A.2d 57, 61 (1968) (containing a detailed description of the various standards of proof).
[72] The State also argues that allegations of misconduct at trial may not be raised in a motion for a new trial, relying on cases decided before the 1995 Amendment to Rule 59. In light of the amendments to Rule 59, however, as described in Part III.A of this Decision, the State's argument is clearly incorrect.
[73] The fair share theme was also the subject of objection to the State's closing argument. E.g., Off. Dr. Tr. 25:22, Feb. 10, 2006.
[74] The Defendants have raised similar objections to the State's closing argument with regards to warnings. See, e.g., Off. Dr. Tr. 41:4-7, Feb. 10, 2006. The Court's reasoning applies similarly to those arguments.
[75] State's counsel made similar statements in closing argument to which the Defendants object. (Off. Dr. Tr. 26:15-24, Feb. 10, 2006.)
[76] State's counsel also made several similar arguments during closing arguments. The Court's reasoning is applicable to both opening statements and closing argument.
[77] The distinction between primary and secondary prevention efforts is addressed in more detail in Part IV of this decision.
[78] "Ladies and Gentlemen, you, I'm sure, will recall that yesterday's proceedings were terminated abruptly when counsel for the State asked Dr. Nolan whether any of the Defendants had contributed any funds to programs in Rhode Island to address the lead pigment in paint issue. I hereby instruct you, you recall that under your oath you must follow my instructions. I instruct you that that was an improper question. At issue in this case is whether the presence of lead pigment in paint in Rhode Island is a public nuisance, and if so, whether any of the Defendants should be held responsible for abating that nuisance. Not, whether in the past, any of the Defendants has contributed funds to Rhode Island lead pigment in paint programs.
Accordingly, I have sustained the Defendants', plural, objection to this question. I am instructing you to disregard that question. It should not have been asked. . . ." (U. Tr. 12:15-13:15, Nov. 16, 2006.)
[79] The briefs on this issue were initially filed under seal, and the proceedings conducted in secret, to prevent prejudicing the jury immediately prior to deliberations. The briefs have since been unsealed.
[80] In addressing this issue, the Court reviewed arguments raised orally on February 10, 2006 and February 13, 2006, and in the following papers: Def's Mem. Law Supp Mot. for Mistrial (Feb. 13, 2006); Def. Atlantic Richfield Co. Suppl. Mem. Supp. Def's Mot. for Mistrial (Feb. 13, 2006); NL's Joinder and Brief Supp. Def's Obj. to State's Final Closing Arg. And Def's Mot. for Mistrial and Dismissal with Prejudice (Feb. 13, 2006); The Sherwin-Williams Co.'s Suppl. Brief Supp. Def's Mot. for Mistrial (Feb. 13, 2006); Joinder and Separate Mem. of Millennium Holdings, LLC Suppl. Obj. to State's Closing Arg. and Mot. for Mistrial (Feb. 13, 2006); Pl's Opp. To All Defs' Mot. for Mistrials Based on Closing Statements (Feb. 13, 2006). The Court additionally relies upon the Defendants' Brief which was filed under seal on April 19, 2006.
[81] Incidentally, unlike many of the other asserted grounds for a new trial, the Court finds that allegedly improper denial of this type of mistrial motion is exactly the type of ground which is contemplated by Rule 59(a) and is appropriately raised herein.
[82] The only difference at this stage is that it is now impossible to give any further curative instruction, so any unfair prejudice can only be cured by ordering a new trial.
[83] Because of this considerable latitude afforded to counsel, the need for continuity in closing argument, and in order to avoid calling the jury's attention to any improper argument, this Court discouraged counsel from raising objection to argument during the course of the argument itself, except in the most egregious of circumstances. The proper means for asserting other objections to closing arguments, as Defendants have done, is to request a conference outside of the presence of the jury at the conclusion of argument. At that conference, the objector should state his objections and request either a curative instruction or a mistrial. Plaintiffs concede, and the Court agrees, that the Defendants' objections were timely raised and were not waived.
[84] It is possible that misconduct was harmless error regardless of whether a curative instruction was given.
[85] As the jury returned a verdict in its favor, the Court will not address grounds for mistrial that are applicable solely to Atlantic Richfield Co.
[86] (Off. Dr. Tr. 21:17, 83:23, Feb. 10, 2006 (indicating time of argument)).
[87] The Defendants arguments regarding references to fair share; dismissed claims; taxpayers; statute of repose; and use of national market share data in closing argument will not be redundantly addressed here. Nor will the Court address the objection to the displaying of Plaintiff's Exhibit 1128 during the State's argument of February 9, 2006. A curative instruction was addressed to this apparently inadvertent use of a document which was not admitted into evidence. (Off. Dr. Tr. 24:8-25, Feb. 10, 2006.)
[88] The Defendants also object to the counsel's argument implying that the Defendants' counsel had misrepresented the Court's jury instructions on agency. (Off. Dr. Tr. 61:16-62:4, Feb. 10, 2006.)
[89] "Generally, where there is no explanation of record accounting for the absence of a witness or evidence that is particularly available to a party in a civil case, counsel may properly comment upon that party's failure to call the witness or introduce the evidence." Stein,Closing Arguments, § 1.52 at 1-188 to 1-189.
[90] Of course, the posture of the present motions only requires the Court to address the instances where the State has erred, and not the Defendants.
[91] Counsel for Millennium clarified at the hearing on this motion that he joined in SW's "Supplemental Motion" seeking a new trial, but that a separate brief contained the reasons for doing so. (Hr'g Tr. 30, Jul. 12, 2006.)
[92] The State did not seek sanctions against NL and Millennium.
[93] The Court heard hearings on this issue on July 12, 2006 and August 30-31, 2006.
[94] Prior to that, Dr. Nolan explained, screening was performed through special "summer screening programs" where state health officials actively performed screening services in Rhode Island communities. (Off. Dr. Tr. 59:4-20, Nov. 14, 2005 AM Session.)
[95] The blood lead levels referred to by Dr. Nolan, and throughout this part of the decision, are measured in micrograms of lead per deciliter of blood (µ g/dL). Childhood Lead Poisoning in Rhode Island:The Numbers, 2005 Edition 8, Def. Ex. 1001 (The Numbers, 2005). The Court will generally omit the unit of measurement unless necessary to avoid confusion.
[96] The Defendants consistently argued that the State should not be allowed to present data which included fingerstick test results because of reliability issues. That debate has been renewed in this motion, and will be addressed below.
[97] This is consistent with the United States Centers for Disease Control's "blood lead level of concern." See Pl's Ex. 31 at 2 (recommending individual intervention for levels greater than 15, and community-wide poisoning prevention activities where many children heave levels greater than 10).
[98] Dr. Nolan also testified that a child is also considered "significantly lead poisoned" if two tests, taken at least three months apart, show a level of 15 or higher. (Off. Dr. Tr. 68:20-25, Nov. 14, 2005 AM Session.)
[99] Therefore, the usefulness of these statistics as a reflection on the Rhode Island population depends partially upon how many screening tests are performed. The State's most recent publication suggests that about 70% of Rhode Island children receive at least one screening test, and about 40% receive two screening tests, prior to their sixth birthday. Childhood Lead Poisoning in Rhode Island: The Numbers, 2005Edition at 13 (The Numbers, 2006).
[100] Any particular child is counted only once, regardless of how many tests taken. The Numbers, 2006 at 11.
[101] The guidelines which call for confirmatory venous testing are phrased as recommendations. The record does not indicate how many of the 1,167 children with EBLs in 2004 actually obtained a confirmatory venous test.
[102] The LESS database allows a user to generate reports or "queries" of different types of information depending upon a particular set of parameters defined by the user. (Off. Dr. Tr. 73:12-15, Nov. 14, 2005 AM Session.) For example, Plaintiff's Exhibit 32 shows a set of such reports.
[103] This exhibit reported the highest test result for any given child. (Pl's Ex. 32.)
[104] It is unclear when this document became available, but it was brought to the Court's attention after the July 12, 2006 hearing on the Supplemental Motions.
[105] The record does not indicate exactly who prepared that appendix or when it was distributed to the Interagency Council.
[106] Rule 60(b)(6) contains a "catch-all" provision which allows the Court to vacate a final judgment for "any other reason justifying relief from the operation of the judgment." The provisions of this rule are available only in unique circumstances to prevent "manifest injustice."Vitale v. Elliott, 120 R.I. 328, 332, 387 A.2d 1379, 1382 (1978).
[107] The parties have suggested, and the Court agrees, that there is little difference between proceeding under Rule 59 or Rule 60(b).See Nat'l Hotel Assocs. v. O. Ahlborg Sons, Inc., 827 A.2d 646, 652
(R.I. 2003) (finding that, for a claim of newly discovered evidence, the standards for ruling on a motion are similar under either rule). Therefore, the Court will not address whether the jury verdict possessed sufficient finality such that Rule 60(b) would be more appropriate.See Murphy v. Bocchio, 114 R.I. 679, 683 (R.I. 1975) (stating that Rule 60(b) "envisions an order that definitely terminates the litigation and leaves nothing more for the court to decide").
[108] The State has suggested a requirement that the evidence be in existence during trial, in an attempt to exclude consideration of the two publications. See Prostrollo v. University of South Dakota,63 F.R.D. 9, 11 (D.S.D. 1974) ("There can be no Rule 60(b)(2) relief for evidence which has only come into existence after the trial is over, for the obvious reason that to allow such a procedure could mean the perpetual continuation of all trials.") It is not clear that such a requirement exists in Rhode Island. Rather, the evidence need only be undiscoverable, through the exercise of diligence, prior to trial. Evidence which is not in existence is certainly undiscoverable during trial. However, this distinction is not determinative of the outcome of these motions because the incidence and prevalence data came into existence during the trial.
[109] This should not be confused with the changes in screening guidelines which formerly required a pediatrician to confirm a fingerstick test for any test greater than 20. On July 1, 2004, that threshold was reduced so that any fingerstick of 10 or greater should be confirmed by a venous test. See The Numbers, 2005 at 6.
[110] Dr. Nolan's testimony at trial indicates that determining the 2005 incidence under the "old" methodology is simply a matter of entering keystrokes into the LESS database. However, the Court need not seek out that data to decide this motion. If the nine months of 2005 data analyzed by Dr. O'Dowd was reflective of the entire year, it can safely be concluded that the incidence of lead poisoning declined by some amount.
[111] The State has asserted, without citation to any evidence, that the 2005 incidence number, under the "old" method would be 835. It appears that this number is not based upon the LESS database directly. Rather, counsel appears to have extrapolated from Dr. O'Dowd's conclusion, based upon only nine months of actual LESS data, that the 2005 incidence rate was 2.7% under the "old" counting method. While this Court is always wary of lawyers doing math, the arithmetic looks like this:
 Step 1: If the 2005 incidence number is 621 under the "new" method, and that represents 2.0% of children tested, then approximately 31,050 children were tested (without regard to errors due to rounding of numbers.) (621 / 0.02 = 31,050).
 Step 2: If the 2005 incidence rate is 2.7% under the "old" counting method, and 31,050 children were tested, then the 2005 incidence number is 838 children. (31,050 × 0.027 = 838).
[112] The main focus of these motions has been the incidence data, and the Court finds that the legal analysis of these motions is similar for all of these types of data. However, in addition to the incidence and prevalence data, the parties have also addressed the new prevalence data and the State's "elimination goal," which requires that each Rhode Island community reach an incidence rate under 5%. The Court will generally focus only on the incidence data, for illustrative purposes, but will address the other types of data where necessary.
[113] This turned out to be true: in 2004, the State instituted the new screening methodology, but retained the former counting methodology.See The Numbers, 2005 at 14 (reporting the 2004 data based upon the "old" counting methodology). It was not until the State had a full year of data under the new screening rules that it changed its counting methodology, which was revealed in the 2005 incidence data.
[114] Although the Court refers to the 2005 counting methodology as "new" for convenience, this label is somewhat misleading. All parties knew that there was a dispute as to the reliability of fingerstick data. Therefore, all parties knew that the LESS data could be analyzed by counting only venous and confirmed fingerstick tests, as opposed to the "old" methodology. Because he possessed the raw LESS data, Dr. O'Dowd was capable, it seems, of providing the Defendants with data based upon the "new" methodology.
[115] To be useful at trial, he would have had to calculate the 2005 incidence data based upon the "old" methodology in order to compare "apples to apples." Alternatively, he could have recalculated the pre-2005 data using the "new" methodology in order to compare "oranges to oranges."
[116] Such a calculation would have been burdensome to do by hand. However, the Defendants could also have made proper discovery requests asking the State to query the LESS database to compile that data using the "new" methodology.
[117] If the Defendants had followed up on the January 10, 2006 e-mail to seek production of the 2005 data, and were successful in obtaining it, there would likely have been ample time for both parties to address it because the State did not rest until January 26, 2006.
[118] Both of these numbers were calculated under the "old" counting methodology which included fingerstick results.
[119] Dr. Nolan stated that annual data
 "allows [us to] track trends, and it also smooths [sic] out the variations that occur in the course of a year. Just as if you test more children in February — in January than in February, monthly data varies more than yearly data." (Off. Dr. Tr. 67:7-11, Nov. 14, 2005 AM Session.)
[120] The Court does not reach the question of the probable effect of the new evidence on the outcome of the trial. However, the Court has had opportunity to remark on the subject before. State v. Lead Indus.Ass'n, 2003 R.I. Super. LEXIS 50, *12-17 (Mar. 20, 2003).
[121] Anderson presents a thoughtful discussion on the analysis of whether a party was prevented from fully presenting its caseif the Court first finds that misrepresentation or misconduct has occurred. 862 A.2d at 924-927. If the misconduct "precluded inquiry into a plausible theory of liability, denied. . . access to evidence that could well have been probative on an important issue, or closed off a potentially fruitful avenue of direct or cross examination" then new trial may be warranted. Id. at 925.
[122] See, e.g. Off. Dr. Tr. 82:17-24, Feb. 9, 2006 (in closing argument, State's counsel quoted Dr. Shannon's testimony that "[s]econdary prevention is what we have practiced for the last three to four decades where we screen children, we do a blood test on children in order to find those children who have lead poisoning. Once we find the poisoned child, we inspect the environment and find out if that environment has lead; and then we remove that lead in hopes that that patient won't have any lead exposure.")
[123] See, e.g., Off. Dr. Tr. 83:14-18, Feb. 9, 2006 (quoting Dr. Shannon's testimony that "[p]rimary prevention means taking those measures to make sure the child never gets lead poisoning so you don't even have to do a blood test. It means going to the environment, finding the source, removing the source before it poisons the child. That's primary prevention.")
[124] The Court assumes that the incidence rate declined, although because of the change in methodology, it is unclear on this record.
[125] The omitted portions are inapplicable. Paragraph (1) only applies to experts and persons having knowledge of discoverable matters. Paragraph (3) is inapplicable because the CMO makes clear that new requests for discovery are not permitted, no order imposed a duty to supplement that would be applicable here, and clearly the parties have not agreed to impose a duty to supplement. Finally, the Defendants have not identified an interrogatory response that would apply to the facts here, so paragraph (4) does not apply.
[126] Although many of the issues addressed in this section are recurring themes in this case, the Court's consideration of the abatement issue addresses arguments and issues presented at the May 22, 2006 hearing and in the following filings by the State and by the Defendants: Plaintiff's Position Paper Concerning Hiring of a Special Master to Assist in the Implementation of the Jury Verdict Ordering Abatement (March 31, 2006) (Pl's Position Paper); Position Paper on Abatement Submitted by Defendants Millennium Holdings LLC, NL Industries, and The Sherwin-Williams Company (April 21, 2006); Plaintiff's Reply to Defendants' Position Paper on Abatement (May 9, 2006); and Sur-Reply Position Paper on Abatement Submitted by Defendants Millennium Holdings LLC, NL Industries, and The Sherwin-Williams Company (May 19, 2006); Supplemental Position Paper on Abatement Submitted by Millennium Holdings, LLC (May 30, 2006); State's Post-Argument Submission on Abatement (May 30, 2006); Defendant The Sherwin-Williams Company's Supplemental Position Paper on Abatement (May 30, 2006).
[127] Evidence of past damages was never considered by the jury because the State could not adequately allocate the portion of their lead expenditures which was attributable to lead paint, as opposed to other lead sources.
[128] Toties quoties means "as often as occasion shall arise." Black's Law Dictionary 1490 (West 6th ed. 1990). While the State is unable to recover future damages in this action for a continuing nuisance, once the State actually performs abatement in a particular area, those costs will no longer be unrecoverable future damages, but will be recoverable as past damages. The amount of those costs will also be readily ascertainable because the State will have already spent the money, and presumably will keep accurate records of those expenditures. Therefore, a future action is required to recover future damages.
[129] The Defendants argued similarly, during the hearings for the motions in limine, that future actions constituted an adequate remedy at law. (Hr'g Tr. 13:14-16:12, Oct. 12, 2005.)
[130] The State avers that "it owes a nondelegable, legally imposed duty to the residents of the State to make lead-related expenditures."State v. Lead Indus. Ass'n, 2001 R.I. Super. LEXIS 37, *52-*53 (R.I.Super.Ct. April 2, 2001). Defendants argue that such a non-delegable duty cannot be delegated to the Defendants. The Court sees no merit in this contention. Though the duty — the ultimate responsibility for performance — is non-delegable, there appears to be no bar to having third parties, such as Defendants, perform the obligations imposed by that duty.
[131] (Off. Dr. Tr. 8:20-67:7, Oct. 12, 2005.)
[132] (Off. Dr. Tr. 7:11-9:4, Oct. 17, 2005.)
[133] (Off. Dr. Tr. 8:25 — 9:4, Oct. 17, 2005 (ruling that the Court will conduct such hearings and make such orders as are necessary to implement any judgment of abatement rendered by the jury)).
[134] "Having said that, the Court believes that presently it is premature for the Court to rule as a matter of law that there could not be any set of facts that may be proven at trial justifying equitable relief as determined by the Court." State v. Lead Indus. Ass'n, 2005 R.I. Super. LEXIS 55, 7-8 (April 25, 2005).
[135] Jury Instructions 16 (instructing the jury that "if you decide that abatement shall take place, it will be for the Court to determine the manner in which such abatement will be carried out").
[136] "The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for the filing of the master's report. Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before the master and to do all acts and take all measures necessary orproper for the efficient performance of the master's duties under theorder. The master may require the production before the master of evidence upon all matters embraced in the reference, including the production of all books, papers, vouchers, documents, and writings applicable thereto. The master may rule upon the admissibility of evidence unless otherwise directed by the order of reference and has the authority to put witnesses under oath and may examine them and may call the parties to the action and examine them upon oath. When a party so requests, the master shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in the Rhode Island Rules of Evidence for a court sitting without a jury." Rule 53(c) (emphasis added).
[137] The costs of such a witness are borne by the parties in such proportion as the Court directs, and are taxed as costs in the usual manner. R.I.R. Evid. 706(b).
[138] Rule 53(c) provides that a master may take evidence and conduct hearings if the appointing order so provides. The parties should consider the need for so empowering the special master.
[139] The Court rejects the suggestion of SW that the mandates of Super. R. Civ. P. Rule 7 (relating to form of motions and pleadings), and the other issues described in its post argument brief of May 30, 2006, are a barrier to proceeding with a special master.
[140] The various written decisions on this issue are available at 2002 R.I. Super. LEXIS 90 (July 2, 2002); 2004 R.I. Super. LEXIS 92, *1 to *3 (May 14, 2004); 2004 R.I. Super. LEXIS 191 (Nov. 9, 2004); 2005 R.I. Super. LEXIS 79 (May 18, 2005).
[141] "Lead safe" means that a "dwelling, dwelling unit, or premises has undergone sufficient lead hazard reduction to ensure that no significant environmental lead hazard is present and includes but is not limited to covering and encapsulation." G.L. 1956 § 23-24.6-4(15). In comparison, "lead free" means that "a dwelling, dwelling unit, or premises either contains no lead or contains lead in amounts less than the maximum acceptable environmental lead levels established by department of health regulations." Id. § 6-4(13).